UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION


ANNISSA COLSON,                          )
                                         )
                    Plaintiff,           )
                                         )
    v.                                   )        No. 3:16-CV-377
                                         )
CITY OF ALCOA, TENNESSEE, *et al.*,      )
                                         )
                    Defendants.          )


## <u>MEMORANDUM OPINION</u>

This matter is before the Court on Defendant Sheriff James L. Berrong and Defendant Officer Mandy England's Motion to Dismiss [doc. 19], Defendant Sheriff James L. Berrong and Defendant Officer Mandy England's Brief in Support of the Motion [doc. 20], Plaintiff Annissa Colson's Response in Opposition [doc. 35], and Defendant Sheriff James L. Berrong and Defendant Officer Mandy England's Reply [doc. 42]. For the reasons herein, the Court will grant the motion in part and deny the motion in part.

## I.    BACKGROUND

Plaintiff Annissa Colson ("Ms. Colson") alleges that one evening she was involved in a car accident and that Officer Dustin Cook ("Officer Cook") and Officer Arik Wilson ("Officer Wilson"), both of the Alcoa Police Department, arrested her on charges that include driving under the influence and reckless endangerment. [Compl., doc. 1, ¶ 5]. Ms. Colson claims that, while at the scene of the accident, she consented to a blood alcohol test and that Officer Cook and Officer Wilson drove her to Blount Memorial Hospital for the

test. [*Id.*]. She alleges, however, that she withdrew her consent once they arrived at the hospital, causing Officer Cook and Officer Wilson to instruct her to get back into their patrol vehicle. [*Id.*]. At that point, Ms. Colson, who claims to suffer from multiple anxiety disorders including "severe panic disorder," alleges that she experienced a "crippling panic attack, gasping for breath, in obvious distress" and asked Officer Cook and Officer Wilson to let her breathe. [*Id.* ¶¶ 1, 5]. "I need to breathe. Please let me breath," she allegedly said to them. [*Id.* ¶ 56]. According to Ms. Colson, who refers to herself as "diminutive," Officer Cook and Officer Wilson believed that she was resisting their commands and responded by forcing her back into their patrol vehicle. [*Id.* ¶ 6]. Specifically, she claims that Officer Cook pulled her into the patrol vehicle from inside while Officer Wilson pushed her into it, and in the process, Officer Wilson thrust his knee into her knee and caused it to "pop." [*Id.* ¶¶ 6–7]. As they maneuvered her into the patrol vehicle, they also allegedly employed "pressure point tactics" on her—one clasping her jugular and the other clasping her clavicle. [*Id.* ¶ 8].

Once Ms. Colson was inside the patrol vehicle, she was allegedly "screaming in pain and crying for her mother." [*Id.* ¶ 9]. Ms. Colson claims that Officer Cook then contacted his supervisor, Lieutenant Keith Fletcher ("Lieutenant Fletcher"), and requested guidance on how to proceed, including advice as to whether they should take Ms. Colson to have her knee examined by a medical professional. [*Id.*]. Lieutenant Fletcher allegedly told them to take Ms. Colson to Blount County Jail, where the staff nurse could check her knee and conduct a mandatory blood draw. [*Id.* ¶¶ 9, 64]. According to Ms. Colson, they transported her to Blount County Jail, and Officer Mandy England ("Officer England")

met them there. [*Id.* ¶ 10].[1] Officer England allegedly escorted Ms. Colson, who claims that she was "screaming about her knee," to a room where she was "surrounded by corrections staff" and strapped into a "restraint chair." [*Id.* ¶¶ 10, 66].

Ms. Colson maintains that Jennifer Russell, a staff nurse at Blount County Jail, then performed a "cursory examination" of her knee, found nothing wrong with it, and attempted to draw her blood with Officer England's help. [*Id.* ¶ 11]. In response, Ms. Colson alleges that she became uncomfortable and resisted their efforts, prompting Officer England to strike her in the face. [*Id.*].[2] Afterwards, Ms. Colson claims that, while still in the restraint chair, she repeatedly requested the opportunity to use the restroom but was denied that opportunity, and she eventually urinated on herself several times. [*Id.* ¶ 12]. According to Ms. Colson, the officers reacted with laughter. [*Id.*]. A male officer then allegedly placed her in a "semi-choke hold" while Officer England forced a helmet onto her head. [*Id.* ¶¶ 13, 73–74]. Ms. Colson claims that she told the officer he was hurting her neck and that he replied, "good." [*Id.* ¶ 73]. She allegedly remained fastened in the restraint chair for roughly another five hours. [*Id.* ¶¶ 13, 75].

Ms. Colson asserts that after she was released from Blount County Jail, she learned that she had suffered "a tibial plateau fracture, a torn ACL, [and] a torn LCL," in addition to abrasions and bruises to her neck, chest, arms, and foot. [*Id.* ¶ 16]. She also maintains that she experienced "substantial mental anguish." [*Id.*]. As a result, she has filed this

---

[1] Ms. Colson, in her Complaint, notes that Officer Cook told another officer at Blount County Jail that Ms. Colson had "ripp[ed] the rubber out of his car door." [Compl. ¶ 67].

[2] Ms. Colson notes that a video recording in the room captured Officer Cook stating that he believed Ms. Colson may have bitten or tried to bite Officer England. [*Id.* ¶ 71].

lawsuit against the City of Alcoa, Tennessee; Blount County, Tennessee; and officers of these local governments in their official and individual capacities, bringing several claims under 42 U.S.C. §§ 1983, 1985, 1986, 1988 and alleging violations of her constitutional rights under the Fourth, Eighth, and Fourteenth Amendments. [*Id.* at 32–53]. She pleads that these violations consist of use of unlawful and excessive force, cruel and unusual punishment, failure to train and supervise, failure to provide adequate medical treatment, and failure to protect. [*Id.*]. Ms. Colson also brings common law claims under Tennessee law for assault and battery against Officer Cook, Office Wilson, and Officer England; intentional infliction of emotional distress against all Defendants; and negligence against all Defendants. [*Id.* ¶¶ 178–94]. Defendants Sheriff James L. Berrong ("Sheriff Berrong") and Officer England now move for dismissal of certain claims against them in their individual capacities. Sheriff Berrong requests dismissal of all the § 1983 claims and state law claims, [Defs.' Br. at 4–12], and Officer England moves for dismissal of the negligence claim, [*id.* at 14].

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff's complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). A claim is facially plausible when the plaintiff pleads facts that create a reasonable inference that the defendant is liable for the alleged conduct in the complaint. *Id.*

When considering a motion to dismiss under Rule 12(b)(6), a court accepts the allegations in the complaint as true and construes them in a light most favorable to the plaintiff. *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however. *Iqbal*, 556 U.S. at 678. A plaintiff's allegations must consist of more than "labels," "conclusions," and "formulaic recitation[s] of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted); *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citation omitted)). "Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity." *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016).

### III. ANALYSIS

Section 1983 permits a claim for damages against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Because § 1983 has "a 'color of law' requirement," a defendant "can be held liable only if state law, whether provided by statute or judicially implied, empowers him with some legal obligation to act."

*Doe v. Claiborne County*, 103 F.3d 495, 512 (6th Cir. 1996) (citation omitted). A claim under § 1983 therefore consists of two elements: (1) the defendant deprived the plaintiff of a constitutional right or a federal statutory right and (2) the defendant deprived the plaintiff of one of these types of rights while acting under color of state law (i.e., state action). *Id.* at 511; *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991). "Absent either element, a section 1983 claim will not lie." *Christy*, 103 F.3d at 511.

### A. Sheriff Berrong

Because of the length of the Complaint, which exceeds sixty pages, and the relatively large number of Defendants in this action, the Court begins with an overview of the allegations against Sheriff Berrong. Ms. Colson prefaces her claims by describing the City of Alcoa's and Blount County's policies as the "moving force" behind the alleged infringements of her constitutional rights:

> 17. The moving force behind the violations of Plaintiff's constitutional rights was Alcoa and Blount County's policies, customs, or practices to employ and apply the same protocols, conventions, customs, or rules of conduct in handling suspects or inmates who suffer from severe mental disorders, here, a severe anxiety and panic disorder, as they do in handling other un-afflicted inmates. This practice is accepted as a policy or custom of deliberate indifference to the safety of suspects or inmates who suffer from debilitating mental disorders.

> 18. Defendants knew, or should have known, by Plaintiff's actions, statements, and medications, that Plaintiff suffered from a severe mental disorder. . . . The officers responded just as they would have to any non-compliant suspect or inmate, disregarding her severe mental disorder.

[Compl. ¶¶ 17–18]. Ms. Colson endeavors to link this alleged policy and the officers' alleged actions to Sheriff Berrong by pleading that, under Tenn. Code Ann. section 41-4-

101,[3] he is "statutorily responsible for the operation of the Blount County Jail; for the screening[,] hiring, firing, training and the supervision of the jailers, deputies, corrections officers, and other jail personal; and responsible for the safety and welfare of those housed in the Jail." [*Id.* ¶¶ 34–35].

Against the backdrop of these general assertions, Ms. Colson goes on to allege four individual-capacity claims[4] against Sheriff Berrong under § 1983: one for use of unlawful and excessive force against her (Count Four); a second for failure to train and supervise personnel (Count Six); a third for failure to provide her with adequate medical treatment (Count Nine); and a fourth for failure to keep her free from harm while she was in custody (Count Ten). Nowhere does Ms. Colson plead that Sheriff Berrong was personally or directly involved in the officers' actions against her.[5] Rather, her individual-capacity claims against Sheriff Berrong are based on allegations that, while executing his responsibilities as a supervisor, he encouraged or implicitly authorized his officers' unconstitutional actions against her. [*See* Pl.'s Resp. at 14 (stating that the allegations implicate Sheriff Berrong "in his role as a supervisor")].

---

[3] Tenn. Code Ann. section 41-4-101 states that "[t]he sheriff of the county has, except in cases otherwise provided by law, the custody and charge of the jail of the county and of all prisoners committed to the jail and may appoint a jailer, for whose acts the sheriff is civilly responsible."

[4] An individual-capacity claim differs from an official-capacity claim under § 1983. An individual-capacity claim attaches personal liability to a state official for an alleged wrongdoing under color of state law, whereas an official-capacity claim attaches liability only to the municipality or government entity. *Essex v. County of Livingston*, 518 F. App'x 351, 354–55 (6th Cir. 2013); *see Cady v. Arenac County*, 574 F.3d 334, 342 (6th Cir. 2009) ("In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." (quotation omitted)).

[5] Ms. Colson acknowledges in her response that Sheriff Berrong did not have "'active' involvement . . . in [her] ordeal." [Pl.'s Resp. at 15].

*1. Ms. Colson's Style of Pleading*

Sheriff Berrong maintains that Count Four, Count Nine, and Count Ten require dismissal because Ms. Colson "broadly alleges how all defendants should be held liable without mentioning or attempting to specify how Sheriff Berrong should be held liable." [Defs.' Br. at 5]. At first blush, Sheriff Berrong appears to be correct in his assessment of these counts, which contain no specific allegations against him in their respective bodies. Rather, Ms. Colson indiscriminately pools all Defendants into these counts and, for the most part, does not levy allegations against any individual Defendant but against all Defendants at once. This haphazard style of pleading is generally grounds for dismissal. *See Tuck v. Off Shore Inland Marine & Oilfield Co.*, No. 12-0379-WS-M, 2013 WL 81135, at *4 n.8 (S.D. Ala. Jan. 4, 2013) ("Part of plaintiffs' problem is that their Complaint lumps the four original defendants together in an undifferentiated mass, which is often itself a defect under Rule 8." (citations omitted)); *Petrovic v. Princess Cruise Lines, Ltd.*, No. 12-21588-CIV, 2012 WL 3026368, at *3 (S.D. Fla. July 20, 2012) ("[A] complaint that 'lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct' fails to satisfy Rule 8." (quotation omitted)); *Ismail v. City of Vallejo*, No. C 93-3253 BAC, 1994 WL 317602, at *2 (N.D. Cal. June 21, 1994) ("Plaintiff's complaint lumps the defendants together and does not identify the role of any particular defendant in causing a deprivation of plaintiff's federally protected civil rights. The complaint fails to meet the pleading requirements for a Section 1983 claim. The plaintiff must sort out and allege the conduct of each defendant which he claims resulted in a deprivation of his federally protected civil rights." (citation omitted)).

A careful reading of the Complaint, however, shows that Ms. Colson's allegations in Count Four, Count Nine, and Count Ten—though perhaps not models of pleading—are technically not lacking in allegations against Sheriff Berrong specifically. Sheriff Berrong loses sight of the fact that Ms. Colson incorporates by reference into these counts other paragraphs from the Complaint, and some of these paragraphs contain allegations that are particular to Sheriff Berrong. *See generally Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) ("A court may dismiss a complaint only if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations." (emphasis added) (citation omitted)). For instance, in Count Four, Ms. Colson incorporates by reference the following allegation against Sheriff Berrong from Count Three:

> 112. No one, not . . . Sheriff Berrong, or any other supervisors named herein took disciplinary action against England.

Similarly, in Count Nine and Count Ten, she incorporates by reference—from Count Six, Count Seven, and Count Eight—the following allegations against Sheriff Berrong:

> 133. Sheriff Berrong . . . had an opportunity to implement corrective action against the various officers involved, but . . . did not. Instead, [he] implicitly authorized, approved, or knowingly acquiesced in those officers' conduct, implicitly acquiescing in the use of excessive force and cruel and unusual punishment as well.

> 134. Sheriff Berrong . . . had a duty to train and supervise [his] departments' officers to avoid the use of excessive force, cruel and unusual punishment, and deprivation of adequate medical care. Yet, [he] failed to train and supervise those officers properly and failed to competently and properly investigate the use of excessive force.

> 135. It is highly unlikely that incidents such as those described herein would not have been reviewed by . . . Sheriff Berrong . . . . Nevertheless, none of the officers involved were disciplined.

136.     Ratification of such conduct by . . . Sheriff Berrong . . . sent a message that officers are allowed to do whatever they want, whenever they want, to whomever they want, irrespective of the Constitution. . . . Sheriff Berrong [was] involved, at least in part, in creating and enforcing their departments' policies. Here, they did not punish officer misconduct, including the use of excessive force and failure to provide adequate medical care, but "rubber stamped" that conduct.

142.     By ratifying Plaintiff's mistreatment . . . Sheriff Berrong acquiesced in the unconstitutional conduct of [his] subordinates through the execution of their job functions.

156.     At all times material hereto, Sheriff Berrong authorized the use of a "restraint chair" at the Blount County Jail[.]

157.     The use of the "restraint chair" under the facts of this case on an inmate who suffers from a severe mental disorder constituted cruel and unusual punishment, which violated Plaintiff's rights under the Eighth and Fourteenth Amendments.

160.     The use of the "restraint chair" is expressly prohibited by the policies and procedures of many corrections facilities, but Sheriff Berrong has known that the "restraint chair" at the Blount County Jail was being used as punishment for certain inmates, including inmates with severe mental disorders. He failed to take action to prevent the abuses.

Clearly, Ms. Colson does not fall short of apprising Sheriff Berrong of how she believes that he—and he specifically—is liable under Count Four, Count Nine, and Count Ten. The issue of whether these allegations add up to factually sufficient claims for supervisory liability, however, is a separate one that the Court will now consider.

### 2. *The Contours of Supervisory Liability under § 1983*

In *Ashcroft v. Iqbal*, the Supreme Court stated that in suits under § 1983, "the term 'supervisory liability' is a misnomer" because "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." 556 U.S. at 677. In other

words, a supervisory official cannot be liable under a theory of vicarious liability, *id.* at 676, or in other words, "simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another," *Peatross*, 818 F.3d at 241 (citation omitted). A supervisor's mere failure to act is therefore not enough to establish supervisory liability; instead "supervisory liability requires some 'active constitutional behavior' on the part of the supervisor." *Id.* (quotation omitted); *see Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998) ("[S]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. Instead the liability must be based upon active unconstitutional behavior." (citation omitted)).

The term "active," however, "does not mean 'active in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Peatross*, 818 F.3d at 242 (citation omitted). Rather, an individual-capacity claim against a supervisor for failure to train or supervise an offending subordinate is actionable if that supervisor (1) "encouraged the specific incident of misconduct or in some other way directly participated in it" or (2) "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982); *see Peatross*, 818 F.3d at 242 (reiterating these two elements). By satisfying either of these two elements, a plaintiff establishes what courts have described as a necessary causal connection between the execution of a supervisor's job function and the constitutional deprivation at issue. *See Claiborne County*, 103 F.3d at 511 ("[A] show[ing] that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional

conduct . . . . follow[s] section 1983's requirement that the person sought to be held accountable actually have 'caused' the deprivation[.]" (quotation omitted)); *see also* § 1983 (stating that liability attaches to a person who, under color of state law, "subjects, or *causes* to be subjected, any citizen" to a constitutional deprivation (emphasis added)).

A supervisor implicitly authorizes, approves, or knowingly acquiesces to a subordinate's unconstitutional conduct "when a history of widespread abuse puts th[at] responsible supervisor on notice of the need to correct the alleged deprivation, and he . . . fails to do so." *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (quotation omitted)). To suffice to put a supervisor on notice, however, the widespread abuse must be "obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences," *id.* at 440–41 (internal quotation omitted)—strong adjectives that demand allegations not merely on par with negligence, *see id.* at 439 ("[I]t is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties."); *see also Claiborne County*, 103 F.3d at 513 (affirming dismissal of supervisory liability claims against school officials because even though they knew of previous incidents and investigations involving a teacher's molestation of students, their failure to take action to prevent the teacher from molesting another student was more akin to negligence, rather than awareness of the need to correct widespread unconstitutional conduct).

To this Court's knowledge, the Sixth Circuit has never issued an opinion in which it found a pattern of abuse to be so "obvious, flagrant, rampant, and of continued duration" that a supervisor's mere awareness of it was, by itself, sufficient to create supervisory

liability. Rather, the Sixth Circuit has traditionally found supervisory liability claims to be plausible only when a supervisor is on notice of misconduct *and* in some way acts in relation to the misconduct. *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988) ("[S]he has merely claimed that the appellants were aware of the alleged harassment, but did not take appropriate action. This is insufficient to impose liability on supervisory personnel under § 1983." (citation omitted)); *Hays*, 668 F.2d at 873–74 ("The mere 'failure to act (even) in the fact of a statistical pattern' of incidents of misconduct . . . [is] insufficient to base [supervisory] liability on." (quoting *Rizzo v. Goode*, 423 U.S. 362, 376 (1976))); *see also Essex v. County of Livingston*, 518 F. App'x 351, 357 (6th Cir. 2013) (determining that a deputy's sexual assault could not impose supervisory liability on the sheriff simply based on an allegation that the sheriff had read newspaper articles about deputies who had perpetrated sexual assaults in "*other* jurisdictions" (emphasis added)); *cf. Iqbal*, 556 U.S. at 677 ("[R]espondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of 'supervisory liability' is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents."). The Sixth Circuit has reiterated this stance in its most recent case law.

In *Peatross*, a decedent's estate sued the Memphis Police Department's director under a theory of supervisory liability after officers had shot the decedent to death. 818 F.3d at 237–39. To support its claim, the estate pleaded that the director failed to train and supervise his officers to avoid the use of excessive force, inadequately investigated their use of excessive force, attempted to hide their use of excessive force by making false

statements to federal officials, and knew of fifty-four shootings by the Memphis Police Department's officers in a four-year span—a pattern that had once led him to express his intention to improve departmental discipline. *Id.* at 243. The Sixth Circuit held that these allegations raised a plausible claim for supervisory liability against the director. *Id.* at 243–44. While it reasoned that the director's alleged knowledge of the pattern of shootings helped to solidify the claim, this allegation was not the bedrock of the claim's sufficiency; rather, it brought the claim "a step further" toward sufficiency. *Id.* at 243. Indeed, in the same opinion, the Sixth Circuit recognized that a "failure to act (even) in the face of a statistical pattern of incidents of misconduct' is not sufficient to confer [supervisory] liability." *Id.* at 241–42 (quotation omitted). The Sixth Circuit's strongest reaction came in response to the allegation that the director made false statements and performed bogus internal investigations—affirmative *actions* in relation to the misconduct that equated to ratification and rubber-stamping:

> [The] Estate alleges that [the Director] . . . attempted to cover-up the unconstitutional conduct of his subordinates by exonerating the officers in an effort to escape liability. . . . Here, we have allegations that a government official with supervisory responsibility ratified the conduct of officers who shoot first and make judgments later, evincing a brazen disregard for human life. Ratification of such conduct is abhorrent.

*Id.* at 243, 246.[6] In reaching this decision, the Sixth Circuit relied on its opinion in *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015), another instructive case in which it also held that a supervisory liability claim was factually sufficient.

---

[6] The Sixth Circuit also held that the factual allegations as to the director's ratification of the wrongful conduct were specific enough even to overcome the director's defense of qualified immunity: "The sufficiency of the Complaint requires rejection of [the director's] claim of qualified immunity at the dismissal stage." *Peatross*, 818 F.3d at 246.

In *Coley*, an officer put a pretrial detainee in a chokehold, causing him to die and prompting his family to sue the officer's supervisor, a sheriff, in his individual capacity under § 1983. *Id.* at 534–35, 541–42. The family's claim consisted of allegations that the sheriff failed to train and supervise his staff on the use of proper force and inadequately investigated the use of excessive force. *Id.* at 542. Although the family did not allege a pattern of widespread abuse, they did allege that, like in *Peatross*, the sheriff tried to cover up the officer's conduct. *Id.* Specifically, the family alleged that the sheriff had "full knowledge of the assault" but "made false statements to federal officials about [his] knowledge." *Id.* Based on these allegations, the Sixth Circuit concluded that the family pleaded a sufficient claim for supervisory liability but only "*insofar* as they have shown that [the sheriff] 'at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate,' when he helped [the officers] cover up their unconstitutional actions." *Id.* (emphasis added) (quotation omitted). The Sixth Circuit's decision in this case, as well as in *Peatross*, show that, again, supervisory liability not only requires a supervisor to be aware of the misconduct but also to act affirmatively in relation it.

### 3. The Factual Sufficiency of the Supervisory Liability Claims

Sheriff Berrong argues that dismissal of the four individual-capacity claims against him is appropriate because the Complaint is without any allegation as to his personal involvement in his officers' alleged misconduct against Ms. Colson—or in other words, the causal connection necessary to implicate him in the alleged constitutional deprivations

is absent. [Defs.' Br. at 4–12]. He maintains that Ms. Colson, at most, conclusorily asserts that he knowingly acquiesced in the alleged unconstitutional behavior. [*Id.* at 7].

Before appraising Ms. Colson's claims for factual sufficiency, the Court reiterates that a § 1983 action requires two inquiries: (1) whether a plaintiff has asserted an injury under the Constitution at all and, if so, (2) whether the injury resulted from state action, or under color of state law. *Claiborne County*, 103 F.3d at 505–06, 511. The threshold inquiry is therefore whether the alleged conduct amounts to a deprivation under the Constitution. *Id.*; *see Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 841 (E.D. Tenn. 2011) (recognizing that "[o]bviously Sheriff Bivens can only be liable if the underlying conduct was unconstitutional"). Sheriff Berrong makes no argument under this threshold issue; he does not challenge whether his officers' alleged conduct deprived Ms. Colson of a right under the Fourth, Eighth, and Fourteenth Amendments. And of course, under the second half of the inquiry, he does not contend that this case is without alleged state action. Instead, he pursues dismissal of the § 1983 claims based on the absence of causation between his responsibilities as Sheriff of Blount County and the alleged unconstitutional behavior by his officers. The Court will therefore examine the § 1983 claims that Sheriff Berrong believes require dismissal—Count Four, Count Six, Count Nine, and Count Ten—for at least a reasonable inference that Sheriff Berrong implicitly authorized, approved, or knowingly acquiesced in the alleged wrongful conduct. [*See* Pl.'s Resp. at 19 (contending that "[t]aken as true, the facts alleged here and inferences drawn therefrom support the plausible inference that Sheriff Berrong acquiesced in the unconstitutional conduct")].

### i. Count Four: Excessive Force

In Count Four, Ms. Colson makes only one allegation against Sheriff Berrong, and it is bereft of factual enhancement and insufficient to link him to his subordinates' alleged use of excessive force. In paragraph 112, which Ms. Colson incorporates into Count Four by reference, she states that "[n]o one, not . . . Sheriff Berrong, or any other supervisors named herein took disciplinary action against England."[7] "The simple failure to discipline an officer for using excessive force," however, "does not make the officer's supervisors liable under § 1983." *Galvan v. Monroe*, No. 1:15-cv-00049, 2015 WL 4419611, at *3 (M.D. Tenn. July 17, 2015) (citing *Frodge v. City of Newport*, 501 F. App'x 519, 532 (6th Cir. 2012)). Without more grist, this allegation is—at best—consistent with simple negligence, which cannot sustain a claim for supervisory liability. *City of Roseville*, 296 F.3d at 439; *see Deom v. Walgreen Co.*, 591 F. App'x 313, 320 (6th Cir. 2014) ("[When] the context makes the factual allegations at most consistent with both conduct that is actionable and conduct that is not, more is required to 'nudge[] [the] claims across the line from conceivable to plausible'" (quoting *Twombly*, 550 U.S. at 570)). The Court will therefore dismiss Count Four as it pertains to Sheriff Berrong in his individual capacity.

### ii. Count Six: Failure to Train and Supervise

Although Count Six, in comparison to Count Four, contains a fourfold increase in the allegations against Sheriff Berrong, they are all equally feeble and do not form a

---

[7] This allegation is the only *factual* assertion against Sheriff Berrong. Ms. Colson does incorporate by reference two other allegations that concern Sheriff Berrong, but in them, she merely traces Tenn. Code Ann. section 41-4-101's language. [*See* Compl. ¶¶ 35–36].

plausible claim for supervisory liability. Excluding paragraph 112, which Ms. Colson also incorporates into Count Six by reference and which fails for the reasons that the Court has identified, Count Six contains four allegations against Sheriff Berrong:

> 133. Sheriff Berrong . . . had an opportunity to implement corrective action against the various officers involved, but . . . did not. Instead, [he] implicitly authorized, approved, or knowingly acquiesced in those officers' conduct, implicitly acquiescing in the use of excessive force and cruel and unusual punishment as well.

> 134. Sheriff Berrong . . . had a duty to train and supervise [his] departments' officers to avoid the use of excessive force, cruel and unusual punishment, and deprivation of adequate medical care. Yet, [he] failed to train and supervise those officers properly and failed to competently and properly investigate the use of excessive force.

> 135. It is highly unlikely that incidents such as those described herein would not have been reviewed by . . . Sheriff Berrong . . . . Nevertheless, none of the officers involved were disciplined.

> 136. Ratification of such conduct by . . . Sheriff Berrong . . . sent a message that officers are allowed to do whatever they want, whenever they want, to whomever they want, irrespective of the Constitution. . . . Sheriff Berrong [was] involved, at least in part, in creating and enforcing their departments' policies. Here, they did not punish officer misconduct, including the use of excessive force and failure to provide adequate medical care, but "rubber stamped" that conduct.

Ms. Colson intones the common-law parlance "implicitly authorized, approved, or knowingly acquiesced," summarizes Sheriff's Berrong's responsibility to supervise and train his subordinates under Tenn. Code. Ann. section 41-4-101, and conclusorily refers to unidentified acts of ratification and rubber stamping. These allegations consist of nothing more than canned recitations of the common-law labels associated with supervisory liability. *See Twombly*, 550 U.S. at 555 (citation omitted). They are devoid of facts.

The mere allegation that Sheriff Berrong failed to implement training that might have spared Ms. Colson from her alleged injuries does not, without more, add up to a plausible claim for supervisory liability. *See Ontha v. Rutherford County*, 222 F. App'x 498, 504 (6th Cir. 2007) ("[T]o establish supervisory liability, it is not enough to point after the fact to a particular sort of training which, if provided, might have prevented the harm suffered in a given case."). In addition, although Ms. Colson asserts that Sheriff Berrong most likely reviewed the incidents yet did not discipline his officers, she weaves no facts into this assertion to distinguish it from an equally plausible explanation that a sloppy or negligent investigation resulted in the lack of discipline. *See City of Roseville*, 296 F.3d at 439, 441. Ms. Colson's allegation that Sheriff Berrong conducted an incompetent and improper investigation suffers from the same shortcoming—a lack of facts to distinguish it from a sloppy or negligent investigation. *See Frodge*, 501 F. App'x at 532 ("[E]ven an inadequate investigation is . . . insufficient to trigger liability because a supervisory liability claim 'cannot be based on simple negligence.'" (quotation omitted)). These allegations as to Sheriff Berrong's failure to investigate and failure to discipline his officers appear to be the foundation for Ms. Colson's contention that Sheriff Berrong ratified or rubber stamped their alleged misconduct, but because these allegations lack factual support themselves, they cannot lay roots for other assertions of wrongdoing like ratification.

Ms. Colson, however, contends that her allegation as to Sheriff Berrong's failure to perform an adequate investigation is sufficient to erect a plausible claim for supervisory liability against Sheriff Berrong. [Pl.'s Resp. at 17]. In raising this argument, she relies on the Sixth Circuit's opinion in *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985), pointing

out that in this case the Sixth Circuit made "a finding of supervisory liability [that] was premised on the failure to initiate and conduct any 'meaningful investigation on the part of the Sheriff himself.'" [Pl.'s Resp. at 17 (quoting *id.* at 187–88)]. *Marchese*, however, is hardly analogous to the facts here. First, *Marchese* was an opinion that arose during the post-judgment stage—a totally different posture from this case, which is of course still in the pleading stage. Second, the appeal in *Marchese* dealt with judgment against the sheriff in his *official* capacity, not in his individual capacity. *See Marchese*, 758 F.2d at 181, 188 ("This is an appeal from a judgment . . . against William Lucas in his official capacity as Sheriff . . . . [T]he Sheriff is sued here in his official capacity and in that capacity, he had a duty to both know and act."). An individual-capacity claim against a supervisor and the relevant legal standard affiliated with it were therefore not in play in *Marchese*, unlike in this case.

Finally, the Court would be remiss if it did not address Ms. Colson's allegations in paragraph 138, in which she appears to assert that Count Six, as a whole, exhibits recklessness or gross negligence on Sheriff Berrong's part:

> 138.    The conduct of the Individual Defendants, in their individual capacities, was intentional, malicious, willful, wanton and in reckless disregard of Plaintiff's constitutional rights and/or grossly negligent in that this conduct shocks the conscience and is fundamentally offensive to a civilized society.

Although supervisory liability is available when "training . . . is so reckless or grossly negligent that future police misconduct is almost inevitable," *Hays*, 668 F.2d at 874 (citation omitted), paragraph 138 is merely a collage of common-law labels, with no facts to underpin the allegation of recklessness or gross negligence. Indeed, "[n]egligence does

not become 'gross' just by saying so," and an "allegation of gross negligence . . . will avail the plaintiff nothing . . . if the facts alleged are not sufficient to make out a constitutional violation." *Lewellen v. Metro. Gov't of Nashville & Davidson Cty.*, 34 F.3d 345, 349 (6th Cir. 1994) (quotation omitted). "[F]acts alleged in support of [a] legal conclusion of gross negligence must be sufficient to charge the government officials with outrageous conduct or arbitrary use of government power." *Id.* (quotation omitted). Ms. Colson pleads no facts in Count Six showing that Sheriff Berrong even knowingly acquiesced in the alleged unconstitutional conduct, let alone engaged in conduct that is outrageous. The Court will therefore dismiss Count Six as it pertains to Sheriff Berrong in his individual capacity.

### iii. Count Nine: Failure to Provide Adequate Medical Care

Count Nine also lacks sufficient facts to support a plausible claim for supervisory liability. While Count Nine has no allegations against Sheriff Berrong in its body, it does have several allegations against him from Count Seven and Count Eight, which Ms. Colson incorporates into Count Nine by reference:

> 142.   By ratifying Plaintiff's mistreatment . . . Sheriff Berrong acquiesced in the unconstitutional conduct of [his] subordinates through the execution of their job functions.

> 156.   At all times material hereto, Sheriff Berrong authorized the use of a "restraint chair" at the Blount County Jail[.]

> 157.   The use of the "restraint chair" under the facts of this case on an inmate who suffers from a severe mental disorder constituted cruel and unusual punishment, which violated Plaintiff's rights under the Eighth and Fourteenth Amendments.

> 160.   The use of the "restraint chair" is expressly prohibited by the policies and procedures of many corrections facilities, but Sheriff Berrong has known that the "restraint chair" at the Blount County Jail

was being used as punishment for certain inmates, including inmates with severe mental disorders. He failed to take action to prevent the abuses.

The thrust of these allegations is that Sheriff Berrong implicitly authorized, approved, or knowingly acquiesced in the unconstitutional behavior against Ms. Colson—the alleged lack of adequate medical care—by allegedly signing off on his subordinates' use of the restraint chair.[8] She claims that Sheriff Berrong not only authorized the restraint chair's use but also knew that his subordinates were using it to discipline inmates suffering from mental disorders like her own. [Compl. ¶¶ 156, 160].

As an initial matter, in paragraph 160, the allegation that Sheriff Berrong "kn[ew] that the 'restraint chair' at the Blount County Jail was being used as punishment for certain inmates, including inmates with severe mental disorders" is a conclusory statement, and the Court is unable to accept it as true. *Cf. Iqbal*, 556 U.S. at 680–81 (analyzing a pleading under the analog to § 1983 and declining to accept as true the conclusory allegation that the "petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [the respondent] to harsh conditions of confinement 'as a matter of policy . . . for no legitimate penological interest'"). Indeed, this allegation is far afield from the allegation concerning the director's knowledge of wrongful conduct in *Peatross*, in which the estate specifically

---

[8] Although Ms. Colson styles Count Nine as a violation of § 1983 based on inadequate medical care, the alleged unconstitutional behavior as it relates to Sheriff Berrong is not so much his failure to provide adequate medical care as it is his authorization of the infliction of psychological harm, which is a type of harm that can constitute cruel and unusual punishment under the Eighth Amendment and excessive force under the Fourth Amendment. *See Hudson v. McMillian*, 503 U.S. 1, 16 (1992) (Black, J., concurring) ("It is not hard to imagine inflictions of psychological harm . . . that might prove to be cruel and unusual punishment." (citing *Wisniewski v. Kennard*, 901 F.2d 1276, 1277 (5th Cir. 1990))); *see also McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992).

pleaded that the director publicly spoke of a pattern of fifty-four shootings and a need for improved disciplinary measures. *Peatross*, 818 F.3d at 243. Because Ms. Colson does not plead facts showing that Sheriff Berrong had knowledge or notice of the restraint chair's use on inmates with mental disorders, she establishes no causal connection or bridge between his approval of the restraint chair[9] and his officers' alleged unconstitutional behavior against her. *See Claiborne County*, 103 F.3d at 511 (stating that the causal link requires **"**a show[ing] that a supervisory official at least implicitly authorized, approved or knowingly acquiesced *in the unconstitutional conduct*" (emphasis added) (quotation omitted)); *see also Essex*, 518 F. App'x at 355 (noting that "[t]here must be some conduct on the supervisor's part to which a plaintiff can point that is directly correlated with the plaintiff's injury" (citation omitted)). In other words, Sheriff Berrong's assent to the restraint chair's use on the general population, without more, is equally consistent with negligence. The only remaining issue is whether, without Sheriff Berrong's knowledge of the restraint chair's use on the mentally ill, Ms. Colson alleges a pattern of this type of use that is so widespread that Sheriff Berrong nevertheless was effectively "on notice of the need to correct the alleged deprivation." *City of Roseville*, 296 F.3d at 440 (quotation omitted).

At best, Ms. Colson sketches the blurred edges of a pattern of unconstitutional behavior, alleging that "the 'restraint chair' at the Blount County Jail was being used as

---

[9] In paragraph 156, Ms. Colson's alleges that "Sheriff Berrong authorized the use of a 'restraint chair' at the Blount County Jail[.]" This is not a conclusory allegation. *See Riley v. Kurtz*, 893 F. Supp. 709, 721 (E.D. Mich. 1995) ("[The allegation] specifically states that defendant performed a particular action . . . . This is not conclusory."). The Court therefore accepts it as true.

punishment for certain inmates, including inmates with severe mental disorders." [Compl. ¶ 160]. This thumbnail allegation is far too general to allow the Court to draw even a reasonable inference that a pattern of abuse—of "obvious, flagrant, [and] rampant" proportions—occurred at Blount County Jail. *City of Roseville*, 296 F.3d at 440 (quotation omitted). Ms. Colson must provide the Court with at least some facts from which it can infer that the restraint chair's alleged use on the mentally ill was "of continued duration, rather than isolated occurrences." *Id.* at 441 (quotation omitted); *see Peatross*, 818 F.3d at 243 (supporting allegations of a pattern of misconduct with factual details that included references to fifty-four shootings in four years and eighteen in one year). In light of the undeniable insufficiency of Ms. Colson's allegations against Sheriff Berrong—not only in this count but in the three other individual-capacity claims against him—the Court cannot help but note Ms. Colson's concession in her response that she "was in a poor position to know the exact contours of Sheriff Berrong's acts or omissions with respect to her without the aid of discovery." [Pl.'s Resp. at 5]. Under Rule 8, however, Ms. Colson is not entitled to "unlock the doors of discovery . . . armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. The Court will therefore dismiss Count Nine against Sherriff Berrong as it applies to him in his individual capacity.

### iv. Count Ten: Failure to Protect

Count Ten contains no other allegations against Sheriff Berrong except those that the Court has already found to be factually insufficient to support a claim for supervisory liability. The Court will therefore dismiss Count Ten as it pertains to Sheriff Berrong in his individual capacity.

### 4. The State Law Claims

In pursuing dismissal of the state law claims, namely Count Twelve for intentional infliction of emotional distress and Count Thirteen for negligence, Sheriff Berrong argues that the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. section 29-20-101, gives him immunity from these claims. [Defs.' Br. at 12]. In the alternative, he maintains that Ms. Colson does not allege sufficient facts to support them. [*Id.* at 12–13].

#### i. Count Twelve: Intentional Infliction of Emotional Distress

To state a plausible claim for intentional infliction of emotional distress—also known in Tennessee as a claim for outrageous conduct, *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012)—a plaintiff must allege facts showing that the conduct at issue is (1) intentional or reckless, (2) outrageous, and (3) resulted in a serious mental injury, *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 31 (Tenn. 2005). The first element's state-of-mind requirement is "significantly higher" than that for negligence, and it means that—at a minimum—a defendant has to "be aware of, but consciously . . . disregard, a substantial and unjustifiable risk," grossly deviating from the standard of care. *Id.* at 39 (citations omitted). When a plaintiff bases a claim for intentional infliction of emotional distress on reckless conduct, like Ms. Colson does here in this case,[10] that conduct "need not be directed at a specific person or occur in the plaintiff's presence." *Rogers*, 367 S.W.3d at 205 (footnote omitted) (citing *id.* at 41).

---

[10] Ms. Colson alleges that Sheriff Berrong's "conduct was perpetrated . . . with reckless disregard of the probability of inflicting[] mental anguish." [Compl. ¶ 185].

Next, under the second element, the term "outrageous conduct" is exacting, requiring conduct "so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly [i]ntolerable in a civilized community." *Doe 1*, 154 S.W.3d at 39 (internal quotation marks and quotation omitted). Lastly, the third element requires a plaintiff to suffer a mental injury that is "particularly serious," *id.*, which demands a showing of "significant impairment in [a plaintiff's] daily life," *Rogers*, 367 S.W.3d at 210. The Tennessee Supreme Court has composed a non-exhaustive list of the types of harm that qualify as a serious mental injury. *Id.* at 209–10. In addition, inclusive in the third element is an implicit causal connection between the tortious conduct and the mental injury. *Doe 1*, 154 S.W.3d at 31; *see Rogers*, 367 S.W.3d at 206 (acknowledging that a claim for intentional infliction of emotion distress is untenable without a "serious mental injury *resulting from* the defendant's conduct" (emphasis added)).

The allegations comprising Ms. Colson's claim for intentional infliction of emotional distress are conclusory—no more than a regurgitation of key words and phrases under Tennessee's common law—and Ms. Colson does not mount a plausible claim. She merely pleads that "[t]he conduct . . . was outrageous," "perpetrated with the intent to inflict, or with reckless disregard," and "result[ed] [in] . . . personal injuries." [Compl. ¶¶ 185, 187]. This Court's sister courts have refused to accept similar allegations when reviewing claims for intentional infliction of emotional distress under Tennessee law. *See, e.g.*, *Mhoon v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:16-cv-01751, 2016 WL 6250379, at *3–4 (M.D. Tenn. Oct. 26, 2016). Even when the Court vets the Complaint in its entirety, *see Hishon*, 467 U.S. at 73, it still can find no allegations that equate to a

26

plausible claim. Ms. Colson's assertions of Sheriff Berrong's failure to train and censure his officers, as well as his alleged failure to investigate competently their alleged misconduct—while possibly consistent with negligence—do not evince a state-of-mind that is "significantly higher" than one for negligence. *Doe 1*, 154 S.W.3d at 39. Simply, these assertions, without more, do not take Ms. Colson's claim beyond the realm of simple negligence and into the ambits of intentional or reckless conduct.

The causal connection between Sheriff Berrong's alleged tortious omissions and any resulting "serious mental injury" to Ms. Colson is therefore too tenuous to establish a plausible claim. *Id.* at 31. In fact, Ms. Colson pleads no serious mental injury at all, only broad assertions of "mental anguish" and "personal injuries." [Compl. ¶¶ 185, 187]. The lone factually based mental injury that she claims to have endured was the aggravation of her *preexisting* anxiety disorder, which, as alleged, does not constitute the sort of injury that Tennessee's courts envision as serious enough to support a claim for intentional infliction of emotional distress. *See Rogers*, 367 S.W.3d at 209–10 (describing specific types of mental injuries that "are pertinent to support a plaintiff's claim" for intentional infliction of emotional distress). The Court will therefore dismiss Count Twelve as it pertains to Sherriff Berrong in his individual capacity.

### ii. Count Thirteen: Negligence

To state a plausible claim for negligence, a plaintiff must allege facts establishing that (1) the defendant owed a legal duty of care to the plaintiff, (2) the defendant engaged in conduct that was below the applicable standard of care, amounting to a breach of the legal duty, (3) an injury or loss, (4) cause in fact, and (5) proximate cause. *Giggers v.*

*Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009). As an initial matter, the Court

notes that Ms. Colson brings her negligence claims under the TGTLA,[11] which governs

liability in tort for Tennessee's governmental entities and employees and which contains

the codification of Tennessee's sovereign immunity law. As the fountainhead of sovereign

immunity for Tennessee's governmental entities,[12] the TGTLA insulates them, generally

but not exclusively, from lawsuits for tortious acts. *See* Tenn. Code Ann. § 29-20-201(a)

("Except as may be otherwise provided in this chapter, all governmental entities shall be

immune from suit for any injury which may result from . . . the exercise and discharge of

any of their functions, governmental or proprietary."). In addition to furnishing immunity

to governmental entities, the TGTLA extends immunity to their employees,[13] but only

when immunity is unavailable to governmental entities under the statute—or, that is, when

immunity for governmental entities is "removed" by the TGTLA: "No claim may be

brought against an employee . . . [when] the immunity of the governmental entity is

---

[11] She titles her claim in Count Thirteen as "Tennessee Governmental Tort Liability Act/Negligence," [Compl. at 55], and pleads that "[p]ursuant to the Tennessee Governmental Tort Liability Act, the Defendants owed Plaintiff a duty of care to be free from excessive force and cruel and unusual punishment and to provide [her] with a safe environment and adequate medical care while [she] was detained in their custody," [*id.* ¶ 192].

[12] The definition of a "governmental entity" under the TGTLA is longwinded but includes "any municipality, metropolitan government, [and] county" in Tennessee. Tenn. Code. Ann. § 29-20-102(3)(A).

[13] The TGTLA defines an "employee" as "any official (whether elected or appointed), officer, employee or servant, or any member of any board, agency, or commission (whether compensated or not), or any officer, employee or servant thereof, of a governmental entity, *including the sheriff* and the sheriff's employees and, further including regular members of voluntary or auxiliary firefighting, police, or emergency assistance organizations." *Id.* § 29-20-102(2) (emphasis added).

removed by this chapter[.]" *Id.* § 29-20-310(b).[14] In other words, the TGTLA does not provide governmental entities and employees with simultaneous immunity.

In one provision in particular, subsection 29-20-205(2), the TGTLA removes immunity for governmental entities, and by extension provides it to employees, for an injury "proximately caused by" an employee's negligent conduct—*except* when the negligent conduct causes an injury that "arises out of" a violation of an individual's civil rights:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of: False imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right to privacy, *or civil rights*[.]

Tenn. Code Ann. § 29-20-205(2) (emphasis added).[15] When this provision does not result in the removal of immunity for governmental entities—that is, when the exception applies because a negligent act "arises out of" a civil rights claim—employees are subject to liability in their individual capacities for negligence. *See Baker v. Snyder*, No. 1:05-CV-152, 2006 WL 2645163, at *10 (E.D. Tenn. Sept. 14, 2006) ("If the TGTLA does not remove sovereign immunity from a governmental entity, that entity's employees can be liable in their individual capacities." (citing *Baines v. Wilson County*, 86 S.W.3d 575, 583

---

[14] This provision contains an exception for claims "for health care liability brought against a health care practitioner." *Id.* § 29-20-310(b).

[15] This Court, in prior case law, construed the term "civil rights" that appears in this provision to "mean[] and includ[e] claims arising under the federal civils rights laws, *e.g.*, 42 U.S.C. § 1983." *Campbell v. Anderson County*, 695 F. Supp. 2d 764, 778 (E.D. Tenn. 2010).

n.5 (Tenn. Ct. App. 2002), *abrogated on other grounds by Young v. City of LaFollette*, 479 S.W.3d 785 (Tenn. 2015))).

In short, the issue for the Court is whether, under subsection 29-20-205(2), Ms. Colson's negligence claim arises out of her civil rights claims. If so, Blount County has immunity, and Sheriff Berrong would then be subject to liability for negligence in his individual capacity, *see* Tenn. Code Ann. § 29-20-310(b); *Baker*, 2006 WL 2645163 at *10—but only of course if Ms. Colson's allegations amount to a plausible claim for negligence, *see Baines*, 86 S.W.3d at 583 n.5 (stating that although the TGTLA creates individual-capacity liability for employees if a governmental entity is immune, "[i]t is still necessary that all the elements of the tort are alleged by the plaintiff"). If not, then the inverse scenario occurs: governmental immunity is removed and Sheriff Berrong, as a result, would retain immunity as an employee. *See* Tenn. Code Ann. § 29-20-310(b); *Baker*, 2006 WL 2645163 at *10. Ms. Colson argues that Sheriff Berrong is not immune because her negligence claim arises out of her civils rights claims and triggers the civil rights exception under subsection 29-20-205(2). [Pl.'s Resp. at 23]. Sheriff Berrong, however, maintains that subsection 29-20-310(b) provides him with immunity from her negligence claim. [Defs.' Br. at 12].

Because the Court already dismissed every § 1983 claim against Sheriff Berrong, no civil rights claims remain standing against him, and Ms. Colson's negligence claim under subsection 29-20-205 cannot arise out of non-existent civil rights claims. *See Butler v. City of Englewood*, No. 1:07-cv-184, 2008 WL 4006786, at *13 (E.D. Tenn. Aug. 25, 2008) (stating that the statutory phrase "arises out of" under subsection 29-20-205 means

that state law claims must "directly flow from the allegations" comprising a federal civil rights claim (quotation omitted)). Without an existing civil rights claim from which the negligence claim against Sheriff Berrong can "directly flow," *id.*, the negligence claim is not within subsection 29-20-205(2)'s civil rights exception. As a governmental employee in Tennessee, Sheriff Berrong is therefore immune under the TGTLA, *see* Tenn. Code. Ann. §§ 29-20-102(2), 29-20-310(b), and cannot be subject to liability for Ms. Colson's negligence claim against him. The Court will therefore dismiss Count Thirteen as it pertains to Sheriff Berrong.

## B. Officer England

Like Sheriff Berrong, Officer England also seeks dismissal of Count Thirteen by relying on the TGTLA to argue that she is entitled to immunity. [Defs.' Br. at 14]. Unlike Sheriff Berrong, however, she has not pursued or obtained dismissal of Ms. Colson's civil rights claims against her under § 1983, which include: (1) excessive force and cruel and unusual punishment (Count Three and Count Four), (2) failure to administer adequate medical care (Count Nine), and (3) failure to protect (Count Ten). [Compl. at 36–38, 48–53]. These claims therefore remain active and contain the following allegations, either in the body of the claims or by reference from other portions of the Complaint:

> 11. England was pressing hard on Plaintiff's chest with her hand and Plaintiff tried to move England's hand with her chin. England reacted by violently striking the restrained Plaintiff in the face.

> 13. Male officers held Plaintiff's neck while England forced a helmet onto her head.

> 37. At all relevant times, Corrections Officer Mandy England ("England"), was employed by the BCSD.

31

72.     Plaintiff repeatedly asked for permission to go to the bathroom, but England responded, "I don't give a fuck what you asked for," and refused to allow Plaintiff a bathroom break. England was eventually overhead saying, "we don't even have to worry about it, she's already peed." Plaintiff wound up urinating on herself multiple times, as England and other officers laughed at her.

113.    The totality of circumstances, as fully described above, reveals that England's blow to Plaintiff's face was unreasonable, unnecessary, an excessive use-of-force, and cruel and unusual punishment.

114.    On or about June 23, 2015, England acted under color of law and her acts deprived Plaintiff of rights secured to her under the Constitution. Her actions proximately caused injuries to Plaintiff and her disregard of Plaintiff's civil rights was done by either actual malice or deliberate indifference to Plaintiff's civil rights.

115.    England is also individually liable for the violation of Plaintiff's civil rights. Plaintiff suffered substantial and serious physical and psychological injury to [her] body and mind, pain and suffering, and medical expenses.

Ms. Colson incorporates into her negligence claim these very allegations of unconstitutional conduct against Officer England. [*Id.* ¶ 190]. In this claim, she also pleads that she was owed a legal duty to be free from this unconstitutional conduct,[16] specifically the use of excessive force and cruel and unusual punishment. [*Id.* ¶ 192]. Without question, her allegations against Officer England for civil rights violations set the context for her negligence claim, or phrased differently, her negligence claim "directly flow[s] from the[se] allegations." *Butler*, 2008 WL 4006786 at *13. For the purpose of the TGTLA,

---

[16] "Whether a defendant owes a duty to a plaintiff in any given situation is a question of law for the court. . . . to be determined by reference to the body of statutes, rules, principles, and precedents which make up the law[.]" *Jones v. Exxon Corp.*, 940 S.W.2d 69, 71 (Tenn. Ct. App. 1996). Officer England does not contest whether the TGTLA, or Tennessee law in general, imposes on governmental employees a legal duty to use reasonable care to keep others free from invasions of federally protected rights.

namely subsection 29-20-205(2), her negligence claim therefore arises out of her civil rights claims under § 1983, *see id.*; *see also Shelton v. Rutherford County*, No. 3:08-cv-0318, No. 3:08-cv-0413, 2009 WL 2929394, at *12 (M.D. Tenn. Sept. 8, 2009) ("[N]egligence claims [that] are asserted in the context of a civil rights case and are based upon the same actions that gave rise to the civil rights claims. . . . fall[] within . . . [the] immunity [exception] under Tenn. Code. Ann. § [2]9-20-205." (citation omitted)). Because her negligence claim arises out of Officer England's alleged civil rights violations, it triggers the TGTLA's civil rights exception, which strips immunity from Officer England. *See* Tenn. Code. Ann. § 29-20-205(2); *Baker*, 2006 WL 2645163 at *10. The Court will therefore decline to dismiss Count Thirteen as it pertains to Officer England in her individual capacity.

## IV. CONCLUSION

Under § 1983, Ms. Colson fails to allege plausible supervisory liability claims against Sheriff Berrong in Count Four, Count Six, Count Nine, and Count Ten. As a result, the Court will dismiss each of these counts as they pertain to Sheriff Berrong in his individual capacity. In addition, Sheriff Berrong has immunity from Ms. Colson's negligence claim in Count Thirteen, which the Court will also dismiss. Officer England, however, does not have immunity from this claim, and the Court will not dismiss it as it pertains to her. Sheriff Berrong and Officer England's Motion to Dismiss [doc. 19] is therefore **GRANTED in part and DENIED in part**. The Court orders as follows:

1. Count Four, Count Six, Count Nine, Count Ten, Count Twelve, and Count Thirteen are **DISMISSED** but only to the extent that they apply to Sheriff

Berrong in his individual capacity. These counts remain pending in all other respects.

2.  Officer England **SHALL** serve a responsive pleading within fourteen days from the date of this Order.

The Court will enter an order consistent with this opinion.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge