UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

ANNISSA COLSON,                    )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        No. 3:16-CV-377
                                   )
CITY OF ALCOA, TENNESSEE, *et al.*, )
                                   )
                Defendants.        )

## MEMORANDUM OPINION

This matter is before the Court on Defendants' Motion to Dismiss [doc. 31],

Defendants' Brief in Support of the Motion [doc. 33], Plaintiff's Response in Opposition

[doc. 46], and Defendants' Reply [doc. 49]. For the reasons herein, the Court will grant the

motion in part and deny the motion in part.

## I.    BACKGROUND

Plaintiff Annissa Colson ("Ms. Colson") alleges that one evening she was involved

in a car accident and that Officer Dustin Cook ("Officer Cook") and Officer Arik Wilson

("Officer Wilson"), both of the Alcoa Police Department, arrested her for driving under the

influence and for reckless endangerment. [Compl., doc. 1, ¶ 5]. Ms. Colson claims that, at

the scene of the accident, she consented to a blood alcohol test and the officers then drove

her to Blount Memorial Hospital for the test. [*Id.*]. She alleges, however, that she withdrew

her consent once they arrived at the hospital, prompting the officers to instruct her to get

back into their vehicle. [*Id.*]. At that point, Ms. Colson, who claims to suffer from anxiety-

related disorders that include "severe panic disorder" and claustrophobia, alleges that she had a "crippling panic attack, gasping for breath, in obvious distress" and asked the officers to let her breathe. [*Id.* ¶¶ 1–2, 5]. "I need to breathe. Please let me breath," she claims to have told them. [*Id.* ¶ 56]. According to Ms. Colson, who refers to herself as "diminutive," the officers believed that she was resisting their commands and responded by forcing her back into their vehicle. [*Id.* ¶ 6]. Officer Cook allegedly pulled her into the vehicle from inside while Officer Wilson pushed her into it, and in the process, Officer Wilson allegedly thrust his knee into her knee and caused it to "pop." [*Id.* ¶¶ 6–7].

Once Ms. Colson was inside the patrol vehicle, she was allegedly "screaming in pain and crying for her mother." [*Id.* ¶ 9]. Ms. Colson claims that Officer Cook contacted his supervisor, Lieutenant Keith Fletcher ("Lieutenant Fletcher"), and asked him for instructions about how to proceed, including about whether they should take Ms. Colson to have her knee examined by a medical professional. [*Id.*]. Lieutenant Fletcher allegedly told them to take Ms. Colson to Blount County Jail, where the staff nurse could check her knee and conduct a mandatory blood draw. [*Id.* ¶¶ 9, 64]. According to Ms. Colson, they transported her to Blount County Jail,[1] where several officers and other staff employees, including Officer Mandy England ("Officer England") and Defendant Nurse Russell ("Nurse Russell"), waited to receive her. [*Id.* ¶¶ 10, 11, 65]. Officer England allegedly ushered Ms. Colson, who claims that she was screaming in pain because of her knee, to a room where officers surrounded her and strapped into a "restraint chair." [*Id.* ¶¶ 10, 66].

---

[1] Ms. Colson, in her Complaint, notes that Officer Cook told another officer at Blount County Jail that Ms. Colson had "ripp[ed] the rubber out of his car door." [Compl. ¶ 67].

Ms. Colson maintains that Nurse Russell, a staff nurse at Blount County Jail, then performed a "cursory examination" of her knee, found nothing wrong, and tried to draw her blood with Officer England's help. [*Id.* ¶ 11]. In response, Ms. Colson alleges that she became uncomfortable and resisted their efforts, prompting Officer England to strike her in the face. [*Id.*].[2] Afterwards, Ms. Colson claims that, while still in the restraint chair, she repeatedly requested the opportunity to use the restroom, was denied that opportunity, and urinated on herself several times. [*Id.* ¶ 12]. According to Ms. Colson, the officers in the room reacted with laughter. [*Id.*]. A male officer then allegedly put her in a "semi-choke hold" while Officer England forced a helmet onto her head. [*Id.* ¶¶ 13, 73–74]. She claims that she told the officer he was hurting her and he said, "good." [*Id.* ¶ 73]. She allegedly remained fastened in the restraint chair for roughly another five hours. [*Id.* ¶¶ 13, 75].

Ms. Colson asserts that after she was released from Blount County Jail, she learned that she had suffered "a tibial plateau fracture, a torn ACL, [and] a torn LCL," in addition to abrasions and bruises to her neck, chest, arms, and foot. [*Id.* ¶ 16]. She also maintains that she experienced "substantial mental anguish." [*Id.*]. As a result, she has filed this lawsuit against the City of Alcoa, Tennessee; Blount County, Tennessee; and officers of these local governments in their official and individual capacities, bringing several claims under 42 U.S.C. §§ 1983, 1985, 1986, 1988 and alleging violations of her constitutional rights under the Fourth, Eighth, and Fourteenth Amendments. [*Id.* at 32–53]. She pleads that these violations consist of use of unlawful and excessive force, cruel and unusual

---

[2] Ms. Colson notes that a video recording in the room captured Officer Cook stating that he believed Ms. Colson may have bitten or tried to bite Officer England. [*Id.* ¶ 71].

punishment, failure to train and supervise, failure to protect, and failure to offer adequate medical care. [*Id.*]. Ms. Colson also brings claims under Tennessee law for assault and battery against Officer Cook and Office Wilson, and claims against all Defendants for negligence and intentional infliction of emotional distress. [*Id.* ¶¶ 178–94].

Defendant City of Alcoa moves to dismiss Ms. Colson's § 1983 claims and state law claims. [Defs.' Br. at 6–9, 11–12]. Defendants Chief Philip K. Potter ("Chief Potter"), Lieutenant Fletcher, Officer Cook, and Officer Wilson also move—in their official and individual capacities—for dismissal of Ms. Colson's claims under § 1983 and Tennessee law. [*Id.* at 4–5, 10–13]. The Court will now consider their requests for dismissal.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff's complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that create a reasonable inference that the defendant is liable for the alleged conduct in the complaint. *Id.*

When considering a motion to dismiss under Rule 12(b)(6), a court accepts the allegations in the complaint as true and construes them in a light most favorable to the plaintiff. *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). "[T]he tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however. *Iqbal*, 556 U.S. at 678. A plaintiff's allegations must consist of more than "labels," "conclusions," and "formulaic recitation[s] of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted); *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citation omitted)). "Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity." *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016).

### III. ANALYSIS

Section 1983 permits a claim for damages against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Because § 1983 has "a 'color of law' requirement," a defendant "can be held liable only if state law, whether provided by statute or judicially implied, empowers him with some legal obligation to act." *Doe v. Claiborne County*, 103 F.3d 495, 512 (6th Cir. 1996) (citation omitted). A claim under § 1983 therefore consists of two elements: the defendant (1) must deprive the plaintiff of either a constitutional or a federal statutory right and (2) must deprive the plaintiff of one of these rights while acting under color of state law (i.e., state action). *Id.*

at 511. "Absent either element, a section 1983 claim will not lie." *Christy v. Randlett*, 932

F.2d 502, 504 (6th Cir. 1991). Based on Defendants' arguments, which the Court has

reviewed and will now address, Defendants do not challenge whether Ms. Colson, under

the first element, has asserted cognizable constitutional rights. Rather, Defendants dispute

her allegations that their actions caused any deprivation of those rights.

### A. The City of Alcoa: Municipal Liability (Count Five and Count Seven)

Because of the length of the Complaint, which exceeds sixty pages, and the

relatively large number of Defendants in this action, the Court begins with an overview of

the allegations against the City of Alcoa. Ms. Colson prefaces her claims by characterizing

the City of Alcoa's "policies, customs, or practices" as the "moving force" behind the

alleged infringements of her constitutional rights:

> 17. The moving force behind the violations of Plaintiff's constitutional rights was Alcoa and Blount County's policies, customs, or practices to employ and apply the same protocols, conventions, customs, or rules of conduct in handling suspects or inmates who suffer from severe mental disorders, here, a severe anxiety and panic disorder, as they do in handling other un-afflicted inmates. This practice is accepted as a policy or custom of deliberate indifference to the safety of suspects or inmates who suffer from debilitating mental disorders.

> 18. Defendants knew, or should have known, by Plaintiff's actions, statements, and medications, that Plaintiff suffered from a severe mental disorder. . . . The officers responded just as they would have to any non-compliant suspect or inmate, disregarding her severe mental disorder.

[Compl. ¶¶ 17–18]. Against the backdrop of these general assertions, Ms. Colson mounts

two claims for municipal liability against the City of Alcoa under § 1983, one in Count

Five and one in Count Seven.

"A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting 42 U.S.C. § 1983). When an official municipal policy or custom causes a person to suffer a constitutional wrong, that policy or custom will create liability against the municipality under § 1983. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997). A plaintiff may contend that he suffered this type of constitutional deprivation in one of four ways, based on "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

### 1. Ms. Colson's Allegations

In Count Five, Ms. Colson alleges that Officer Cook and Officer Wilson's use of excessive force against her while she was suffering a panic attack "evidences a complete lack of training" from the City of Alcoa regarding the appropriate use of force against mentally ill inmates. [Compl. ¶ 125]. Similarly, she maintains that the City of Alcoa fails to supervise and train its officers in handling and protecting inmates who suffer from mental disorders. [*Id.* ¶ 127]. According to Ms. Colson, the City of Alcoa's failures in training its officers illustrate a policy of "deliberate indifference" to the constitutional rights of mentally ill inmates and indicate that the City of Alcoa "condoned" or "ratified"

this policy. [*Id.* ¶¶ 123–24]. Ms. Colson reiterates these same allegations in Count Seven, in which she asserts that the City of Alcoa's various "failures" and "complete lack of training" amount to ratification of "a de facto policy of . . . allowing the unnecessary and unreasonable use-of-force to go unchecked." [*Id.* ¶¶ 145, 148, 151]. In sum, Ms. Colson, in her municipal liability claims against the City of Alcoa, bases liability on "a policy of inadequate training or supervision" and "a custom of tolerance or acquiescence of federal rights violations." *Spears*, 589 F.3d at 256 (quoting *Thomas*, 398 F.3d at 429).[3] In arguing that Ms. Colson's municipal liability claims require dismissal, the City of Alcoa attacks the sufficiency of the allegations only as they pertain Ms. Colson's inadequate-training theory. [*See* Defs.' Br. at 8–9]. The Court will therefore limit its analysis to this theory of liability. Also, the City of Alcoa argues that if the Court declines to dismiss the municipal liability claims, it should as a matter of course dismiss the official-capacity claims against its officers—Chief Potter, Lieutenant Fletcher, Officer Cook, and Officer Wilson—because those claims are duplicative. [*Id.* at 4–5].

### 2. *Municipal Liability under an Inadequate-Training Theory*

To state a plausible claim for municipal liability based on a policy of inadequate training or supervision, a plaintiff has to allege sufficient facts showing that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the

---

[3] A "policy" includes "decisions of [the municipality's] duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bryan Cty.*, 520 U.S. at 403–04 (citation omitted). A "custom" includes a practice that has "not been formally approved by an appropriate decisionmaker" but "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404 (citation omitted).

result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citation omitted). Deliberate indifference, under the second element, "is a stringent standard of fault" and requires allegations from which the Court can infer that a municipality's policy-maker disregarded a known or an obvious risk of a constitutional violation. *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997) (quoting *Bryan Cty.*, 520 U.S. at 410); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986) ("[M]unicipal liability . . . attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." (citation omitted)).

### 3. The Factual Sufficiency of Ms. Colson's Allegations

In challenging the sufficiency of Ms. Colson's municipal liability claims, the City of Alcoa targets the element of deliberate indifference, arguing that these claims fail because Ms. Colson does not "identify prior constitutional violations." [Defs.' Br. at 9]. In response, Ms. Colson concedes that she does not allege prior constitutional violations by the City of Alcoa's officers. [Pl.'s Br. at 15–17]. But she contends that an inadequate-training theory does not always require assertions of prior violations to establish deliberate indifference. [*Id.* at 15–16]. According to Ms. Colson, allegations of prior constitutional misconduct are unnecessary when a plaintiff's allegations support an inference that a

municipality's failure to train is so egregious that future constitutional infringements are inevitable. [*Id.* at 15]. Ms. Colson is correct on this point.

A plaintiff can establish that inadequate-training is the product of deliberate indifference "in one of two ways." *Shadrick v. Hopkins County*, 805 F.3d 724, 738 (6th Cir. 2015). He can plead sufficient facts showing (1) the municipality's officers engaged in a pattern of comparable constitutional violations *or* (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential" for a violation. *Id.* at 738–39 (quoting *Bryan Cty.*, 520 U.S. at 409). An allegation of a pattern of similar misconduct—the first of the two approaches—is the "ordinar[y]" or traditional way for a plaintiff to establish an inadequate-training theory. *See Connick*, 563 U.S. at 62. This is so because repetitive wrongdoing by officers who exercise their discretion is a sure sign that those officers require additional training, and it should be "plainly obvious to the city policymakers." *Bryan Cty.*, 520 U.S. at 407 (quoting *Canton*, 489 U.S. at 390 n.10).

But the Supreme Court has acknowledged "the possibility," "in a narrow range of circumstances," *Connick*, 563 U.S. at 63 (quoting *id.* at 409), that a municipal policy-maker's deliberate indifference "could" arise without a pattern of prior constitutional misconduct, *Bryan Cty.*, 520 U.S. at 409. This is where the second of the two approaches has its application. The Supreme Court confined this second approach to cases in which there is (1) a "likelihood that [a] situation will recur" (2) with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." *Id.* at 409–10. To flesh out these elements, the Supreme Court provided

the hypothetical of a municipality that arms its officers and then mobilizes them into the public to capture absconding felons without training them to use proper force. *Canton*, 489 U.S. at 390 n.10; *Connick*, 563 U.S. at 63–64. "Given the *known frequency* with which police attempt to arrest fleeing felons and the '*predictability* that an officer lacking specific tools to handle that situation will violate citizens' rights," the consequences of the municipality's failure to train the officers "could be so patently obvious" that the municipality could be liable without a pattern of previous violations. *Connick*, 563 U.S. at 63–64 (emphasis added) (quotation omitted).

The City of Alcoa, however, attempts to procure dismissal of Ms. Colson's municipal liability claims by relying solely on the first approach; it makes no effort to perform any analysis as to whether Ms. Colson's municipal liability claims suffice under the equally viable, though narrow, second approach. Even if Ms. Colson's claims are insufficient under the first approach, as the City of Alcoa contends they are, they may still pass muster under the second approach, as Ms. Colson contends they do. The Court therefore deems the City of Alcoa's argument to be incomplete. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation omitted)). As a result, the Court will decline its invitation to dismiss Ms. Colon's municipal liability claims. In allowing the municipal liability claims against the City of Alcoa to remain intact, however, the Court will dismiss the official-capacity claims against Chief Potter, Lieutenant Fletcher, Officer Cook, and

Officer Wilson because they are duplicative. *See Thorpe ex rel. D.T. v. Breathitt Cty. Bd. of Educ.*, 932 F. Supp. 2d 799, 802 (E.D. Ky. 2013) ("[W]hen a § 1983 complaint asserts a claim against a municipal entity and a municipal official in his or her official capacity, federal courts will dismiss the official-capacity claim." (citing *Claiborne County*, 103 F.3d at 509)).[4]

## B. Chief Potter and Lieutenant Fletcher: Supervisory Liability (Count Four and Count Six)

Next, Chief Potter and Lieutenant Fletcher, in their individual capacities, contend that the Court should dismiss Ms. Colson's supervisory liability claims against them in both Count Four and Count Six. [Defs.' Br. at 5–6, 10–11].[5] As to Count Four, a claim for use of excessive force, Chief Potter and Lieutenant Fletcher argue that dismissal is proper because they were not aware of the alleged use of excessive force, were not present during the alleged use of excessive force, and altogether had "[no] involvement in the events of that day." [*Id.* at 10–11]. As to Count Six, a claim for failure to train and supervise, they merely contend that "those claims are cumulative and appropriately made out only against the City of Alcoa." [*Id.* at 11]. In response, Ms. Colson argues that her allegations show

---

[4] An individual-capacity claim differs from an official-capacity claim under § 1983. An individual-capacity claim attaches personal liability to a state official for an alleged wrongdoing under color of state law, whereas an official-capacity claim attaches liability only to the municipality or government entity. *Essex v. County of Livingston*, 518 F. App'x 351, 354–55 (6th Cir. 2013); *see Cady v. Arenac County*, 574 F.3d 334, 342 (6th Cir. 2009) ("In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." (quotation omitted)).

[5] Although Chief Potter and Lieutenant Fletcher request dismissal of the supervisory liability claims in Count Four and Count Six, they do not request dismissal of the supervisory liability claims in Count Nine or Count Ten.

that Chief Potter and Lieutenant Fletcher "implicitly condoned" their officers' conduct toward Ms. Colson and that this showing is adequate to sustain a claim of supervisory liability. [Pl.'s Resp. at 19].

### 1. The Contours of Supervisory Liability under § 1983

In *Ashcroft v. Iqbal*, the Supreme Court stated that in suits under § 1983, "the term 'supervisory liability' is a misnomer" because "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." 556 U.S. at 677. In other words, a supervisory official cannot be liable under a theory of vicarious liability, *id.* at 676, or in other words, "simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another," *Peatross*, 818 F.3d at 241 (citation omitted). A supervisor's mere failure to act is therefore not enough to establish supervisory liability; instead "supervisory liability requires some 'active constitutional behavior' on the part of the supervisor." *Id.* (quotation omitted); *see Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998) ("[S]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. Instead the liability must be based upon active unconstitutional behavior." (citation omitted)).

The term "active," however, "does not mean 'active in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Peatross*, 818 F.3d at 242 (citation omitted). Rather, an individual-capacity claim against a supervisor for failure to train or supervise an offending subordinate is actionable if that supervisor (1) "encouraged the specific

incident of misconduct or in some other way directly participated in it" or (2) "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982); *see Peatross*, 818 F.3d at 242 (reiterating these two elements). By satisfying either of these two elements, a plaintiff establishes what courts have described as a necessary causal connection between the execution of a supervisor's job function and the constitutional deprivation at issue. *See Claiborne County*, 103 F.3d at 511 ("[A] show[ing] that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct . . . . follow[s] section 1983's requirement that the person sought to be held accountable actually have 'caused' the deprivation[.]" (quotation omitted)); *see also* § 1983 (stating that liability attaches to a person who, under color of state law, "subjects, or *causes* to be subjected, any citizen" to a constitutional deprivation (emphasis added)).

A supervisor implicitly authorizes, approves, or knowingly acquiesces to a subordinate's unconstitutional conduct "when a history of widespread abuse puts th[at] responsible supervisor on notice of the need to correct the alleged deprivation, and he . . . fails to do so." *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (quotation omitted)). To suffice to put a supervisor on notice, however, the widespread abuse must be "obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences," *id.* at 440–41 (internal quotation omitted)—strong adjectives that demand allegations not merely on par with negligence, *see id.* at 439 ("[I]t is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties."); *see also Claiborne County*, 103 F.3d at 513

(affirming dismissal of supervisory liability claims against school officials because even though they knew of previous incidents and investigations involving a teacher's molestation of students, their failure to take action to prevent the teacher from molesting another student was more akin to negligence, rather than awareness of the need to correct widespread unconstitutional conduct).

To this Court's knowledge, the Sixth Circuit has never issued an opinion in which it found a pattern of abuse to be so "obvious, flagrant, rampant, and of continued duration" that a supervisor's mere awareness of it was, by itself, sufficient to create supervisory liability. Rather, the Sixth Circuit has traditionally found supervisory liability claims to be plausible only when a supervisor is on notice of misconduct *and* in some way acts in relation to the misconduct. *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988) ("[S]he has merely claimed that the appellants were aware of the alleged harassment, but did not take appropriate action. This is insufficient to impose liability on supervisory personnel under § 1983." (citation omitted)); *Hays*, 668 F.2d at 873–74 ("The mere 'failure to act (even) in the fact of a statistical pattern' of incidents of misconduct . . . [is] insufficient to base [supervisory] liability on." (quoting *Rizzo v. Goode*, 423 U.S. 362, 376 (1976))); *see also Essex v. County of Livingston*, 518 F. App'x 351, 357 (6th Cir. 2013) (determining that a deputy's sexual assault could not impose supervisory liability on the sheriff simply based on an allegation that the sheriff had read newspaper articles about deputies who had perpetrated sexual assaults in "other jurisdictions"); *cf. Iqbal*, 556 U.S. at 677 ("[R]espondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject

this argument. Respondent's conception of 'supervisory liability' is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents."). The Sixth Circuit has reiterated this stance in its most recent case law.

In *Peatross*, a decedent's estate sued the Memphis Police Department's director under a theory of supervisory liability after officers had shot the decedent to death. 818 F.3d at 237–39. To support its claim, the estate pleaded that the director failed to train and supervise his officers to avoid the use of excessive force, inadequately investigated their use of excessive force, attempted to hide their use of excessive force by making false statements to federal officials, and knew of fifty-four shootings by the Memphis Police Department's officers in a four-year span—a pattern that had once led him to express his intention to improve departmental discipline. *Id.* at 243. The Sixth Circuit held that these allegations raised a plausible claim for supervisory liability against the director. *Id.* at 243–44. While it reasoned that the director's alleged knowledge of the pattern of shootings helped to solidify the claim, this allegation was not the bedrock of the claim's sufficiency; rather, it brought the claim "a step further" toward sufficiency. *Id.* at 243. Indeed, in the same opinion, the Sixth Circuit recognized that a "failure to act (even) in the face of a statistical pattern of incidents of misconduct' is not sufficient to confer [supervisory] liability." *Id.* at 241–42 (quotation omitted). The Sixth Circuit's strongest reaction came in response to the allegation that the director made false statements and performed bogus internal investigations—affirmative *actions* in relation to the misconduct that equated to ratification and rubber-stamping:

> [The] Estate alleges that [the Director] . . . attempted to cover-up the unconstitutional conduct of his subordinates by exonerating the officers in an effort to escape liability. . . . Here, we have allegations that a government official with supervisory responsibility ratified the conduct of officers who shoot first and make judgments later, evincing a brazen disregard for human life. Ratification of such conduct is abhorrent.

*Id.* at 243, 246.[6] In reaching this decision, the Sixth Circuit relied on its opinion in *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015), another instructive case in which it also held that a supervisory liability claim was factually sufficient.

In *Coley*, an officer put a pretrial detainee in a chokehold, causing him to die and prompting his family to sue the officer's supervisor, a sheriff, in his individual capacity under § 1983. *Id.* at 534–35, 541–42. The family's claim consisted of allegations that the sheriff failed to train and supervise his staff on the use of proper force and inadequately investigated the use of excessive force. *Id.* at 542. Although the family did not allege a pattern of widespread abuse, they did allege that, like in *Peatross*, the sheriff tried to cover up the officer's conduct. *Id.* Specifically, the family alleged that the sheriff had "full knowledge of the assault" but "made false statements to federal officials about [his] knowledge." *Id.* Based on these allegations, the Sixth Circuit concluded that the family pleaded a sufficient claim for supervisory liability but only "*insofar* as they have shown that [the sheriff] 'at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate,' when he helped [the officers] cover

---

[6] The Sixth Circuit also held that the factual allegations as to the director's ratification of the wrongful conduct were specific enough even to overcome the director's defense of qualified immunity: "The sufficiency of the Complaint requires rejection of [the director's] claim of qualified immunity at the dismissal stage." *Peatross*, 818 F.3d at 246.

up their unconstitutional actions." *Id.* (emphasis added) (quotation omitted). The Sixth Circuit's decision in this case, as well as in *Peatross*, show that, again, supervisory liability not only requires a supervisor to be aware of the misconduct but also to act affirmatively in relation it.

## 2. The Factual Sufficiency of the Supervisory Liability Claims

Before appraising Ms. Colson's claims for factual sufficiency, the Court reiterates that a § 1983 action requires two inquiries: (1) whether a plaintiff has asserted an injury under the Constitution at all and, if so, (2) whether the injury resulted from state action, or under color of state law. *Claiborne County*, 103 F.3d at 505–06, 511. The threshold inquiry is therefore whether the alleged conduct amounts to a deprivation under the Constitution. *Id.*; *see Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 841 (E.D. Tenn. 2011) (recognizing that "[o]bviously Sheriff Bivens can only be liable if the underlying conduct was unconstitutional"). As to this threshold inquiry, Chief Potter and Lieutenant Fletcher do not challenge whether their officers' alleged conduct deprived Ms. Colson of a right under the Fourth, Eighth, and Fourteenth Amendments. And of course, under the second half of the inquiry, they do not contend that this case is without alleged state action. Instead, they pursue dismissal of the supervisory claims based on a lack of causation between their responsibilities as chief and lieutenant, respectively, and the alleged unconstitutional acts by their officers. To survive, these claims must therefore support at least a reasonable inference that Chief Potter and Lieutenant Fletcher implicitly authorized, approved, or knowingly acquiesced in the alleged wrongful conduct. [*See* Pl.'s Resp. at 22 (contending

that "[t]aken as true, the facts alleged by Plaintiff . . . support the plausible inference that in the execution of their job functions, Chief Potter and Lt. Fletcher at least knowingly acquiesced in and condoned Cook and Wilson's actions")].

### i. Count Four: Excessive Force

In Count Four, Ms. Colson makes only one substantive allegation against Chief Potter, and it is bereft of factual enhancement and insufficient to link him to his officers' alleged use of excessive force. In paragraph ninety-seven, which Ms. Colson incorporates into Count Four by reference, she pleads that "[n]either Alcoa nor the Alcoa PD, headed by Chief Potter, took any disciplinary action against Wilson (or any other Defendant, for that matter), despite evidence demanding suspension, termination, or other reprimand." But the "simple failure to discipline an officer for using excessive force," by itself, "does not make [an] officer's supervisors liable under § 1983." *Galvan v. Monroe*, No. 1:15-cv-00049, 2015 WL 4419611, at *3 (M.D. Tenn. July 17, 2015) (citing *Frodge v. City of Newport*, 501 F. App'x 519, 532 (6th Cir. 2012)). Without additional grist, this allegation is—at best—consistent with simple negligence, which cannot sustain a supervisory liability claim. *Roseville*, 296 F.3d at 439; *see Deom v. Walgreen Co.*, 591 F. App'x 313, 320 (6th Cir. 2014) ("[When] . . . allegations [are] at most consistent with both conduct that is actionable and conduct that is not, more is required to 'nudge[] [the] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).

Similarly, Ms. Colson compiles only one substantive allegation against Lieutenant Fletcher in Count Four, and it is much too flimsy to implicate him in his officers' alleged

use of excessive force. In paragraphs nine and sixty-four, which Ms. Colson incorporates into Count Four by reference, she alleges that Lieutenant Fletcher directed the officers to bring her to Blount County Jail, where Nurse Russell was available and waiting to examine her injured knee. This allegation—a supervisor's mere instruction to transport an arrestee to a jail for medical treatment—is hardly the sort of allegation that can breed supervisory liability under the Sixth Circuit's jurisprudence. *See Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) ("[T]he § 1983 liability of supervisory personnel must be based on more than the right to control employees."). The Court will therefore dismiss Count Four as it pertains to Chief Potter and Lieutenant Fletcher in their individual capacities.

### ii. Count Six: Failure to Train and Supervise

As to Count Six, Chief Potter and Lieutenant Fletcher contend that Ms. Colson's individual-capacity claims—in which she raises supervisory liability based on a failure to train and supervise—warrant dismissal because they are "cumulative and appropriately made out only against the City of Alcoa." [Defs.' Br. at 11]. But Ms. Colson's claims are not cumulative, or duplicative, because they apply to Chief Potter and Lieutenant Fletcher in their *individual* capacities. An individual-capacity claim is never at risk of being or becoming duplicative of another claim; that risk applies only to official-capacity claims because they are the functional equivalent of claims against a government entity. *See Johnson v. Metro. Gov't of Nashville & Davidson Cty.*, Nos. 3:07-0979, 3:08-0031, 2008 WL 2066475, at *5 (M.D. Tenn. May 13, 2008) ("The issue is not whether official capacity claims are duplicative of individual capacity claims, but whether they are duplicative of

claims against the public entity. It is the very fact that official capacity claims are treated as claims against the public entity that they *are not* duplicative of individual capacity claims." (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985))). The Court already recognized that the official-capacity claims against Chief Potter and Lieutenant Fletcher require dismissal because they model the claims against the City of Alcoa. Ms. Colson's individual-capacity claims against them, however, do not and cannot fail on that same basis. The Court will therefore decline to dismiss the individual-capacity claims against them in Count Six.

### C. Officer Cook and Officer Wilson: Assault and Battery (Count Eleven)

Under Tenn. Code Ann. sections 8-8-301–303, Ms. Colson alleges assault and battery against Officer Cook and Officer Wilson in Count Eleven. [Compl. at 53]. In pursuing dismissal of Count Eleven's allegations, Officer Cook and Officer Wilson argue that Tenn. Code Ann. sections 8-8-301–303 apply only to sheriffs and their deputies, not to non-deputies like themselves. [Defs.' Br. at 11]. Ms. Colson now appears to admit that the statute cannot create liability against Officer Cook and Officer Wilson for assault and battery. [*See* Pl.'s Resp. at 22]. In full, the statute reads:

> (a) No sheriff, whether elected or appointed, nor any surety on the sheriff's bonds, shall be liable for any wrongs, injuries, losses, damages or expenses incurred as a result of any act or failure to act on the part of any deputy appointed by the sheriff, whether the deputy is acting by virtue of office, under color of office or otherwise.
>
> (b) As used in this section and § 8-8-302, "deputy" includes a jailer appointed by a sheriff pursuant to § 41-4-101.

Tenn. Code. Ann. § 8-8-301.

Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

Tenn. Code. Ann. § 8-8-302.

(a) The governmental immunity of the county in which the sheriff serves is waived for purposes of § 8-8-302, but to an extent not in excess of the amount of the surety bond executed for that county's sheriff pursuant to § 8-8-103.

(b) Anyone incurring any wrong, injury, loss, damage, or expense resulting from any act or failure to act on the part of any special deputy appointed by the sheriff, but not employed by the sheriff or the county, shall not bring suit therefor against the sheriff or the county, and the sheriff and county shall be immune from such suits, and the plaintiff shall be required to pursue the remedy therefor against such special deputy and/or the employer or employers of such special deputy, whether the special deputy is acting within the scope of employment or not. Such immunity from suit shall not apply in the case of special volunteer or reserve sheriff's deputies while performing official law enforcement duties under supervision or direction of the sheriff.

(c) No person may serve as a special deputy unless such person proves to the appointing sheriff financial responsibility, as evidenced by a corporate surety bond in no less amount than fifty thousand dollars ($50,000) or by a liability insurance policy of the employer in no less amount than fifty thousand dollars ($50,000).

Tenn. Code. Ann. § 8-8-303.

Under the first section of the statute, Tenn. Code Ann. section 8-8-301, "the sheriff is given an absolute immunity for the acts of his deputies." *Erwin v. Rose*, 980 S.W.2d 203, 209 (Tenn. Ct. App. 1998). The second section, section 8-8-302, "authorizes suit against

the County based on the acts of a deputy sheriff," in certain instances. *Grundy County v. Dyer*, 546 S.W.2d 577, 580 (Tenn. 1977); *see Currie v. Haywood County*, No. W2010-00453-COA-R3CV, 2011 WL 826805, at *3 n.1 (Tenn. Ct. App. Mar. 10, 2011) (stating that sections 8-8-301–303 "controls as to suits for intentional acts of official misconduct by *sheriff's deputies*" (emphasis added)). The final section, section 8-8-303, "waives the immunity of the county," to a certain extent. *Dyer*, 546 S.W.2d at 580.

Clearly, then, Tenn. Code Ann. sections 8-8-301–303 create a cause of action for individuals who suffer harm from the wrongful conduct of a sheriff's deputy, and those individuals must direct their cause of action against the county in which the sheriff serves in Tennessee. *See O'Neal v. DeKalb County*, 531 S.W.2d 296, 298 (Tenn. 1975) ("Section 8–833 sanctions suits against counties for the misconduct of deputies[.]"). But Ms. Colson neither implicates a sheriff's deputy nor sues a county in Count Eleven. She does not plead that Officer Cook and Officer Wilson are sheriff's deputies.[7] Rather, she only pleads that they were "employed by the Alcoa PD." [Compl. ¶¶ 29–30]. And in suing the officers themselves rather than a county, she ventures beyond the recourse available to a plaintiff under the statute. *Cf. Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute[.]"). The Court will therefore dismiss Count Eleven as it pertains to Officer Cook and Officer Wilson.

---

[7] Incidentally, she also does not allege that either Officer Cook or Officer Wilson is a "jailer" under Tenn. Code Ann. section 8-8-301(b).

### D.  The City of Alcoa, Chief Potter, and Lieutenant Fletcher: Intentional Infliction of Emotional Distress (Count Twelve)

In Count Twelve, Ms. Colson claims that the City of Alcoa is liable for intentional infliction of emotional distress under this same statute, maintaining that "Alcoa . . . [is] liable . . . under Tenn. Code Ann. § 8-8-301." [Compl. ¶ 189]. But again, this statute provides a cause of action only against a county, not a municipality, and the Court will therefore dismiss Count Twelve as it pertains to the City of Alcoa. Throughout the remainder of Count Twelve, Ms. Colson appears to erect a common-law claim for intentional infliction of emotional distress against Chief Potter, Lieutenant Fletcher, and the other individual defendants in the case. Chief Potter and Lieutenant Fletcher contend that the allegations in Count Twelve warrant dismissal because they lack a "factual basis or allegation[s] sufficient to support such a claim against them." [Defs.' Br. at 12]. In response, Ms. Colson appears to concede that her allegations cannot support a claim for intentional infliction of emotional distress against Chief Potter; she offers no defense of her claim against him. [*See* Pl.'s Resp. at 23–24]. As to Lieutenant Fletcher, however, she proposes that her allegations support this type of claim because Lieutenant Fletcher told his officers to transport her to Blount County Jail instead of a hospital. [*Id.* at 24].

To state a plausible claim for intentional infliction of emotional distress—also known in Tennessee as a claim for outrageous conduct, *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012)—a plaintiff must allege facts showing that the conduct at issue is (1) intentional or reckless, (2) outrageous, and (3) resulted in a serious mental injury, *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 31

(Tenn. 2005). The first element's state-of-mind requirement is "significantly higher" than that for negligence, and it means that—at a minimum—a defendant has to "be aware of, but consciously . . . disregard, a substantial and unjustifiable risk," grossly deviating from the standard of care. *Id.* at 39 (citations omitted). When a plaintiff bases a claim for intentional infliction of emotional distress on reckless conduct, like Ms. Colson does here in this case,[8] that conduct "need not be directed at a specific person or occur in the plaintiff's presence." *Rogers*, 367 S.W.3d at 205 (footnote omitted) (citing *id.* at 41).

Next, under the second element, the term "outrageous conduct" is exacting, requiring conduct "so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly [i]ntolerable in a civilized community." *Doe 1*, 154 S.W.3d at 39 (internal quotation marks and quotation omitted). Lastly, the third element requires a plaintiff to suffer a mental injury that is "particularly serious," *id.*, which demands a showing of "significant impairment in [a plaintiff's] daily life," *Rogers*, 367 S.W.3d at 210. The Tennessee Supreme Court has composed a non-exhaustive list of the types of harm that qualify as a serious mental injury. *Id.* at 209–10. In addition, inclusive in the third element is an implicit causal connection between the tortious conduct and the mental injury. *Doe 1*, 154 S.W.3d at 31; *see Rogers*, 367 S.W.3d at 206 (acknowledging that a claim for intentional infliction of emotion distress is untenable without a "serious mental injury *resulting from* the defendant's conduct" (emphasis added)).

---

[8] Ms. Colson alleges that Lieutenant Fletcher's "conduct was perpetrated . . . with reckless disregard of the probability of inflicting[] mental anguish." [Compl. ¶ 185].

The allegations comprising Ms. Colson's claim for intentional infliction of emotional distress are conclusory—no more than a regurgitation of key words and phrases under Tennessee's common law—and Ms. Colson does not mount a plausible claim. She merely pleads that "[t]he conduct . . . was outrageous," "perpetrated with the intent to inflict, or with reckless disregard," and "result[ed] [in] . . . personal injuries." [Compl. ¶¶ 185, 187]. This Court's sister courts have refused to accept similar allegations when reviewing claims for intentional infliction of emotional distress under Tennessee law. *See, e.g.*, *Mhoon v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:16-cv-01751, 2016 WL 6250379, at *3–4 (M.D. Tenn. Oct. 26, 2016). Even when the Court vets the Complaint in its entirety, *see Hishon*, 467 U.S. at 73, it still can find no allegations that equate to a plausible claim. The mere assertion that Lieutenant Fletcher instructed his officers to transport Ms. Colson to Blount County Jail for treatment by its medical staff, rather than to a hospital, is hardly the sort of conduct that "go[es] beyond all bounds of decency" and is "utterly [i]ntolerable." *Doe 1*, 154 S.W.3d at 39.

The causal connection between Lieutenant Fletcher's alleged tortious act and any resulting "serious mental injury" to Ms. Colson is therefore too tenuous to establish a plausible claim. *Id.* at 31. In fact, Ms. Colson pleads no serious mental injury at all, only broad assertions of "mental anguish" and "personal injuries." [Compl. ¶¶ 185, 187]. The lone factually based mental injury that she claims to have endured was the aggravation of her *preexisting* anxiety disorder, which, as alleged, does not constitute the sort of injury that Tennessee's courts envision as serious enough to support a claim for intentional infliction of emotional distress. *See Rogers*, 367 S.W.3d at 209–10 (describing specific

types of mental injuries that "are pertinent to support a plaintiff's claim" for intentional infliction of emotional distress). The Court will therefore dismiss Count Twelve as it pertains to the City of Alcoa, Chief Potter, and Lieutenant Fletcher.

### E. Negligence: Chief Potter, Lieutenant Fletcher, Officer Cook, and Officer Wilson (Count Thirteen)

To state a plausible claim for negligence, a plaintiff must allege facts establishing that (1) the defendant owed a legal duty of care to the plaintiff, (2) the defendant engaged in conduct that was below the applicable standard of care, amounting to a breach of the legal duty, (3) an injury or loss, (4) cause in fact, and (5) proximate cause. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009). As an initial matter, the Court notes that Ms. Colson brings her negligence claims under the TGTLA,[9] which governs liability in tort for Tennessee's governmental entities and employees and which contains the codification of Tennessee's sovereign immunity law. As the fountainhead of sovereign immunity for Tennessee's governmental entities,[10] the TGTLA insulates them, generally but not exclusively, from lawsuits for tortious acts. *See* Tenn. Code Ann. § 29-20-201(a) ("Except as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result from . . . the exercise and discharge of

---

[9] She titles her claim in Count Thirteen as "Tennessee Governmental Tort Liability Act/Negligence," [Compl. at 55], and pleads that "[p]ursuant to the Tennessee Governmental Tort Liability Act, the Defendants owed Plaintiff a duty of care to be free from excessive force and cruel and unusual punishment and to provide [her] with a safe environment and adequate medical care while [she] was detained in their custody," [*id.* ¶ 192].

[10] The definition of a "governmental entity" under the TGTLA is longwinded but includes "any municipality, metropolitan government, [and] county" in Tennessee. Tenn. Code. Ann. § 29-20-102(3)(A).

any of their functions, governmental or proprietary."). In addition to furnishing immunity to governmental entities, the TGTLA extends immunity to their employees,[11] but only when immunity is unavailable to governmental entities under the statute—or, that is, when immunity for governmental entities is "removed" by the TGTLA: "No claim may be brought against an employee . . . [when] the immunity of the governmental entity is removed by this chapter[.]" *Id.* § 29-20-310(b).[12] In other words, the TGTLA does not provide governmental entities and employees with simultaneous immunity.

In one provision in particular, subsection 29-20-205(2), the TGTLA removes immunity for governmental entities, and by extension provides it to employees, for an injury "proximately caused by" an employee's negligent conduct—*except* when that conduct causes an injury that "arises out of" a violation of an individual's civil rights:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of: False imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right to privacy, *or civil rights*[.]

Tenn. Code Ann. § 29-20-205(2) (emphasis added).[13] When this provision does not result in the removal of immunity for governmental entities—that is, when the exception applies

---

[11] The TGTLA defines an "employee" as "any official (whether elected or appointed), officer, employee or servant, or any member of any board, agency, or commission (whether compensated or not), or any officer, employee or servant thereof, of a governmental entity . . . including the . . . police[.]" *Id.* § 29-20-102(2) (emphasis added).

[12] This provision contains an exception for claims "for health care liability brought against a health care practitioner." *Id.* § 29-20-310(b).

[13] This Court, in prior case law, construed the term "civil rights" that appears in this provision to "mean[] and includ[e] claims arising under the federal civils rights laws, *e.g.*, 42 U.S.C. § 1983." *Campbell v. Anderson County*, 695 F. Supp. 2d 764, 778 (E.D. Tenn. 2010).

because a negligent act "arises out of" a civil rights claim—employees are subject to liability in their individual capacities for negligence. *See Baker v. Snyder*, No. 1:05-CV-152, 2006 WL 2645163, at *10 (E.D. Tenn. Sept. 14, 2006) ("If the TGTLA does not remove sovereign immunity from a governmental entity, that entity's employees can be liable in their individual capacities." (citing *Baines v. Wilson County*, 86 S.W.3d 575, 583 n.5 (Tenn. Ct. App. 2002), *abrogated on other grounds by Young v. City of LaFollette*, 479 S.W.3d 785 (Tenn. 2015))).

So under subsection 29-20-205(2), if Ms. Colson's negligence claims arise out of her civil rights claims, the City of Alcoa has immunity, and Chief Potter, Lieutenant Fletcher, Officer Cook, and Officer Wilson would then be subject to liability for negligence in their individual capacities, *see* Tenn. Code Ann. § 29-20-310(b); *Baker*, 2006 WL 2645163 at *10—but only if Ms. Colson has pleaded plausible negligence claims, *see Baines*, 86 S.W.3d at 583 n.5 (stating that although the TGTLA creates individual-capacity liability for employees if a governmental entity is immune, "[i]t is still necessary that all the elements of the tort are alleged by the plaintiff"). If Ms. Colson's negligence claims do not arise out of her civil rights claims, the inverse occurs: the City of Alcoa's immunity is removed and Chief Potter, Lieutenant Fletcher, Officer Cook, and Officer Wilson, as a result, would retain immunity as employees. *See* Tenn. Code Ann. § 29-20-310(b); *Baker*, 2006 WL 2645163 at *10.

But in relying on the TGTLA to procure dismissal of Ms. Colson's negligence claims, Chief Potter, Lieutenant Fletcher, Officer Cook, and Officer Wilson contend that they "have absolute immunity for all general negligence claims" because "[n]o claim can

be raised against them as immunity is not removed from the City." [Defs.' Br. at 13]. They have it backwards; if the TGTLA does not remove immunity from the City of Alcoa, as they say, then they *are* subject to individual liability. *See Baker*, 2006 WL 2645163 at *10 ("If the TGTLA does not remove sovereign immunity from a governmental entity, that entity's employees can be liable in their individual capacities." (citing *Baines*, 86 S.W.3d at 583 n.5)). In addition to their confusion as to the TGTLA's proper application, they do little to show that the underlying negligence claims are factually inadequate. They rely on ipse dixits to undercut the claims, asserting that they "def[y] reason" and "the Complaint is devoid of any reference to a specific act of negligence." [Defs.' Reply Br. at 9]. They identify no portion of Count Thirteen—paragraphs, phrases, or wording—that is wanting in facts as to any of the negligence claims' four elements. Their argument for dismissal therefore falls well short of its goal, *see McPherson*, 125 F.3d at 995–96, and the Court must decline to dismiss the negligence claims against them in Count Thirteen.

## IV. CONCLUSION

The City of Alcoa fails to show that Ms. Colson's municipal liability claims against it warrant dismissal, but it does show that Ms. Colson's claim against it for intentional infliction of emotional distress requires dismissal. Similarly, Chief Potter, Lieutenant Fletcher, Officer Cook, and Officer Wilson succeed in showing that some, but not all, of the claims against them require dismissal. Defendants' Motion to Dismiss [doc. 31] is therefore **GRANTED in part and DENIED in part**. The Court orders as follows:

1. The Court **GRANTS** dismissal of all official-capacity claims against Chief Potter, Lieutenant Fletcher, Officer Cook, and Officer Wilson.

2. The Court **DENIES** dismissal of Count Five and Count Seven.

3. The Court **GRANTS** dismissal of Count Four only to the extent that it applies to Chief Potter and Lieutenant Fletcher in their individual capacities. This count remains pending in all other respects.

4. The Court **DENIES** dismissal of Count Six.

5. The Court **GRANTS** dismissal of Count Eleven only to the extent that it applies to Officer Cook and Officer Wilson. This count remains pending in all other respects.

6. The Court **GRANTS** dismissal of Count Twelve only to the extent that it applies to the City of Alcoa, Officer Cook, and Officer Wilson. This count remains pending in all other respects.

7. The Court **DENIES** dismissal of Count Thirteen.

The Court will enter an order consistent with this opinion.

**IT IS SO ORDERED.**

ENTER:


s/ Leon Jordan
United States District Judge