UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

ANNISSA COLSON,                          )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )          No. 3:16-CV-377
                                         )
CITY OF ALCOA, TENNESSEE, *et al.*,      )
                                         )
                    Defendants.          )

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on Defendant Officer Mandy England's Motion for Summary Judgment [doc. 66], Officer England's Brief Supporting the Motion [doc. 67], Plaintiff Annissa Colson's Response [doc. 101], and Officer England's Reply [doc. 102]. For the reasons herein, the Court will grant Officer England's motion in part and deny it in part.

## I. BACKGROUND

On June 23, 2015, Officer Dustin Cook of the Alcoa Police Department parks his patrol vehicle alongside Springbrook Road—a two-lane road with fields on either side of it—in Blount County, Tennessee. [Video: Officer Cook VieVu, 19:25:56–60 (June 23, 2015) (on file with the Court); Officer Cook Aff., doc. 66-9, at 9]. Ahead, just off the road, a vehicle rests fender-first in a ditch. [Officer Cook VieVu at 19:26:09]. Behind the vehicle, a woman sits in the grass. [*Id.* at 19:26:07]. A man wearing a police officer's badge around his neck, but not wearing a uniform, stands in the grass not far away from

her. [*Id.* at 19:26:10]. Officer Cook acknowledges him. "What's up?" Office Cook says to him. [*Id.* at 19:26:24]. "She's drunk," the off-duty officer says, pointing to the woman in the grass. [*Id.* at 19:26:27].

The off-duty officer tells Officer Cook that he was driving on Springbrook Road earlier in the afternoon, saw the woman driving her vehicle—the same vehicle now lying in the ditch—and witnessed a boy jump from the vehicle and run into the grass adjacent to the road. [*Id.* at 19:26:30–49]. According to the off-duty officer, the woman "gunned it" after the boy fled the vehicle, traversing off road, nearly hitting the boy, and crashing into the ditch. [*Id.*]. He describes the boy as the woman's son and informs Officer Cook that he is sitting safely in his sport utility vehicle by the road. [*Id.* at 19:26:32, 50]. He hands the woman's driver's license to Officer Cook. [*Id.* at 19:27:05]. Officer Cook radios for backup and approaches the woman sitting in the grass. [*Id.* at 19:27:07–12; 19:27:28–42].

"Ms. Colson," he says. [*Id.* at 19:27:42]. "Yes," she says. [*Id.* at 19:27:43]. He asks her how many drinks she consumed during the day. [*Id.* at 19:29:05]. Her answer is two shots of vodka. [*Id.* at 19:29:07–10]. After gathering some information about her prescribed medications, Officer Cook ends their conversation and walks to the sport utility vehicle by the road. [*Id.* at 19:29:10–40]. He finds Ms. Colson's son, Mason, inside and introduces himself. [*Id.* at 19:29:42–48]. He asks Mason to describe what happened. [*Id.*]. Mason says that he and his mom spent the day at a public pool and she brought "something that makes her drunk, alcohol," but he did not actually see her drink it. [*Id.* at 19:30:49–56, 19:30:36–40]. He adds that, after they left the pool and got to this

point in the road, he pulled the emergency break in his mom's vehicle and ran away because she was driving "very fast" and he was afraid they were going to crash.[1]

After Officer Cook finishes speaking with Mason, Officer Arik Wilson arrives at the scene. [*Id.* at 19:33:48]. Officer Cook approaches Ms. Colson again and tells her that he would like her to submit to a field-sobriety test. [*Id.* at 19:36:21]. She declines to participate in the test. [*Id.* at 19:36:32]. He asks her to stand up. [*Id.* at 19:36:38]. She refuses. [*Id.* at 19:36:39]. He then places her under arrest, charging her with driving under the influence. [*Id.* at 19:36:39–59].[2] He and Officer Wilson instruct her to stand up and place her hands behind her back, at least half a dozen times before she complies with their orders. [*Id.* at 19:36:36–19:37:35]. As Officer Cook escorts her to his patrol vehicle, he asks her if she will consent to a blood alcohol test. [*Id.* at 19:38:16–19]. Her answer is no. [*Id.*]. Officer Cook advises her that he will attempt to obtain a search warrant for her blood and will bring another charge against her if she does not consent to a blood alcohol test. [*Id.* at 19:49:02–06]. After he offers to drive her to a local hospital for the test, she relents and assents to the test. [*Id.* at 19:49:34–49]. Officer Wilson agrees to follow them to the hospital after Officer Cook tells him that Ms. Colson is "screaming and cussing a little." [*Id.* at 19:50:32–35].[3]

---

[1] At the time, Mason was ten-years old. [Officer Cook VieVu at 19:31:10]. Ms. Colson, in an affidavit that she filed with the Court, maintains that Mason ran from her vehicle because he was "mad that [she] would not take him to McDonald's." [Colson Aff., doc. 101-3, ¶ 10].

[2] Officer Cook, in an affidavit that he later filed in state court, declared that Ms. Colson had a "strong odor of an intoxicant" and "her speech was slurred." [Officer Cook Aff. at 10].

[3] Ms. Colson calls Officer Cook a "motherfucker" during their conversation about the blood alcohol test. [*Id.* at 19:74:39–42].

Once they reach the hospital, Ms. Colson exits Officer Cook's patrol vehicle and informs the officers that she will not consent to a blood alcohol test after all. [*Id.* at 19:59:06–11]. "Okay," Officer Cook says. [*Id.*]. He tells Ms. Colson that he will attempt to acquire a search warrant for her blood, and he instructs her to retake her seat in the patrol vehicle in the meantime. [*Id.* at 19:59:53–20:00:04]. Ms. Colson refuses to get back into the patrol vehicle. "I'm standing here," she says. [*Id.*]. After Ms. Colson does not heed his command for the fifth time, he uses force against her. [*Id.*]. "I'm standing here, fucker," she says in response. [*Id.*]. A struggle then ensues between Ms. Colson and the officers, with Officer Wilson trying to push her into the backseat from one side of the patrol vehicle and Officer Cook trying to pull her in from the other side. [*Id.* at 20:00:04–50]. To the sound of a thud, Ms. Colson—who is now outside the lens of Officer Cook's body camera—screams: "Ow, my fucking knee, motherfucker!" [*Id.*]. Officer Wilson tells Officer Cook that "her knee just popped." [*Id.* at 20:00:58].

At that point, they release Ms. Colson, [*id.* at 20:00:55], but continue to order her to get inside the patrol vehicle, [*id.* at 20:00:56–20:01:55]. And she continues to defy their orders, shouting about her knee, swearing at the officers, and pleading for time to breathe. [*Id.*].[4] The officers give her some time, but she only continues to ask for more, prompting them to reapply force to her. [*Id.* at 20:01:56—20:02:09]. She resists them, but they eventually manage to strong-arm her into the patrol vehicle. [*Id.*]. Officer Cook then radios his supervisor, describing the struggle that had ensued at the hospital and

---

[4] Ms. Colson suffers from "a severe panic disorder," an anxiety disorder for which she takes medication. [Colson Aff. ¶ 7]. She maintains that she "experienced such an attack on June 23, 2015, when [she] was arrested by Officers Cook and Wilson." [*Id.* ¶ 9].

noting that Ms. Colson just "ripped the rubber off the side of [the patrol] car, on the inside of the door." [*Id.* at 20:03:36–20:04:32]. He also informs his supervisor of a possible injury to Ms. Colson's knee. [*Id.*]. His supervisor instructs him to bring her to the local jail. [*Id.*]. As Officer Cook transports her to the jail, she repeatedly swears at him, cries out for her mother, and wails about her knee. [*Id.* at 20:04:43–20:06:32].

They soon arrive at the jail's sally port, and Officer England is there waiting for them. [*Id.* at 20:06:20–20:07:10]. "Bringing you a combative one," Officer Cook says to her. [*Id.*]. He explains that he had to use force against Ms. Colson at the hospital, though he does not mention her possible injury. [*Id.*]. Officer England escorts Ms. Colson, who is sobbing but walking upright, from the sally port to a pat down room, where officers are present. [*Id.* at 20:07:11–48]. Ms. Colson tells Officer England that "my knee is fucked up thanks to your officers." [*Id.* at 20:07:49–50]. Officer England acknowledges her, responding, "Okay." [*Id.* at 20:07:51]. Seconds later, Ms. Colson falls to the floor, unable to support her own weight as Officer England is frisking her. "Ow, ow, my fucking knee!" she says. [*Id.* at 20:08:13–20]. Officer England lifts her to her feet and instructs her to stand. [*Id.* at 20:08:15–18]. Ms. Colson again says, "That's from your officers," referring to her knee. [*Id.* at 20:08:17–20]. Once more, Officer England acknowledges her. [*Id.*].

Officer Cook asks for the nurse. [*Id.* at 20:08:56–20:09:00]. Shortly afterwards, one of the other officers in the pat down room calls for the nurse. "Would you send the nurse over here, please?" the officer says into her walkie-talkie. [*Id.* at 20:09:28–37]. In response, Ms. Colson echoes her, saying, "Please." [*Id.* at 20:09:39]. While the officers

remove Ms. Colson's jewelry as part of the pat-down process, Ms. Colson steps forward to place her ring in a plastic bag. [*Id.* at 20:11:27:31]. She totters and winces, prompting both Officer England and another officer to take her by the arms and steady her. [*Id.* at 20:11:21–32].

The nurse enters the pat down room and approaches Ms. Colson, who points out her injured knee and says she "never heard it pop so much in her life." [*Id.* at 20:12:02–25]. The nurse directs her to straighten her leg, to bend it back, and to move it from side to side. [*Id.* at 20:12:28–41]. "It hurts, it hurts," Ms. Colson says. [*Id.*]. The nurse next instructs her to stand up straight against the wall. "I can't," she says. "I can't straighten my legs." [*Id.* at 20:12:57–20:13:04]. After bending to examine Ms. Colson's knee, the nurse says, "I don't see no swelling," and she leaves the room. [*Id.* at 20:13:08–14]. In response to this statement, the officers guide Ms. Colson toward a cell located farther inside the jail. [*Id.* at 20:13:12–20:14:04]. Officer Cook lingers so he can speak with the nurse about drawing Ms. Colson's blood. [*Id.*]. As they are talking to each other, and as the officers are moving Ms. Colson into the cell, Ms. Colson—who is now outside the lens of Officer Cook's body camera—raises her voice at the officers. [*Id.* at 20:13:43–20:14:04]. She continuously yells the word "bitch." [*Id.* at 20:13:55–20:14:05].

"Hang on," Officer Cook says, "I'm going to record this." [*Id.* at 20:14:04–06]. As the commotion between Ms. Colson and the officers is stirring in the background, he moves toward the cell where the officers have taken her. [*Id.* at 20:14:06–11]. Inside, at

least five officers are pinning her to the floor. [*Id.* at 20:14:12].[5] "Are you done?" one of them says to her. [*Id.* at 20:14:13]. "Bitch," she says back. [*Id.* at 20:14:14]. Officer Cook turns off his body camera; all goes black. [*Id.* at 20:14:15].

By the time Officer Cook turns his camera on again, Ms. Colson is lying in a restraint chair, strapped down to it. [Video: Officer Cook VieVu 2, 21:31:07 (June 23, 2015) (on file with the Court)]. Officer Cook shows Ms. Colson a search warrant from a magistrate. [*Id.* at 21:31:17–27; Search Warrant, doc. 66-6]. He informs her that the nurse is now going to draw her blood. [Officer Cook VieVu 2 at 21:31:28]. She complains that no one has let her use the restroom, even though she has requested to use it "for the last hour." [*Id.* at 21:31:31–32]. Officer Cook says that he is sure the jail's officers will let her use the restroom if she cooperates with them. [*Id.* at 21:31:33–36]. "Okay," she says, nodding. [*Id.* at 21:31:40]. Seconds later, she again asks for permission to go to the restroom. [*Id.* at 21:31:50–52]. "I pissed myself," she says. [*Id.* at 21:21:59–32:00:03]. In the background, a female officer—possibly Officer England—says, "Guys, you don't have to worry about it. She's already peed." [*Id.* at 21:32:28–29].

The nurse enters the room and prepares to take blood from Ms. Colson's left arm, but Ms. Colson intimates that she would prefer to have the nurse draw blood from her right arm instead. [*Id.* at 21:32:33–21:33:07]. Accommodating her, the nurse moves to

---

[5] According to a sworn statement from Officer England, Ms. Colson "became even more upset and belligerent" inside the cell. [Officer England Decl., doc. 66-4, ¶ 10]. "[S]he lunged at, kicked at, and struggled with us to prevent us from shutting the door" and "was taken down and then put into the restraint chair to bring her under control," not only "[f]or officer protection" but also "for her own safety." [*Id.*]. Corporal Michelle Bishop—who was the supervisory officer in charge at the jail on June 23, 2015—filed her own declaration corroborating Officer England's rendition of these events. [Corporal Bishop Decl., doc. 66-5, ¶¶ 7, 10].

the restraint chair's opposite side, where she readies to draw blood from Ms. Colson's right arm. [*Id.*]. But Ms. Colson appears to resist her efforts, refusing to keep her arm at rest. [*Id.* at 21:33:22]. "I have no control over my arm staying still. I'm sorry," she says to the nurse. [*Id.* at 21:33:22–25]. She refuses to cooperate because the officers did not let her use the restroom: "I have no control over my arm staying still. I had to pee like an hour ago and nobody let me," she says. [*Id.* at 21:33:36–40]. Several officers enter the room, including Officer England, who says, "We're going to draw that motherfucking blood whether you like it or not." [*Id.* at 21:33:56–59]. Ms. Colson says, "I'm just going to move. I'm just going to keep moving and nobody's going to take my blood. Blah, blah, blah." [*Id.* at 21:33:59–21:34:03]. Nearly at eye-level with Ms. Colson, Officer England holds down her right arm with one hand and presses into her shoulder with the other hand, while two other officers also help to keep her still. [*Id.* at 21:34:06–44]. As the nurse is attempting to take Ms. Colson's blood, Ms. Colson lunges at Officer England's bare arm with her mouth. [*Id.* at 21:34:45].

Almost in one motion, Officer England recoils from Ms. Colson and slaps her in the face. [*Id.* at 21:34:46]. "Don't you fucking bite me!" Officer England says, her eyes ballooning. [*Id.* at 21:34:49–50]. She leaves the room, while a male officer places a headlock around Ms. Colson. [*Id.* at 21:34:51–52]. "You're hurting my neck!" she says to him. [*Id.* at 21:34:53]. "Good, you shouldn't have just bit my officer," he says back to her. [*Id.* at 21:34:54–57]. "I didn't bite her. I tried to. I didn't bite the bitch, though," she replies. [*Id.* at 21:34:57–21:35:00]. Officer England says, "You fucking bit me, I've got the marks." [*Id.* at 21:34:58–21:35:00]. Carrying a motorcycle helmet, she returns to the

room. [*Id.* at 21:35:11]. She fastens the helmet to Ms. Colson's head, with the officers' help. [*Id.* at 21:35:12–21:35:30]. The helmet has a convex guard covering the jaw and mouth area. [*Id.*]. While the officers hold Ms. Colson, the nurse finishes drawing her blood without further incident. [*Id.* at 21:35:31–21:38:48].

Following her release from the jail, Ms. Colson went to the hospital, where she learned that she had a fractured tibial plateau, a torn anterior cruciate ligament, and a torn lateral collateral ligament. [Colson Aff., doc. 101-3, ¶ 43]. She required surgery to repair the damage. [*Id.* ¶ 44]. Officer Cook later filed several affidavits against her, for charges that included felony reckless endangerment, driving under the influence, assault on a police officer,[6] and resisting arrest. [Officer Cook Aff. at 5–12]. Her blood sample from the night of June 23, 2015, revealed a blood alcohol concentration of .151%, [Alcohol Report, doc. 66-2, at 1], which is approximately twice the legal limit under Tennessee law, Tenn. Code. Ann. § 55-10-401.[7]

Ms. Colson has now filed suit in this Court against the City of Alcoa, Tennessee; Blount County, Tennessee; and officers of these local governments in their official and individual capacities. She brings several claims under 42 U.S.C. § 1983, asserting that these parties violated her rights under the Fourth, Eighth, and Fourteenth Amendments of the Constitution. [Compl., doc. 1-1, 32–53]. As to Officer England, Ms. Colson maintains

---

[6] Officer Cook accused Ms. Colson of kicking him while he tried to force her into his patrol vehicle at the hospital. [Officer Cook Aff. at 10]. During their struggle, his body camera records him saying to Ms. Colson, "Don't try to kick me." [Officer Cook VieVu at 20:00:10–11].

[7] Despite her blood alcohol concentration on that day and despite telling Officer Cook that she had consumed two shots of vodka, Ms. Colson now, in a sworn statement to the Court, insists that she only "drank a coke that had whipped cream alcohol in it." [Colson Aff. ¶ 10].

that these violations consist of the use of excessive force (Count Four) and the failure to provide adequate medical care (Count Nine). [*Id.* ¶¶ 116–18, 165–72].[8] Ms. Colson also brings three claims against Officer England under Tennessee law, including assault and battery (Count Eleven), intentional infliction of emotional distress (Count Twelve), and negligence (Count Thirteen). [*Id.* ¶¶ 178–82, 183–89, 190–94]. Officer England, in her individual capacity, now moves for summary judgment on most of these claims, arguing that she is entitled to qualified immunity. [Def.'s Mot. Summ. J. at 1–2].[9]

When Officer England moved for summary judgment, discovery had yet to begin in this case, and discovery is now ongoing. [*See* Scheduling Order, doc. 90, at 3 (allowing the parties to conduct discovery until ninety days before trial)]. By agreement of the parties, the Court permitted Ms. Colson to carry out limited discovery so that she could properly respond to Officer England's motion. [Order, doc. 83, 2–3]. The parties elected to limit discovery to the depositions of Officer England and Corporal Michelle Bishop, her supervisor. [*Id.*]. To date, the parties have reported no problems with their agreed-upon discovery process. Ms. Colson has now filed a response, with excerpts from the testimonies of Officer England and Corporal Bishop, and Officer England has filed a reply. The Court therefore deems Officer England's motion for summary judgment to be ripe for its consideration.

---

[8] Under § 1983, Ms. Colson also brought a claim against Officer England for failure to protect (Count Ten), [Compl. ¶¶ 173–77], but now informs the Court that she wishes to abandon that claim to the extent it applies to Officer England, [Pl.'s Br. at 4 n.2].

[9] Although Officer England requests summary judgment on all the claims, she does not address Ms. Colson's assault and battery claim in her legal brief.

## II. LEGAL STANDARD

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, *id.* at 325, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he

judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A court may also resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

## III. ANALYSIS

As an initial matter, the Court notes that Officer England, in supporting her motion, has filed numerous video recordings—from the point of view of the officers' body cameras and dash cameras—for the Court's consideration. These videos bring illumination to many of the events and circumstances that the parties have disputed through the pleading stage and up to this point. Because the Court does not ordinarily receive video evidence when resolving motions for summary judgment, it will explain how it intends to view—not weigh, but view—this evidence through the prism of the legal standard governing summary judgment.

First, the Court may properly consider the videos as evidence at this stage in the litigation, and neither party argues otherwise. *See Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (recognizing that "a court may properly consider videotape evidence at the summary-judgment stage"); *see, e.g.*, *Lewis v. Charter Twp.*, 660 F. App'x 339, 340–47 (6th Cir. 2016) (relying on video evidence in a § 1983 case). Second, when viewing the videos, the Court has to construe them "in the light most favorable to [the nonmoving party]." *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008).

But the Court also has to "view[] the facts in the light depicted by the videotape." *Scotty v. Harris*, 550 U.S. 372, 381 (2007). In other words, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the [video], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. In short, the Court, under the guise of construing the videos in the light most favorable to Ms. Colson, will not peddle a version of events that is tantamount to "visible fiction." *Id.* at 381.

## A. Section 1983

Section 1983 permits a claim for damages against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Because § 1983 has "a 'color of law' requirement," a defendant can be liable "only if state law, whether provided by statute or judicially implied, empowers him with some legal obligation to act." *Doe v. Claiborne County*, 103 F.3d 495, 512 (6th Cir. 1996) (citation omitted). A claim under § 1983 therefore consists of two elements: the defendant (1) must deprive the plaintiff of either a constitutional or a federal statutory right[10] and (2) must deprive the plaintiff of one of these rights while acting under color of state law (i.e., state action). *Id.*

---

[10] A violation of a constitutional or federal statutory right is a prerequisite to a claim under § 1983 because § 1983 "does not confer substantive rights" on a plaintiff; rather, it is merely a conduit through which a plaintiff may sue another to "vindicate rights conferred by the Constitution or laws of the United States." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010).

at 511. "Absent either element, a section 1983 claim will not lie." *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).

## B. Qualified Immunity

"Qualified immunity is a personal defense that applies only to government officials in their individual capacities." *Benison v. Ross*, 765 F.3d 649, 665 (6th Cir. 2014) (citation omitted). It insulates government officials "from undue interference with their duties," *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982), affording them "breathing room to make reasonable but mistaken judgments" and protecting "all but the plainly incompetent or those who knowingly violate the law," *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). To obtain qualified immunity, the defendant shoulders the initial burden to present evidence showing that his acts were within his discretionary authority. *Gravely v. Madden*, 142 F.3d 345, 347 (6th Cir. 1998); *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991). If the defendant dispatches this burden, the burden then shifts to the plaintiff, who must identify evidence satisfying a two-party inquiry. *Gravely*, 142 F.3d at 348; *Wegener*, 933 F.2d at 392.

Under this two-party inquiry, the defendant is entitled to qualified immunity unless the evidence, "viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Morrison v. Bd. of Trs.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation and footnote omitted). "An answer of 'yes' to both questions defeats qualified

immunity, while an answer of 'no' to either question results in a grant of qualified immunity." *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011). In performing an analysis under the two-party inquiry, a court does not have to address the prongs sequentially; neither one is an antecedent to the other. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see al-Kidd*, 563 U.S. at 735 (instructing courts to "think carefully before expending 'scare judicial resources' to resolve difficult and novel questions" under the two-party inquiry, particularly when those questions "will 'have no effect on the outcome of the case'" (quotation omitted)).

Before the Court begins its analysis, it notes that record contains no dispute regarding whether Officer England was acting within her discretionary authority during the events in question. First, Ms. Colson maintains that Officer England "used her position of authority" when violating her constitutional rights, and second, she accedes that "it is [her] burden to show that [Officer England] is not entitled to qualified immunity." [Pl.'s Resp. at 12, 25]. The Court therefore considers Ms. Colson to be the party carrying the burden. To discharge her burden, she must offer evidence satisfying both prongs of the two-part inquiry—with the Court viewing that evidence in the light most favorable to her. *Morrison*, 583 F.3d at 400.

### 1. Ms. Colson's Claim for Excessive Force

Under the Constitution, four provisions proscribe the use of excessive force—the Fourth, Eighth, Fifth, and Fourteenth Amendments—and whether one applies over the other depends on the circumstances. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2477

(2015) (Scalia, J., dissenting). Any excessive force claim under § 1983 therefore cannot be "governed by a single generic standard." *Graham v. Connor*, 490 U.S. 386, 393 (1989). Instead, "analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Id.* at 394 (citation and footnote omitted).

### i. The Specific Constitutional Right

Ms. Colson identifies the "challenged application of force" as Officer England's slap to her face: "Plaintiff's excessive force claim[] focuses only on England's actions in slapping Plaintiff across the face while she was restrained in the restraint chair." [Pl.'s Resp. at 1 n.3]. Officer England concedes that she "reflexively and defensively open handedly smacked Ms. Colson's face away from where she was biting my arm." [Officer England Decl., doc. 66-4, ¶ 15]. The "specific constitutional right allegedly infringed" by Officer England's slap to Ms. Colson's face, however, is a source of dispute between the parties. Ms. Colson describes her claim as falling within the Fourth Amendment's protections, whereas Officer England believes that the Fourteenth Amendment's protections should be in play instead. [Def.'s Br. at 10–28; Pl.'s Resp. at 12–13; Def.'s Reply at 4–5].

The parties' disagreement is hardly an insoluble one. The Fourth Amendment protects people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under this amendment, a police officer's use of force "will constitute a seizure," and it will violate a federal right

16

if it is "'objectively [un]reasonable' in light of the facts and circumstances." *Jackson v. Washtenaw County*, 678 F. App'x 302, 306 (6th Cir. 2017) (quoting *Graham*, 490 U.S. at 397). "[I]t is well-settled that the Fourth Amendment's protections extend through the booking process." *Muhammad v. Skinner*, 193 F. Supp. 3d 821, 830 (E.D. Mich. 2016); *see Malory v. Whiting*, 489 F. App'x 78, 81 (6th Cir. 2012) ("The Fourth Amendment of the United States Constitution protects a person from being subjected to excessive physical force during the course of . . . booking[.]" (citations omitted)). The parties agree that Officer England slapped Ms. Colson while she was a pretrial detainee undergoing booking, [Officer England Decl. ¶ 7; Def.'s Br. at 4, 10, 19–20; Pl.'s Resp. at 3, 13], and this mutual concession ought to put to rest any issue about the applicable constitutional provision.

Even if this is not the case, "a pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment." *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–75 (2015)); *see Kingsley*, 135 S. Ct. at 2479 (Alito, J., dissenting) (stating that a pretrial detainee's excessive force claim under the Fourth Amendment "would be indistinguishable from [a] substantive due process claim"). So "under either amendment, the court would employ the same objective test for excessive force," *Clay*, 797 F.3d at 369 (citing *Kingsley*, at 2472–73), and the Court can therefore identify no reason to restyle Ms. Colson's claim as one falling within the Fourteenth Amendment rather than the Fourth Amendment, *see generally*, *Energy Conversion Devices Liquidation Tr. v.*

*Trina Solar Ltd.*, 833 F.3d 680, 688 (6th Cir. 2016) ("As the master of the complaint, the plaintiff may decide what claims to bring and how to prove them.").

ii. The Two-Part Inquiry for Qualified Immunity

Now that the Court has determined that the Fourth Amendment is the appropriate terrain for Ms. Colson's excessive force claim, it must next address Officer England's right to qualified immunity under the two-part inquiry. Again, the Court has license to begin with either prong, and it makes its decision based on "the circumstances in the particular case at hand." *Pearson*, 55 U.S. at 236. "There are cases in which it is plain that a constitutional right is not clearly established[.]" *Id.* at 237. This case is one of those cases, so the Court will begin with the second prong.

To show that Officer England violated a clearly established Fourth Amendment right under this prong, Ms. Colson's task is to demonstrate that the "contours" of that right, at the time of the conduct in question, were "sufficiently clear" so "that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate," though the existence of precedent that is "directly on point" with the specific facts or circumstances at issue is unnecessary. *al-Kidd*, 563 U.S. at 741 (citations omitted). The test is simply whether the law was clear enough in relation to the specific facts that confronted an official when he acted. *See Crockett v. Cumberland Coll.*, 316 F.3d 571, 583 (6th Cir. 2003) ("Whether the right at issue was 'clearly established' will turn on the 'particularized' circumstances

of the case" (quotation omitted)); *see also* al-Kidd, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality" but in relation to "the violative nature of [the] particular conduct." (citations omitted)). Under this test, the parties cite reams of precedent to undergird their positions. Ms. Colson maintains that the law clearly establishes that an officer violates the Fourth Amendment by slapping a restrained detainee. [Pl.'s Resp. at 19]. Officer England, however, argues that the law clearly establishes that a slap is merely a de minimis use of force and does not violate the Fourth Amendment. [Def.'s Br. at 15 n.36].

"[I]n this Circuit, the law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized." *Alkhateeb v. Charter Twp.*, 190 F. App'x 443, 452 (6th Cir. 2006) (citations omitted). While the Sixth Circuit has not adopted a blanket definition for the term "neutralized," it has imparted ample meaning to it by indicating, in various cases, that a person is neutralized when he is (1) restrained and (2) non-resistant. *See Lustig v. Mondeau*, 211 F. App'x 364, 371–72 (6th Cir. 2006) (stating that "[i]t is sufficiently obvious" that an officer would violate the Fourth Amendment by using additional force on a detainee who is already [1] "restrained in a full control hold by two officers" and [2] "nonviolent" (citing *Smith v. Cupp*, 430 F.3d 766, 777 (6th Cir. 2005))); *Bultema v. Benzie County*, 146 F. App'x 28, 37 (6th Cir. 2005) ("[W]e have . . . held for more than twenty years that it is clearly established in this circuit that 'a totally gratuitous blow' to a suspect who is [1] handcuffed and [2] offering no resistance violates the Fourth Amendment." (citation omitted)); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) ("[I]t is clearly established

that the Officers' use of pepper spray against [the plaintiff] after he was [1] handcuffed and [2] hobbled was excessive."); *see also Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 96–97 (6th Cir. 2012) (concluding that one officer's use of a taser on a prostrate plaintiff was not gratuitous because the plaintiff continued to "actively resist[] the officers' attempts to secure his arms" and the taser "gain[ed] control over a highly intoxicated, volatile, and uncooperative subject"); *see generally Rudlaff v. Gillispie*, 791 F.3d 638, 641, 643 (6th Cir. 2015) (defining "active resistance" as a person's use of physical force against an officer and recognizing that it entitles the officer to react with the "amount of force necessary to ensure submission").

When a person is neutralized—restrained and non-resistant—even an officer's de minimis use of force against that person, including a slap, will constitute excessive force under the Fourth Amendment. *See Pigram ex. rel Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006) (determining that an officer violated the Fourth Amendment when he slapped the handcuffed plaintiff to squelch his "smart-ass mouth," rather than "to protect himself, other officers, or the public"); *Baskin v. Smith*, 50 F. App'x 731, 737 n.2 (6th Cir. 2002) ("A factor that is not crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment is the extent of the injury inflicted."); *Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999) (acknowledging that "a plaintiff may allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage" (citation omitted)). A de minimis use of force can violate the Fourth Amendment because its protections are broad enough to prohibit "'antagonizing' and 'humiliating' conduct" when it "crosses the

line 'into physical abuse of an incapacitated suspect.'" *Morrison*, 583 U.S. at 407 (quotations omitted).

In this case, the question is whether, on June 23, 2015, the law clearly established that Officer England, by slapping Ms. Colson while she was tied to the restraint chair, used excessive force in violation of the Fourth Amendment. The answer is no, based on this case's specific facts. Ms. Colson concedes that she was not fully restrained in the restraint chair, stating that she was "unable to move *most* of [her] body" but was able to move her head and neck. [Colson Aff. ¶¶ 29, 32 (emphasis added)]. The video shows that, with this partial range of motion, she turned her head sideward and incontrovertibly tried to bite Officer England's nearby arm. [Officer Cook VieVu 2 at 21:34:45]. No reasonable jury could form a different conclusion. Ms. Colson even admitted during the incident that she tried to bite Officer England: "I didn't bite her. I tried to. I didn't bite the bitch, though." [*Id.* at 21:34:57–21:35:00]. In line with this evidence, Officer England testified that Ms. Colson's mouth contacted her arm and left saliva on it, before she thwarted Ms. Colson's attack by slapping her face. [Officer England Dep., doc. 101-1, 40:17–18].[11][12]

Ms. Colson now maintains that, at the time, she was in pain and simply "tried to nudge England's hand away from [her] chest with [her] chin." [Colson Aff. ¶ 32]. This rendering of the incident is outright fiction; it is untenable when the Court views it "in

---

[11] Officer England also testified that the attempted bite left a red mark on her arm but did not draw blood, and that afterwards the jail's nurses washed her with "hepatitis soap." [Officer England Dep. at 40:17–18; 40:21–22].

[12] Pincites to the record refer to the electronic page numbers.

the light depicted by the videotape," and it is equally untenable when it views it in the light most favorable to Ms. Colson. *Scott*, 550 U.S. at 381. To be clear, the Court is not weighing the evidence, not only because it would err by doing so but also because there is nothing for it to weigh. Simply, Ms. Colson's story is so "blatantly contradicted" by the video that the Court is under no obligation to "adopt that version of the facts for purposes of ruling on [the] motion for summary judgment." *Id.* at 380. Again, no reasonable jury could return a verdict for Ms. Colson based on her story.

The doctrine of qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law." *Stanton*, 571 U.S. at 5 (quoting *al-Kidd*, 563 U.S. at 743). When Officer England slapped Ms. Colson, she fit neither description. While true, Ms. Colson was mostly restrained when the incident took place, she was not—by her own admission—fully restrained, and with her limited ability to move, she managed to perpetrate an act of violence against Officer England. Under these *particular facts*, the law was sufficiently clear so that a reasonable officer, on June 23, 2015, would have understood that a slap to Ms. Colson's face was not gratuitous and did not violate her rights under the Fourth Amendment. *Compare Bultema*, 146 F. App'x at 37 (defining the parameters of neutralization, which requires a person to be restrained and not actively resistant to officers), *with Rudlaff*, 791 F.3d at 641, 643 (defining "active resistance" as a physical use of force against an officer); *see Caie*, 485 F. App'x at 96–97 (concluding that even though the plaintiff was face down on the ground, the officers did not act unlawfully by applying additional force to him because his ongoing bouts of resistance illustrated he was not neutralized); *see also Graham*, 490 U.S. at 396 ("Not every push or

shove . . . violates the Fourth Amendment." (internal quotation and internal quotation marks omitted)). Ms. Colson therefore fails to discharge her burden, and Officer England is entitled to qualified immunity and summary judgment on Ms. Colson's claim under the Fourth Amendment.

### 2. Ms. Colson's Claim for Inadequate Medical Care

Next, Ms. Colson contends that Officer England violated the Eighth Amendment by failing to provide her with adequate medical care while she was a detainee on the night of June 23, 2015. [Pl.'s Br. at 20–22]. Again, the "first step in a qualified immunity analysis is whether . . . a constitutional violation occurred." *Dickerson v. McClellan*, 101 F.3d 1151, 1157–58 (6th Cir. 1996) (citations omitted). In undertaking this analysis, the Court begins by noting that the Eighth Amendment forbids "cruel and unusual punishments," U.S. Const. amend. VIII, and as a rampart against this type of punishment, it prohibits prison officials from "'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs," *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Grose v. Caruso*, 284 F. App'x 279, 284 (6th Cir. 2008) (recognizing that "it is well-settled that lack of proper medical treatment can constitute an Eighth Amendment violation" (citing *West v. Atkins*, 487 U.S. 42, 57 (1988))).[13] The Court therefore defines the constitutional violation at issue as whether Officer England consciously disregarded Ms. Colson's serious medical

---

[13] The Eighth Amendment's protections apply analogously to pretrial detainees through the Fourteenth Amendment. *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015); *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009); *Blackmore*, 390 F.3d at 895.

needs, or in other words, whether she treated her serious medical needs with deliberate indifference.

To establish deliberate indifference, Ms. Colson has to muster evidence to create a material factual dispute as to two components, one objective and one subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015). The objective component requires evidence showing that Ms. Colson had a serious medical need, which means "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quotation omitted).[14] The subjective component requires evidence showing that Officer England (1) knew of and (2) disregarded a substantial risk to Ms. Colson's health. *Farmer*, 511 U.S. at 840–47. As to the first element—knowledge—she must have (a) been "aware of facts from which the inference could be drawn that a substantial risk of serious harm" to Ms. Colson was present, and she (b) must "[have] draw[n] the inference." *Id.* at 837.[15] As to the second element—disregard for a substantial risk of harm to Ms. Colson—Officer England must have "fail[ed] to take reasonable measures to abate" this risk. *Id.* at 847; *see Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 816 (6th Cir. 1996).[16]

---

[14] "Objectively, the risk of serious harm must be undeniably serious *at the time* the injurious actions are taken, *not in hindsight*." *Beyer ex rel. Estate of Beyer v. City of Johnson City*, No. 2:01-CV-45, 2003 WL 23737298, at *5 (E.D. Tenn. Feb. 24, 2003) (emphasis added) (citing *Durham v. Nu'man*, 97 F.3d 862, 869 (6th Cir. 1996)). So Ms. Colson's discovery, after the fact, that she had a broken leg and torn ligaments plays no part in the Court's analysis.

[15] Likewise, "knowledge must be gauged *at the time* of the alleged deprivation of the constitutional right, *not in hindsight*." *Id.* (emphasis added).

[16] *See Williams v. Mehra*, 135 F.3d 1105, 1112 n.9 (6th Cir. 1998) ("[T]his Court does

i. The Objective Component

Under the objective component, Ms. Colson contends that her knee injury would have been obvious to a layperson, [Pl.'s Br. at 20–21], and in making this contention, she identifies more than enough evidence establishing genuine issues of material fact in the record. She highlights her repetitious complaints about knee pain, her screams, and her intermittent ability to remain standing—all of which occurred in Officer England's presence. [*Id.* at 21]. She underscores the fact that Officer England herself lifted her to her feet after she fell to the floor while agonizing about her knee. [*Id.*]. In addition to this fact, Officer England had to steady Ms. Colson on a separate occasion, when she tottered and winced in the pat down room while stepping forward to put her ring in a bag. [Officer Cook VieVu 2 at 20:11:21–32].

Countering this evidence, Officer England testified that Ms. Colson was "walking just fine," and she "walked all the way from the car to the pat down room" and "from the pat down room to [the cell]." [Officer England Dep. at 18:15, 18:17–19]. She also testified that Ms. Colson "tried kicking my officers using full range of motion" with her injured leg. [*Id.* at 18:19–25; 19:1]. But this conflicting evidence is precisely why the record contains genuine factual disputes. Some of the evidence points to obvious signs of injury at the time of the conduct in question. *Cf. Taylor v. Franklin County*, 104 F. App'x 531, 538 (6th Cir. 2004) (stating that a plaintiff's "debilitating immobility" was one

---

not evaluate Defendants' qualified immunity defense under the objective test of whether a reasonable official would have known that his acts or omissions violated a clearly established right. Rather it is evaluated under the subjective test employed in *Farmer*." (citation omitted)), *vacated on other grounds*, 186 F.3d 685 (6th Cir. 1999).

symptom that indicated a serious problem, even if the defendants did not believe him); *Moore v. United States*, No. 07-14640, 2008 WL 4683425, at *2 (E.D. Mich. Oct. 22, 2008) ("If a lay person saw the way in which [the plaintiff] walked, he or she could easily recognize that [he] needs medical attention."). And other evidence indicates differently at the time of the conduct in question. The objective component of the deliberate indifference test therefore requires a jury's deliberation.

### ii. The Subjective Component

In this circuit, "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to the medical professionals' opinions.'" *McGaw v. Sevier County*, No. 16-6729, 2017 WL 4924676, at *2 (6th Cir. Oct. 31, 2017) (quotation omitted); *see Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) (awarding qualified immunity to an officer despite a detainee's death because the officer reasonably deferred to the EMT's and the nurse's medical opinions that the detainee did not require hospitalization). Officer England relies on the leeway that a jail's non-medical staff has under the law, arguing that she was not deliberately indifferent because she relied on the nurse's professional assessment of Ms. Colson's knee. [Def.'s Br. at 24; Officer England Dep. at 13:6–10 (stating that she relied on the nurse's opinion that Ms. Colson's knee "was okay")]. Ms. Colson, however, points out that Officer England witnessed the nurse's examination of her knee and considered it to be hasty. [Pl.'s Resp. at 21; *see* Officer England's Dep. at 20:15–18 (testifying that the nurse's exam was "[q]uick")]. According to Ms. Colson, her various manifestations of

pain in tandem with Officer England's impression that the exam was cursory "surely triggered England's own suspicion that [her] knee was badly injured," precluding her reliance on the nurse's judgment. [Pl.'s Resp. at 21].

For a non-medically trained police officer to "reasonably defer[]" to a medical professional's opinion," he must have "had no reason to know or believe that [the] recommendation was inappropriate." *McGaw*, 2017 WL 4924676 at *2, 3; *see Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with . . . deliberate indifference."). In *McGaw v. Sevier County*, a newly minted opinion, the Sixth Circuit identified facts that are sufficient for an officer's reasonable reliance on a medical professional's opinion. The plaintiff in *McGaw* was noticeably impaired when he turned himself in at the Sevier County Jail on an outstanding warrant for his arrest, having ingested alcohol and opiates. *McGaw*, 2017 WL 4924676 at *1. He was unable to recite the time of day or sit up by himself, and when he told officers that he had consumed an unspecified amount of vodka and three roxicodone, they called the nurse. *Id.* The nurse performed an exam and discovered that he had constricted pupils and slurred speech, but his blood pressure, heart rate, and blood-oxygen levels were all normal. *Id.* After meeting with her supervisor, the nurse informed the officers that the plaintiff did not require a physician's oversight or hospitalization and could remain in a cell overnight for monitoring. *Id.* But later that night, he died in his cell from cardiac arrest. *Id.*

The plaintiff's estate sued the officers under § 1983, contending that they had not provided the plaintiff with adequate medical care, in violation of his Eighth Amendment right. *Id.* at *2. The Sixth Circuit concluded that the officers did not act with deliberate indifference when they placed the plaintiff in the cell and administered no additional medical care to him, noting in particular that the subjective component was "clearly not met." *Id.* The Sixth Circuit reasoned that the officers were not deliberately indifferent because they recognized the plaintiff's ailment, summoned a proper person to assess his medical risks, and followed the nurse's "indication that this was an appropriate response to [his] condition." *Id.* at *2–3. And importantly, the Sixth Circuit pointed out that nothing in the record even supported an inference that the officers had "reason to know or believe that [the nurse's] recommendation was inappropriate." *Id.* at *3.

Unlike in *McGraw*, the facts in this case show that Officer England had reasons to believe that the nurse's assessment of Ms. Colson's knee was not reliable. As an initial matter, whether the nurse even rendered any type of medical opinion to begin with— much less one that should invite deference—is dubious. After the nurse completed her exam, her lone statement was "I don't see no swelling," and she left the room without uttering another word to the officers. [Officer Cook VieVue 2 at 20:13:08–14]. Unlike the nurse in *McGraw*, she did not confer with her supervisor and did not recommend a particular—or even a general—course of action that the officers should follow based on her exam. The question of whether this evidence amounts to a medical opinion or recommendation at all is a genuine issue of material fact for a jury.

Next, as to whether Officer England had reasons to believe that the nurse's medical opinion—to the extent she offered one—was not reliable, Officer England was privy to the exam and observed Ms. Colson's pained reactions to the movements that the nurse asked her to perform, if not her outright inability to perform them. The exam began inauspiciously when the nurse inquired about Ms. Colson's problem, and Ms. Colson identified her injured knee and exclaimed that she had "never heard it pop so much in her life." [*Id.* at 20:12:02–25]. From there, she tried to extend her leg, bend it, and move it from side to side. [*Id.* at 20:12:28–41]. "It hurts, it hurts," she said. [*Id.*]. The nurse next instructed her to stand up straight against the wall. "I can't," she said. "I can't straighten my legs." [*Id.* at 20:12:57–20:13:04]. At the exam's conclusion, Officer England's own impression was that the exam was perfunctory. [Officer England's Dep. at 20:15–18].

This evidence—and the evidence that the Court has previously discussed to this point: Ms. Colson's complaints of knee pain, Officer England's acknowledgments of these complaints, and Officer England's impulse to steady Ms. Colson in the pat down room—raises genuine issues of material fact as to Officer England's state of mind. From these issues of fact, a reasonable jury could decide that Officer England not only knew that Ms. Colson had a serious medical need but also harbored reasons to believe that the nurse's opinion was not reliable. *See Baynes*, 799 F.3d at 618–19 ("Because government officials do not readily admit the subjective component of th[e] [deliberate indifference] test, it may be 'demonstrat[ed] in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" (quoting *Terrance v. Northville Reg'l*

*Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002))). And the record indicates that the upshot of Officer England's reliance on the nurse is that Ms. Colson received no other medical attention—not crutches, not a knee brace, and not an X-ray—despite the fact that the jail contains its own "full medical room," a "full medical staff" that includes a medical doctor, and even a "mobile X-ray team." [Officer England Dep. at 16:17–25; 17:10–13; 18:11–15]; *see Farmer*, 511 U.S. at 847 ("[A] prison official may be held liable under the Eighth Amendment . . . if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.").

In reaching this conclusion as to the subjective component, the Court pauses here to stress an important point: the requirement that the record must support a substantial risk of serious harm "does not require actual harm to be suffered." *Blackmore*, 390 F.3d at 899 (citation omitted). Rather, "[w]here the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise." *Id.*; *see Baynes*, 799 F.3d at 618–19 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (quoting *Terrance*, 286 F.3d at 843)); *Williams v. Mehra*, 186 F.3d 685, 694 (6th Cir. 1999) (Keith, J., concurring in part and dissenting in part) ("[A] claimant is not necessarily required to prove that the prison official had actual knowledge of the substantial risk; rather, one may conclude that a prison official knew of a severe risk from the very fact that the risk was obvious." (citing *Farmer*, 511 U.S. at 842)). And that is exactly the case here—the evidence shows that Ms. Colson demonstrated an obvious and serious need for

medical treatment.[17] It also shows that a reasonable jury could find that Officer England knew of this need and disregarded it despite having reasons to believe that the nurse rendered an unreliable medical opinion, if no medical opinion at all.

In sum, the factual questions in the record raise genuine issues of material fact under the deliberate indifference test, precluding the Court from granting qualified immunity to Officer England. *See Bass v. Robinson*, 167 F.3d 1041, 1051 (6th Cir. 1999) ("We . . . hold that Defendants are not entitled to qualified immunity on this claim because a question of fact exists[.]" (citation omitted)). A jury has to consider Ms. Colson's claim under the Eighth Amendment.

### iii. Punitive Damages

Officer England also seeks summary judgment on Ms. Colson's request for punitive damages under § 1983, [*see* Compl. at 60 (pleading punitive damages)], arguing that Ms. Colson "has not . . . presented material facts to support . . . 'callous disregard' to any constitutional right," [Def.'s Br. at 28 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983))]. Under § 1983, punitive damages are available to a plaintiff when a defendant's individual conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56. The Sixth Circuit has acknowledged that this standard is "consistent" with

---

[17] Officer England argues that she is entitled to qualified immunity because Ms. Colson has no evidence of a "detrimental effect" from a delay in medical treatment, [Def.'s Br. at 26], but in cases like this one, in which the evidence shows that the injury was obvious, this argument is meritless. *See Blackmore*, 390 F.3d at 898 ("[T]he 'verifying medical evidence' requirement is relevant only to those claims involving . . . non-obvious complaints of a serious need for medical care.").

the standard for measuring deliberate indifference under the Eighth Amendment, and that "much of the evidence bearing on the one questions bears on the other." *Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008) (quotation omitted); *compare Farmer*, 511 U.S. at 839 (adopting a subjective recklessness standard "as the test for 'deliberate indifference' under the Eighth Amendment"), *with Smith*, 461 U.S. at 56 (stating that reckless indifference will establish a plaintiff's right to punitive damages).

Because material factual issues preclude summary judgment under the deliberate indifference standard governing Ms. Colson's Eighth Amendment claim, the Court must refrain from granting summary judgment under the similar standard governing her request for punitive damages. *See Gibson*, 523 F.3d at 664 (holding that the district court properly delegated the question of punitive damages to the jury because the plaintiff presented "sufficient evidence to support a finding of deliberate indifference"); *Wright v. County of Franklin*, 881 F. Supp. 2d 887, 914 (S.D. Ohio 2012) (denying the defendant's request for summary judgment on the plaintiff's § 1983 claim for punitive damages because the factual issues as to deliberate indifference were equally relevant to whether punitive damages were appropriate).

### 3. Ms. Colson's Claims under Tennessee Law

Officer England requests summary judgment "as to any state-law claims" as well, though she only makes arguments pertaining to Ms. Colson's claims for negligence and intentional infliction of emotional distress. [Def.'s Br. at 27–28]. Because she does not raise any argument against Ms. Colson's claim for assault and battery, the Court cannot

disturb that claim. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation omitted)).

### i. Negligence

Ms. Colson brings her negligence claim under the Tennessee Governmental Tort Liability Act ("TGTLA"), section 29-20-101. [Compl. at 59–60]. A negligence claim under the TGTLA requires facts showing that (1) the defendant owed a legal duty of care to the plaintiff; (2) the defendant engaged in conduct that was below the standard of care, resulting in a breach of the legal duty; (3) an injury or loss; (4) cause in fact; and (5) proximate cause. *Cadorette v. Sumner Cty. Bd. of Educ.*, No. 01A01-9510-CV-00441, 1996 WL 187586, at *1 (Tenn. Ct. App. Apr. 19, 1996). In arguing that Officer England is negligent, Ms. Colson asserts that Officer England allowed her "to suffer throughout the night," "neglect[ed] her injuries and pain," and "fail[ed] to provide her with humane treatment." [Pl.'s Resp. at 24]. Officer England, however, contends that she is entitled to summary judgment because she has statutory immunity under the TGTLA, and even if she does not have immunity, she maintains that she is not negligent because she did not proximately cause any injury to Ms. Colson. [Def.'s Br. at 27].

The TGTLA governs liability in tort for Tennessee's governmental entities and employees, and it contains the codification of Tennessee's sovereign immunity law. As

the fountainhead of sovereign immunity for Tennessee's governmental entities,[18] it insulates them, though not without some exceptions, from lawsuits involving alleged tortious conduct. *See* Tenn. Code Ann. § 29-20-201(a) ("Except as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result from . . . the exercise and discharge of any of their functions, governmental or proprietary."). In addition to furnishing governmental entities with immunity, the TGTLA extends immunity to their employees,[19] but only when immunity is unavailable to governmental entities under the statute—or, that is to say, only when immunity for governmental entities is "removed" by the TGTLA: "No claim may be brought against an employee . . . [when] the immunity of the governmental entity is removed by this chapter[.]" *Id.* § 29-20-310(b).[20] In other words, the TGTLA does not provide governmental entities and employees with simultaneous immunity.

In one provision in particular, subsection 29-20-205(2), the TGTLA removes immunity for governmental entities, and by extension provides it to employees, for an injury "proximately caused by" an employee's negligent conduct—*except* when the negligent conduct causes an injury that "arises out of" certain cause of action:

[18] The definition of a "governmental entity" under the TGTLA is longwinded but includes "any municipality, metropolitan government, [and] county" in Tennessee. Tenn. Code. Ann. § 29-20-102(3)(A).

[19] The TGTLA defines an "employee" as "any official (whether elected or appointed), officer, employee or servant, or any member of any board, agency, or commission (whether compensated or not), or any officer, employee or servant thereof, of a governmental entity, *including the sheriff* and the sheriff's employees and, further including regular members of voluntary or auxiliary firefighting, police, or emergency assistance organizations." *Id.* § 29-20-102(2) (emphasis added).

[20] This provision contains an exception for claims "for health care liability brought against a health care practitioner." *Id.* § 29-20-310(b).

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of: False imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right to privacy, or civil rights[.]

Tenn. Code Ann. § 29-20-205(2).[21] When this provision does not result in removal of immunity for governmental entities—that is, when the exception applies because a negligent act "arises out of" certain conduct—employees remain subject to liability in their individual capacities for negligence. *See Baker v. Snyder*, No. 1:05-CV-152, 2006 WL 2645163, at *10 (E.D. Tenn. Sept. 14, 2006) ("If the TGTLA does not remove sovereign immunity from a governmental entity, that entity's employees can be liable in their individual capacities." (citing *Baines v. Wilson County*, 86 S.W.3d 575, 583 n.5 (Tenn. Ct. App. 2002), *abrogated on other grounds by Young v. City of LaFollette*, 479 S.W.3d 785 (Tenn. 2015))).

Under the TGTLA, Tennessee courts recognize that the burden rests on the party moving for summary judgment. *See Sides v. Cooper*, No. W2011–00813–COA–R3–CV, 2011 WL 6712717, at *2 (Tenn. Ct. App. Dec. 21, 2011) (stating that, in a claim under the TGTLA, "we must consider . . . the evidentiary materials in the light most favorable to the movant's opponent" (quotation omitted)); *Condra v. Bradley County*, No. E2007–01290–COA–R3–CV, 2009 WL 196020, at *5 (Tenn. Ct. App. Jan. 28, 2009) (stating that "the movant . . . did not meet its burden" to obtain summary judgment under the

---

[21] This Court, in prior case law, construed the term "civil rights" that appears in this provision to "mean[] and includ[e] claims arising under the federal civil rights laws, *e.g.*, 42 U.S.C. § 1983." *Campbell v. Anderson County*, 695 F. Supp. 2d 764, 778 (E.D. Tenn. 2010).

plaintiff's TGTLA claim). In addition, a defendant's request for statutory immunity under the TGTLA is an affirmative defense, *Morgan v. Memphis Light Gas & Water Co.*, No. W2016–01249–COA–R3–CV, 2018 WL 733217, at *1 (Tenn. Ct. App. Feb. 6, 2018), for which the defendant bears the burden of proof at trial, *Weaver v. Deverell*, No. W2011-00563-COA-R3-CV, 2011 WL 5069418, at *7 (Tenn. Ct. App. Oct. 26, 2011) ("An affirmative defense will shift the burden of proof to the defendant." (citation omitted)).

Because Officer England raises immunity under the TGTLA as an affirmative defense and requests summary judgment on it, [Officer England Answer, doc. 21, ¶ 202; Def.'s Br. at 27], she has the initial burden as the movant for summary judgment, *see Snyder v. Kohl's Dep't Stores, Inc.*, 580 F. App'x 458, 461 (6th Cir. 2014) (entitling a defendant to summary judgment on an affirmative defense "only if the record shows that [the defendant] established the defense so clearly that no rational jury could have found to the contrary" (internal quotation marks and quotation omitted)); *cf. Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 40–41 (Tenn. 2005) (stating that the movant bears the initial burden to "conclusively establish[]" that summary judgment is proper on an affirmative defense); *see generally George v. Alexander*, 931 S.W.2d 517, 527 (Tenn. 1996) ("An affirmative defense pleads a matter that is not within the plaintiff's prima facie case." (citation omitted)).

Turning now to the parties' arguments, the Court begins with Officer England's request for immunity under subsections 29-20-205(2), 310(b). Officer England contends that she is entitled to immunity "because the immunity of defendant Blount County is

removed as to any such negligence claim." [Def.'s Br. at 27]. This statement comprises the extent of her argument for immunity under the TGTLA; she does not cite any case law or even propose that subsection 29-20-205(2)'s exception, which is of course part of the statute's plain language, does not apply to the facts in the record. Ms. Colson asserts that Officer England's failure to confront the exception is fatal to her pursuit of immunity. [Pl.'s Resp. at 23].

The question of whether 29-20-205(2)'s exception applies to any given case is a threshold legal issue under the TGTLA, and because Officer England does not address it, the Court cannot award immunity to her or consider arguments concerning the merits of the TGTLA claim. *See Guthrie v. Rutherford County*, No. M2015–01718–COA–R3–CV, 2016 WL 7242815, at *3 (Tenn. Ct. App. Dec. 15, 2016) ("The question of whether the immunity has been removed from the entity being sued is a threshold determination that must be resolved in every TGTLA case in order to proceed to the merits of the case[.]" (citation omitted)); *see also* Tenn. Code. Ann. § 29-20-310(a) (providing that courts must "first determine" whether any exception under subsection 29-20-205 is "applicable to the facts" before addressing potential liability). Officer England's barebones argument is well short of satisfying her burden as the movant under subsection 29-20-205(2).

Even if Officer England provided the Court with grounds to address the merits of the TGTLA claim, her argument as to proximate cause fails because it is equally threadbare. Under Tennessee law, proximate cause consists of a three-prong test, requiring that:

(1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm complained of; (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Cadorette*, 1996 WL 187586 at *2 (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991). Officer England does not cite this test. She does not raise any argument that bears on each of its three elements. She contends that she "took action that was reasonable," but this contention deals with the applicable standard of care rather than proximate cause. [Def.'s Br. at 27]. She also argues that Ms. Colson's injuries were the result of her own behavior, but with this argument, she evokes a theory of contributory negligence—which is not an element of a negligence claim but an affirmative defense that Officer England has not raised to date. *See Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 436 (Tenn. 2015) (defining contributory negligence is "the legal concept that '[a] plaintiff's own negligence . . . played a part in causing [his or her] injury" (quotation omitted)). And besides, Officer England cites no portion of the record to buttress her positions, despite carrying the burden as the movant. *See Celotex*, 477 U.S. 323 ("[A] party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of 'the [record]' which it believes demonstrate the absence of a genuine issue of material fact." (quotation omitted)). Officer England therefore fails to meet her burden as the movant for summary judgment on Ms. Colson's negligence claim.

ii. Intentional Infliction of Emotional Distress

Officer England also requests summary judgment on Ms. Colson's claim for intentional infliction of emotional distress. [Def.'s Br. at 28]. A viable claim for intentional infliction of emotional distress—which is also known under Tennessee law as a claim for outrageous conduct, *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012)—requires conduct that is (1) intentional or reckless, (2) outrageous, and (3) resulted in a serious mental injury to the plaintiff, *Doe 1*, 154 S.W.3d at 31. Under the second element, the term "outrageous" requires behavior that is "so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly [i]ntolerable in a civilized community." *Id.* at 39 (internal quotation mark and quotation omitted). Under the third element, the plaintiff has to suffer a "particularly serious" mental injury, *id.*, which requires "significant impairment in [the plaintiff's] daily life," *Rogers*, 367 S.W.3d at 210.

Officer England moves for summary judgment by attacking the second and the third elements of Ms. Colson's claim. [Def.'s Br. at 28]. As to the third element, she maintains only that summary judgment is proper because Ms. Colson "cannot present proof of a 'serious mental injury.'" [*Id.*]. Ms. Colson is not the movant. She has no burden to "present" proof. Rather, Officer England bears the initial burden to establish that the record is without evidence of a serious injury. *See Celotex*, 477 U.S. 323 ("[A] party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of 'the [record]' which it believes demonstrate the absence of a genuine issue of material fact." (quotation omitted)). The burden shifts to Ms. Colson to identify

proof of her injury only if Officer England satisfies her initial burden. *Id.* By confusing the legal standard, Officer England makes no headway toward summary judgment under the third element of Ms. Colson's claim.

As to the second element—outrageous behavior—Officer England contends that the record evidence establishes that she "used the amount of force necessary to reasonably control Plaintiff" and that "[t]his [reasonable use of force] is not 'outrageous behavior.'" [Pl.'s Br. at 28]. Ms. Colson, however, asserts that Officer England's failure to heed her requests to use the restroom caused her to urinate on herself several times, in the presence of male officers who laughed at her. [Colson Aff. ¶¶ 35, 39]. She also maintains that when she requested to go to the restroom, Officer England said, "I don't give a fuck what you asked for," and "[W]e don't have to worry about it, she's already peed." [*Id.* ¶ 35; Officer Cook VieVue 2 at 21:32:28–29].[22] Ms. Colson argues that all of this evidence establishes a genuine issue of material fact as to whether Officer England's behavior was outrageous, [Def.'s Resp. at 25], or "beyond all bounds of decency," *Doe 1*, 154 S.W.3d at 39 (quotation omitted).

The Court cannot weigh this evidence and decide whether it constitutes outrageous behavior or a reasonable response to Ms. Colson's own behavior at the time—that task belongs to the jury. Indeed, "[o]rdinarily the question of whether . . . acts are 'outrageous in character and extreme in degree' should to go the jury," *Lineberry v. Locke*, No.

---

[22] Ms. Colson declares that, in the end, "[t]he experience was embarrassing" and "also humiliating." [Colson Aff. ¶ 39]. The question of whether embarrassment and humiliation are insufficient to constitute a serious mental injury, however, is not one that Officer England raises in her motion, so the Court does not address it.

M1999-02169-COA-R3-CV, 2000 WL 1050627, at *3 (Tenn. Ct. App. July 31, 2000) (citing *Dunn v. Moto Photo, Inc.*, 828 S.W.2d 747, 753 (Tenn. Ct. App. 1991). The record contains enough evidence to preclude the Court from parting with the norm and resolving the question of outrageous behavior under its own initiative. It would invade the jury's province. The Court will therefore allow Ms. Colson's claim for intentional infliction of emotional distress to continue to trial.

### iii. Punitive Damages

Lastly, Officer England seeks summary judgment on Ms. Colson's request for punitive damages under her state-law claims. [*See* Compl. ¶¶ 14, 186, 188 (pleading punitive damages)]. Officer England maintains that "Plaintiff should not recover any punitive damages against Officer England under state-law because the undisputed material facts do not support that Officer England acted intentionally, fraudulently, maliciously, or recklessly in relation to Plaintiff." [Def.'s Br. at 28 (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992))].

By doing nothing more than regurgitating the legal standard for punitive damages to the Court—without citing any portion of the record—Officer England does not persuade the Court that punitive damages are unavailable under Ms. Colson's claim for intentional infliction of emotional distress. *See Moorhead v. J.C. Penney Co.*, 555 S.W.2d 713, 718 (Tenn. 1977) (recognizing that "punitive damages may, in the discretion of the trier of facts, be awarded in cases of recovery for outrageous conduct"). As a matter of law, however, an ordinary negligence claim cannot result in punitive damages. *Duran*

*v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 206 (Tenn. Ct. App. 2008). And more particularly, the TGTLA—the statute under which Ms. Colson claims negligence—prohibits a plaintiff from recovering punitive damages. *See Tipton Cty. Bd. of Ed. v. Dennis*, 561 S.W.2d 148, 152 (Tenn. 1978) ("[I]t seems to us inappropriate and not in accord with the legislative intent [of the TGTLA] to permit a punitive award against a public body and its employees where only a negligent act is involved, even though it might be characterized as gross[.]"). The Court will therefore permit Ms. Colson to pursue punitive damages for intentional infliction of emotional distress but not for negligence. The Court offers no opinion regarding the availability of punitive damages under Ms. Colson's claim for assault and battery because Officer England does not broach this claim anywhere in her motion.

## IV.  CONCLUSION

Officer England meets her burden on summary judgment in some respects but not in others, and her Motion for Summary Judgment [doc. 66] is therefore **GRANTED in part and DENIED in part**. The Court orders as follows:

1. The Court **GRANTS** summary judgment on Count Four.

2. The Court **DENIES** summary judgment on Count Nine.

3. The Court **DENIES** summary judgment on Count Twelve.

4. The Court **GRANTS** summary judgment on Count Thirteen only to the extent that Ms. Colson seeks punitive damages.

5. The Court **DENIES** summary judgment on Count Thirteen in all other respects.

The Court will enter an order consistent with this opinion.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge