IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION


ANNISSA COLSON,                              )
                                             )
                Plaintiff,                   )
                                             )
v.                                           )      No. 3:16-CV-377
                                             )
CITY OF ALCOA, *el al*.,                     )
                                             )
                Defendants.                  )


## <u>MEMORANDUM OPINION</u>

This civil action is before the Court for consideration of the motion for summary

judgment filed by Defendants Chief Philip K. Potter, Lieutenant Keith Fletcher, Officer

Duston Cook, Officer Arik Wilson, and the City of Alcoa ("City Defendants") [doc. 128].

Plaintiff has responded [doc. 162], and the City Defendants have replied [doc. 173].  Oral

argument is unnecessary, and the motion is ripe for the court's determination.

Plaintiff has filed suit pursuant to 42 U.S.C. §§ 1983, 1985, 1986, and 1988,

alleging, violations of her constitutional rights under the Fourth, Eighth, and Fourteenth

Amendments.  Plaintiff also raises claims under Tennessee law for assault and battery,

negligence, and intentional infliction of emotional distress.  For the reasons that follow, the

motion will be granted in part and denied in part.

## I.      BACKGROUND

Plaintiff's lawsuit stems from her arrest by Officers Cook and Wilson, both of the

Alcoa Police Department ("APD"), for driving under the influence ("DUI") and reckless

endangerment. [Doc. 1 at 6-7]. At the scene of her initial arrest, Plaintiff consented to a blood alcohol test, and the officers drove her to Blount Memorial Hospital ("BMH") for the test. [*Id.* at 7]. However, once she arrived, she withdrew her consent, prompting the officers to instruct her to get back into the police cruiser. At that point, Plaintiff alleges, she began suffering from a panic attack, and asked the officers to let her breathe. The officers, however, believed that she was resisting their commands and responded by forcing her back into the vehicle. In the process, Officer Wilson pushed his knee into Plaintiff's knee, causing her knee to "pop." [*Id.*]. Plaintiff alleges that, once she was inside the patrol vehicle, she was screaming in pain, and Officer Cook contacted his supervisor, Lieutenant Fletcher, for instructions about how to proceed. [*Id.* at 8]. Lieutenant Fletcher allegedly told the officers to take Plaintiff to the Blount County Jail where the staff nurse could check her knee and conduct a mandatory blood draw. [*Id.* at 8, 28]. The officers then took her to the Blount County Jail, where Plaintiff alleges that she suffered from numerous other abuses from the Blount County staff. Plaintiff alleges that after she was released from the jail she learned that she had suffered knee injuries including a tibial plateau fracture, a torn ACL, and a torn LCL, as well as abrasions and bruises. [*Id.* at 10]. She also states that she experienced "substantial mental anguish." [*Id.*].

Plaintiff specifically raised the following claims against the City Defendants:

1. Use of Unlawful and Excessive Force (Against Officer Wilson)

2. Use of Unlawful and Excessive Force (Against Officer Cook)

4. Use of Unlawful and Excessive Force and Cruel and Unusual Punishment (Against All Individual Defendants)

5. *Monell* Claim (Against Alcoa)

6. Failure to Train and Supervise and Acquiescing in Unconstitutional Conduct of Subordinates (Against Chief Potter and Lieutenant Fletcher)

7. *Monell* Claim (Against Alcoa)

9. Failure to Provide Adequate Medical Care (Against All Defendants)

10. Failure to Protect (Against All Defendants)

11. Assault and Battery (Against Officer Cook and Officer Wilson)

12. Outrageous Conduct/Intentional Infliction of Emotional Distress (Against All Defendants)

13. Tennessee Governmental Tort Liability Act ("TGTLA") / Negligence (Against All Defendants)

[*Id.* at 36-60]. This Court dismissed all official-capacity claims against Chief Potter, Lieutenant Fletcher, Officer Cook, and Officer Wilson. [Doc. 79 at 31]. The Court also dismissed: (a) Count 4 as to Chief Potter and Lieutenant Fletcher; (b) Count 11 as to Officer Cook and Officer Wilson; and (c) Count 12 as to Alcoa, Chief Potter, and Lieutenant Fletcher. [*Id.* at 20, 23, 27]. In her response to the instant motion for summary judgment, Plaintiff explicitly states that she is abandoning Counts 4, 6, 10, and 11 in the entirety, and Count 9 as it relates to Chief Potter. [Doc. 162 at 5-6]. Accordingly, those claims will be dismissed, and the Court will address summary judgment as to the remaining claims.

**A. Body Camera Video**

The primary evidence in this case is the two video recordings from Officer Cook's body camera [Exhibits F and H]. The Court has reviewed the video evidence, and summarizes the events shown on the video as follows.

3

Officer Cook first arrives at the scene of an apparent accident, where a black SUV has been driven into a field off the side of a roadway, and left fender-first in a ditch, facing the roadway. A woman, later identified as Plaintiff, is sitting in the field behind the SUV. A man wearing a police badge around his neck, but not wearing a uniform, stands in the grass not far away from her. Officer Cook acknowledges him. "What's up?" Officer Cook says to him. "She's drunk" the off-duty officer says, pointing to the woman in the grass. The off-duty officer tells Officer Cook that he was driving on Springbrook Road earlier in the afternoon, saw the woman driving her vehicle—the same vehicle now lying in the ditch—and witnessed a boy jump from the vehicle and run into the grass adjacent to the road. According to the off-duty officer, the woman "gunned it" after the boy fled the vehicle, traversing off road, nearly hitting the boy, and crashing into the ditch. He states that the boy was Plaintiff's son, and informs Officer Cook that he is sitting safely in the officer's SUV, parked on the side of the road. He also hands Plaintiff's driver's license to Officer Cook, and Officer Cook radios for backup.

Officer Cook then approaches Plaintiff and asks what was going on, and she responds that she stopped to get her son and pulled off in a ditch. She states that her son was in the car and then ran out, and she followed him. When Officer Cook asks how much Plaintiff had drank that day, she states that she had "two shots" of vodka. Officer Cook then asks Plaintiff what medications she took, and she lists numerous medications, and states that there were numerous others, but does not specifically mention Klonopin.

Officer Cook then goes to speak to Plaintiff's son, Mason, who is still sitting in the off-duty police officer's vehicle. Officer Cook asks Mason what happened, and Mason

4

states that they were at the pool and his mom got "some . . . something that makes her drunk . . . alcohol," but he did not actually see her drink it. He states "I didn't know until she started cooking, I mean, not cooking, driving." Mason states that he pulled the emergency brake and ran away because his mom was "driving very fast" and he was afraid that they were going to crash.[1]

Officer Cook then begins setting up a sobriety test, by placing duct tape on the pavement. At that point, Officer Wilson arrives on the scene, and Officer Cook relays the information he had learned from Plaintiff, Mason, and the off-duty police officer (whom he refers to as "Opie"). When Officer Cook approaches Plaintiff again, she is talking to someone on her cell phone, and hands the phone to Officer Cook, to talk to her "friend." Officer Cook speaks to Plaintiff's friend for a moment and writes down the individual's phone number to return the call later. Officer Cook instructs Plaintiff to walk down in front of his car, and Plaintiff responds "no." Officer Cook then asks Plaintiff if she is willing to submit to sobriety tests and she responds "no, I'm not," and states "I was driving [unintelligible] I was buzzed." Plaintiff again confirms that she is refusing to submit to a sobriety test. Officer Cook then instructs Plaintiff to stand up and she refuses. Officer Cook informs her that she is under arrest for DUI, and Plaintiff yells back that her keys were not in her ignition. Officer Cook informs Plaintiff that it does not matter, and instructs her that, if she does not want to be charged with resisting arrest, to stand up and put her

---

[1] At the time, Mason was ten years old. In an affidavit, Plaintiff alleges that Mason ran from her vehicle because he was mad that she would not take him to McDonalds. [Doc. 101-3 at ¶ 10].

5

hands behind her back. Plaintiff continues to refuse, but ultimately relents when threatened again with a charge of resisting arrest. After she is handcuffed Officers Cook and Wilson tell Plaintiff that she is under arrest for DUI, and she repeatedly states that her keys were not in her ignition.

As Officer Cook escorts Plaintiff to his patrol vehicle, he asks Plaintiff if she is willing to submit to a blood alcohol test and she responds "no, I'm not willing to do anything for you because my keys were not in my ignition." The officers place Plaintiff in the backseat of a police cruiser, and get contact information for her mother, to come pick up Mason. Plaintiff continues to yell at the officers that her keys were not in the ignition, and begins swearing at the officers. Officer Cook then calls the district attorney to determine whether the situation would require a mandatory blood draw, and is informed that it is a mandatory blood draw. Officer Cook confirms that if Plaintiff does not consent to the blood draw, he should get a search warrant.

Lieutenant Fletcher then arrives on the scene, and Officer Cook recounts the events to Lieutenant Fletcher. Lieutenant Fletcher agrees with Officer Cook's plan to read Plaintiff the implied consent law, inform her that it is a mandatory blood draw, and obtain a search warrant if she refused to consent. Officer Cook then reads the implied consent form to Plaintiff, and informs her that, if she refuses to consent to a blood draw, he is authorized to obtain a search warrant for her blood. Plaintiff swears at Officer Cook and states that she is not willing to consent to the blood draw. Officer Cook informs Plaintiff that the district attorney has advised him to seek a search warrant for her blood and that, if she does not consent to the blood draw, she will face an additional charge and her blood

6

will be drawn anyway.  Plaintiff then asks how much time she has to decide, and Officer Cook states she must decide right then.  Plaintiff ultimately says "yeah, do it!"  Officer Cook then asks Lieutenant Fletcher to wait with Mason, until his grandmother arrives to pick him up.  Officer Cook states that he wants Officer Wilson to follow him to the hospital, because he is concerned that Plaintiff will revoke her consent to the blood draw.  Officer Cook then drives Plaintiff to BMH for the blood draw, and Plaintiff continues to yell at Officer Cook that her keys were not in the ignition throughout the car ride.

When they arrive at BMH, Officer Cook exits the vehicle and instructs Plaintiff to exit as well.  Plaintiff stands up and immediately says "I'm not taking a blood test."  Officer Cook confirms that Plaintiff is now refusing the blood draw, and Plaintiff continues cursing at the officers.  Several minutes go by while the officers look at paperwork and Officer Cook places another call to the district attorney.  Officer Cook informs the district attorney that Plaintiff is at the hospital but has now refused to consent to the blood draw.  Officer Cook hangs up the phone, and tells Officer Wilson that they will get a search warrant for Plaintiff's blood.  Officer Cook tells Plaintiff to get back into the car.  She responds "search warrant for what," and Officer Cook states "for your blood."  Plaintiff says "get one, I'm standing here."  Officer Cook tells her again to get in the car, and she yells back "I'm standing here."

After Plaintiff refuses to comply with Officer Cook's fifth command to get in the vehicle, Officer Cook begins trying to push Plaintiff into the police car.  Plaintiff yells "I'm standing here, fucker."  After being instructed several more times to get in the car, Plaintiff yells "let me breathe, motherfucker."  She then continues to yell "let me breathe," while

7

the officers continue telling her to get in the car. Officer Cook goes around to the other side of the car, crawls in the back seat, and attempts to pull Plaintiff into the car by her arms. The video at this point is somewhat unclear, as Officer Cook is actively struggling with Plaintiff. Plaintiff can be heard continuing to yell "let me breathe" and cursing. Plaintiff also yells at the officers that they are "using unusual force" and that she is "not stupid." She also tells the officers she has a bachelor's degree in psychology. The officers continue instructing Plaintiff to get into the police car.

At this point, a popping sound can be heard in the video, and Plaintiff screams "ow, my fucking knee, motherfucker!" She then begins yelling "I am breathing" repeatedly, while the officers continue ordering her to get in the car. Officer Cook comes back around to the side of the car where Officer Wilson is trying to force Plaintiff into the car, and Plaintiff yells "give me five fucking seconds." At that point, the officers release Plaintiff, but continue ordering her to get in the police vehicle. Plaintiff then begins to calm down somewhat, and Officer Cook appears to call for backup to the hospital. Thereafter, both Officers Cook and Wilson continue instructing Plaintiff to get in the car, and Plaintiff yells "you popped my knee 10 fucking times you motherfucker, I know my rights! Just let me fucking breathe!" Plaintiff is given a second while the officers trade places, and Officer Wilson goes around to pull Plaintiff in from the backseat. Plaintiff then requests ten seconds, and Officer Cook counts "10, 9, 8," but Colson continues to scream "give me 10 seconds" and "I will sue you motherfuckers." Officer Cook appears to then use a pressure point on Plaintiff's neck to try to force her into the car. Plaintiff continues to fight, curse,

and scream. Ultimately, Officer Cook successfully pushes Plaintiff into the back seat of the car, where she begins screaming "I'm so suing you" and "you don't know who I am."

Officer Wilson then informs Officer Cook that he had his knee pressed into Plaintiff's leg, and her knee popped. Plaintiff can be heard screaming and crying from inside the police car. Officer Cook then calls Lieutenant Fletcher and informs him that Plaintiff had become combative, and that, in the struggle, Officer Wilson "had heard her knee maybe pop or something like that." Officer Cook asks if he should go ahead over to the jail, and Officer Wilson asks if they should get her knee looked at. Officer Cook hangs up the phone, instructs Officer Wilson that they will take Plaintiff straight to the jail, and asks Officer Wilson to obtain a blood draw kit from the hospital so that the jail nurse can take her blood. Officer Cook re-enters his police car, where Plaintiff is screaming "I want my mom" repeatedly, and complains that her knee was popped. Officer Cook then transports Plaintiff to the Blount County jail.

Officer Cook pulls up to the jail and informs staff that he has "one female, combative." Two jail employees, including Officer Mandy England, approach the police vehicle to assist in getting Plaintiff out of the car. Officer England helps Plaintiff stand up, but Plaintiff walks from the car, into the pat-down room without any limp or noticeable sign of injury. As soon as she walks into the pat-down room, Plaintiff states "my knee is fucked up thanks to your officers." Officer England acknowledges her, responding "okay." Seconds later, Plaintiff falls to the floor as Officer England is frisking her, and cries out "ow, ow my fucking knee." Officer England instructs Plaintiff to stand up, and helps lift her off the floor, along with another female officer. Plaintiff informs all the officers "you

9

all are getting sued just to let you know." Officer Cook asks for a nurse, and shortly thereafter, one of the officers in the pat down room radios for the nurse. Plaintiff echoes the request for the nurse, stating "please." Plaintiff stands for several minutes while removing jewelry from her person, but continues to cry and complain about the officers injuring her knee. At one point, Plaintiff steps forward to place a ring in a plastic bag and totters and winces, prompting Officer England and another officer to take her by the arms and steady her.

The jail nurse, Jennifer Russell, is then brought into the pat down room and the female officer conducting the pat down requests that the nurse check Plaintiff over. Plaintiff yells "yeah, they done fucked up my knee, okay." She also states she has "never heard it pop so much" in her life. The nurse directs Plaintiff to straighten her leg, to bend it back, and to move it from side to side. "It hurts, it hurts," Plaintiff responds. The nurse next instructs her to stand up straight against the wall. "I can't, she says, "I can't straighten my legs." After bending to examine Plaintiff's knee, the nurse states, "I don't see no swelling," and leaves the room. In response to this statement, the officers guide Plaintiff toward a cell located further inside the jail. Officer Cook lingers so he can speak with the nurse about drawing Plaintiff's blood. As they are talking to each other, and as the officers are moving Plaintiff into the cell, Plaintiff—who is now outside the lens of Officer Cook's body camera—raises her voice at the officers. She continuously yells the word "bitch." "Hang on," Officer Cook says, "I'm going to record this." As the commotion between Plaintiff and the officers is stirring in the background, he moves toward the cell where the officers have taken her. Inside, at least five officers are pinning her to the floor. "Are you

10

done?" one of them says to her. "Bitch," she says back. Officer Cook turns off his body camera and all goes black.

By the time Officer Cook turns his camera on again, Plaintiff is lying in a restraint chair, strapped down to it. Officer Cook comes into the room and informs Plaintiff that he has obtained a search warrant for her blood and shows her the warrant. Plaintiff complains that she has been asking to use the bathroom for an hour but has not been allowed. Officer Cook tells her that if she cooperates, he is sure that the jail's officers will allow her to use the bathroom. He informs Plaintiff that, once she is in the jail, the Blount County officers are in charge, not him. "Okay," Plaintiff replies, nodding. Seconds later, she again asks for permission to go to the restroom. "I pissed myself," she says. In the background, a female officer, possible Officer England, says, "Guys, you don't have to worry about it. She's already peed."

Nurse Russell then enters the room and prepares to take blood from Plaintiff's left arm, but Plaintiff intimates that she would prefer to have the nurse draw blood from her right arm instead. Accommodating her, Nurse Russell moves to the restraint chair's oppose side, where she readies to draw blood from Plaintiff's right arm. However, Plaintiff appears to resist her efforts, refusing to keep her arm at rest. "I have no control over my arm staying still. I'm sorry," she says to the nurse. She refuses to cooperate because the officers did not let her use the restroom: "I have no control over my arm stating still. I had to pee like an hour ago and nobody let me," she says. Officer England is then heard yelling at Plaintiff from outside the room. Plaintiff yells back "I already pissed myself once," "I'll sit here until it don't fucking matter," and "what are you going to do, I'm in a restraint

11

chair." Several officers enter the room, including Officer England, who says "We're going to draw that motherfucking blood whether you like it or not." Plaintiff responds "I'm just going to move. I'm just going to keep moving and nobody's going to take my blood. Blah, blah, blah." Nearly at eye-level with Plaintiff, Officer England holds down her right arm with one hand and presses into her shoulder with the other hand, while two other officers also help to keep her still. As the nurse is attempting to take Plaintiff's blood, Plaintiff lunges at Officer England's bare arm with her mouth.

Almost in one motion, Officer England recoils and slaps Plaintiff in the face. Plaintiff immediately screams "Oh, bitch." "Don't you fucking bite me," Officer England yells. Officer England then goes to get a helmet, while another officer holds Plaintiff by the neck. Plaintiff complains that the officer is hurting her neck, and the officer responds "good, you shouldn't have just bit my officer." Plaintiff responds "I didn't bite her, I tried to, I didn't bite the bitch though." Officer England yells "Oh, you fucking bit me, I've got the marks." Plaintiff begins yelling for the officer to let go of her neck, and Officer England re-enters with the helmet, which she places on Plaintiff's head. Plaintiff begins complaining about the helmet, and Officer England says "you bit me once so." Plaintiff responds "I didn't bite you, I was just moving my mouth, it's funny how people will jump huh?" Officer England threatens to charge Plaintiff for the bite, and Plaintiff says "charge me with it cause I didn't, and you smacked me bitch. And that's on camera, right there! I know where the camera is." Officer England then looks directly into Officer Cook's body camera and smiles. Plaintiff continues to complain, and continues on to state, "I didn't bite you, you stupid bitch, if I wanted to bite you I would have bit you." Officer England

12

responds "well, you bit me," and Plaintiff responds "no, I didn't." Officer England yells "I've got your spit on my arm lady," and Plaintiff responds, "yeah, I opened my mouth, I didn't bite you, dumbass, you know what a bite is?" This bickering between Plaintiff and Officer England continues. Plaintiff also begins badgering Officer England to give her badge number and discusses her plans to sue again. Officer England leaves the room as the blood draw finishes, and Officer Cook obtains a bandage for Nurse Russell. The video ends after Officer Cook hands Nurse Russell the bandage.

Plaintiff ultimately pled guilty to resisting arrest, reckless endangerment, and driving under the influence [Doc. 128-3 at 2; Doc. 128-4 at 2; Doc. 128-5 at 2]. An official alcohol report from the Tennessee Bureau of Investigation's Knoxville Crime Laboratory indicated that Plaintiff's blood was collected at 9:54 p.m., and indicated a blood alcohol content of .151, nearly twice the legal limit. [Doc. 128-6].

**B. Testimonial Evidence**

**a. APD Testimony**

In his affidavit, Lieutenant Fletcher stated that he has been employed by the City of Alcoa for over 18 years, and has worked in law enforcement for over 27 years. [Doc. 128-1 at 1-2]. While employed by the City, Lieutenant Fletcher received both the forty hours of training required by the State and additional training. [*Id*. at 2]. Lieutenant Fletcher stated that the APD's custom and practice provides that an officer has discretion to take an arrestee to the hospital without supervisor permission only if the situation is life-threatening. Otherwise, a supervisor must approve before an arrestee may be taken to the hospital. Additionally, the City's practice, policy, and training requires that an arrestee

13

who is suffering a non-life-threatening injury, and who is combative, disruptive, or belligerent, should be taken to the jail rather than the hospital, because jail staff are better trained and equipped to handle such an individual. Lieutenant Fletcher stated that he was not present during any of the events involving Plaintiff, however, Lieutenant Fletcher instructed Officer Cook, via telephone, to take Plaintiff to the jail, after he was informed of Plaintiff's behavior and the "pop" heard in Plaintiff's knee.[2] Lieutenant Fletcher stated that he never heard Plaintiff ask to be taken to the hospital or ask for medical care. [*Id.*]. Lieutenant Fletcher further stated that he was not aware of any information that indicated that the "pop" in Plaintiff's knee was life-threatening or even a serious injury, but he did know that a nurse would be on staff at the jail to review any possible injury and determine if Plaintiff's knee needed any immediate medical care. [*Id.* at 2-3]. Lieutenant Fletcher stated that the City maintains a policies and procedures manual, APD officers are required to be familiar with this manual, and APD officers are trained to follow the manual. [*Id.* at 3]. Once the officers released Plaintiff to the jail staff in the sally port and pat-down room of the Blount County jail, the City police officers no longer had control or custody over her. [*Id.*]. Thus, the City officers had no authority to control, supervise, or provide orders to jail staff. [*Id.* at 4].

In his affidavit, former Chief Potter stated that he worked in law enforcement for over 40 years before becoming the Chief of Police for Alcoa, a position he retained until

---

[2] Although Lieutenant Fletcher states that he was "not present with Ms. Colson when any of the relevant events she's alleged in her complaint happened," it does appear, from the video evidence, that Lieutenant Fletcher was present at the initial accident scene at some point, although he does not appear to have ever personally interacted with Plaintiff.

14

his retirement in February 2017. [Doc. 128-2 at 2]. While employed by the City, he always received the State-required 40 hours of training, as well as additional training. While he was the Chief of Police, he ensured that all City officers were familiar with the policies and procedures of the APD, including Officers Cook and Wilson and Lieutenant Fletcher. Former Chief Potter ensured that each of the officers received, at a minimum, all annual training required by the State. Former Chief Potter stated that all City officers were required to be familiar with the APD's policies and procedures manual, and Officers Cook and Wilson, and Lieutenant Fletcher were all trained. Former Chief Potter was not at the scene of any of the events referenced in the complaint, and was not involved with Plaintiff on the day of her arrest. [*Id*.].

During his deposition, Officer Cook stated that, on June 23, 2015, he drove Plaintiff to BMH because she had consented to a blood draw. [Doc. 128-10 at 4]. He asked Officer Wilson to accompany him to BMH due to Plaintiff's demeanor and attitude. [*Id*. at 4-5]. When Plaintiff refused to go into the hospital, Officer Cook believed that he would need to obtain a search warrant for a blood draw from the magistrate's office in the Blount County Justice Center, a building which also housed the Blount County jail. [*Id*. at 6-7]. When Plaintiff refused to get into the police car, Officer Cook got into the back seat of the car and grabbed the chain of her handcuffs, attempting to pull her into the car. [*Id*. at 8-9]. Officer Cook was having substantial difficulty getting Plaintiff into the police cruiser, despite her being handcuffed. [Doc. 165-3 at 7]. When Officer Cook first heard Plaintiff's knee pop, he thought that the noise was Plaintiff ripping off the rubber piece attached the

car door, not her knee. [Doc. 128-10 at 10]. When the "pop" sound happened, Plaintiff screamed. [*Id*. at 12].

Officer Cook stated that his discretion as an officer to take someone to the hospital or the jail for medical treatment depended on if the situation was life-threatening. [*Id*.]. He stated that he did not have the discretion or authority to walk Plaintiff into the hospital without getting authority from someone higher up, even if she was having a panic attack. [*Id*. at 14]. Officer Cook admitted that he did nothing to advocate for taking Plaintiff to the emergency room, he simply deferred to Lieutenant Fletcher's decision. [*Id*. at 16]. The City of Alcoa is not involved with the Blount County jail's operation, and once an arrestee is accepted in the pat-down room at the jail, she is in Blount County's custody. [*Id*. at 17]. Officer Cook stated that he received all of the required training for law enforcement officers in Tennessee since employed by the APD, and had also received additional training. [*Id*. at 19]. Officer Cook stated that he had been trained to notice certain signals in people's mental health, but did not have any specific training in panic attacks. [Doc. 165-3 at 4].

In his deposition, Officer Wilson stated that when Plaintiff refused to get back into the police car, while Officer Cook was at Plaintiff's back pulling her into the car, Officer Wilson pressed his body against Plaintiff's body, including his leg against Plaintiff's leg. [Doc. 128-12 at 5]. His knee was touching Plaintiff's knee, but he was not bending his knee into hers. [*Id*. at 6-7]. Officer Wilson tried to grab Plaintiff by the top of the head and the stomach and push her into the car, and then he tried using the jugular notch pressure technique. [*Id*. at 9]. At some point during the struggle, Officer Wilson separated his leg from Plaintiff's while attempting to push her down in the car, leaving approximately half

16

a foot of space between his leg and Plaintiff's leg. [*Id*. at 11]. He then moved his leg back against Plaintiff's leg and was struggling to get her in the car when he felt and heard the pop in her knee. [*Id*. at 12]. The pop did not occur when Officer Wilson made contact with Plaintiff's leg again, his knee was in place a couple of seconds before the pop. [*Id*.]. After her knee popped, Plaintiff never said that she wanted to go into the hospital. [*Id*. at 23]. Officer Wilson stated that, after Plaintiff's knee popped, she continued resisting, refusing to sit down in the car, and, instead, chose to continue standing. [Doc. 173-7 at 5]. At that time, he did not know that Plaintiff suffered from panic attacks. [Doc. 128-12 at 9]. After Plaintiff's knee popped, and she was in the police car, Officer Cook called Lieutenant Fletcher, and Officer Wilson asked whether Lieutenant Fletcher wanted the officers to get Plaintiff's knee looked at, because he wanted to ensure that the information about Plaintiff's knee was relayed to Lieutenant Fletcher. [Doc. 165-6 at 18-19].

Officer Wilson stated that he had taken arrestees to the hospital many times for blood draws, but could not recall taking any to the hospital for medical reasons. [Doc. 128-12 at 2-3]. Generally, officers are required to get authority from a supervisor to take someone in their custody to a local hospital rather than the Blount County jail. [*Id*. at 4]. Officer Wilson stated that he received all of the required training for law enforcement officers in Tennessee since employed by the APD, and also received additional training. [*Id*. at 24]. Officer Wilson stated that he had received training on signals or signs of people dealing with mental health problems, including excited delirium. [Doc. 165-6 at 5]. Officer Wilson never asked Plaintiff if she had any medical issues or what type of medication she was on, because Officer Cook was handling the investigation. [*Id*. at 3].

17

Officer Wilson never asked Plaintiff if she suffered from panic attacks or had any other mental issue. [*Id*. at 11].

### b. Plaintiff's Testimony

In her deposition Plaintiff stated that, on June 23, 2015, she woke up, had coffee, and went to her job as a receptionist at East Tennessee Children's Hospital. [Doc. 128-9 at 7, 10]. She worked her normal hours of 9 a.m. to 3 p.m. and did not have any alcohol to drink prior to 3 p.m. that day. [*Id*. at 8]. After work, she took her son, Mason, to the pool. [*Id*. at 10]. She stated that she had a "little bit of vodka in [her] Coke Zero" at the pool. She arrived at the pool around 4 or 4:30 p.m. and left when the pool closed at 7 p.m. [*Id*.]. Plaintiff stated that she "just drank one thing," which she described as "whipped cream schnapps." [*Id*. at 11].

Plaintiff stated that, after leaving the pool, Mason was having a "fit" in the back of the car because he wanted to go to McDonalds, and she pulled off of the road and onto the shoulder to turn around and talk to him. [Doc. 128-9 at 12-13; Doc. 165-1 at 37]. When she pulled off and slowed down to stop the car, Mason jumped out and began running. [*Id*.]. Plaintiff began following Mason in the car, trying to get him back into the car, but Mason ignored her. [Doc. 128-9 at 13]. Plaintiff stated that she ultimately stopped her car in the field to get out and get Mason. [*Id*. at 13, 15]. Where she parked was the same location that the vehicle was when Officer Cook arrived on the scene. [*Id*. at 15-16]. Almost immediately after she got out of her car to get Mason, a man pulled up beside her and said that he was calling the police. [*Id*. at 16-17]. Plaintiff stated that she did not say

18

anything to the man, but went and sat down. [*Id*. at 17]. At that point, Plaintiff stated, the man and his wife, who was also in the car, had Mason with them. [*Id*. at 18].

After Officer Cook drove her to BMH, Plaintiff changed her mind about consenting to the blood draw because she believed that not having her keys in the ignition of her car meant that she could not be arrested for DUI, and therefore, should not be forced to give blood. [Doc. 165-1 at 55-56]. She alleged that she began having a panic attack when the officers said that they were going to get a warrant for her blood, and the only reason that she refused to comply with Officer Cook's commands to get into the police car was that she was trying to calm down. [*Id*. at 59]. Plaintiff described this as a "horrific" panic attack, and the worst panic attack she has ever experienced. [*Id*. at 28-29]. She also stated that she did not have the ability to calm herself down. [*Id*.]. The symptoms that she was experiencing included chest pain, feeling like she could not breathe, lightheadedness, and stomach pain. [Doc. 128-9 at 44].

At the time of her alleged panic attack, Plaintiff recognized her symptoms as that of a panic attack, but she never told the officers that she was having a panic attack. [Doc. 128-9 at 43-44]. She stated that she could not vocalize her symptoms to the officers because "[a]t that point I was a mess[.]" [*Id*.]. She was also trying to focus on her breathing and calm herself down. [Doc. 165-1 at 31]. Plaintiff also never told Officers Cook or Wilson that she suffered from panic attacks, or that she took Klonopin for panic attacks, although she did ask for a chance to breathe to calm herself down. [*Id*. at 30]. Further, she did not take the Klonopin after her first contact with the police officers, even though she had the medicine in her purse, because she did not have an opportunity to do so. [*Id*.

19

at 21]. She claimed that if the officers had given her "20 seconds" to focus on her breathing and calm down, she "probably" would have gotten in the car. [*Id*. at 32].

With regard to her struggle with Officers Wilson and Cook outside BMH, Plaintiff stated that, at the point where her knee "popped," Officer Wilson was trying to push her into the car. [Doc. 128-9 at 27]. She was resisting these efforts by keeping her body stiff, with her feet planted shoulder-width apart on the ground. [*Id*.]. When her knee popped, it "felt like being kneed in the side of [her] knee." [*Id*. at 28]. In describing the knee injury, Plaintiff stated that "it felt like a knee into the side of my knee. And it popped and it was excruciating pain." [*Id*. at 32]. Plaintiff explained that the officer was leaning into her with his knee. [*Id*. at 33]. She stated that there was an increase of pressure and her knee popped. [*Id*.]. The pressure on her knee lasted four or five seconds. [*Id*. at 34]. She also agreed that there was not a sudden burst of contact with her knee, it was several seconds of leaning against the knee that resulted in the pop. [Doc. 165-1 at 73]. She stated that she had never felt her knee pop like that before. [Doc. 128-9 at 42]. Plaintiff alleged that, at the point when her knee popped, she had suffered at least one torn ligament. [*Id*. at 30].

Later, the officers used pressure points by her neck, but those still did not work to get her into the car, according to Plaintiff, because she was having a panic attack. [*Id*. at 29]. However, she did not go down to the ground, her feet did not get swept out from under her, and her leg did not come off the ground at all. [*Id*. at 30-31]. After that, Plaintiff was "in a full-blown panic attack." [*Id*. at 31]. Plaintiff agreed that, even the "knee strike" and use of force, were not sufficient to get her back in the police car, because she was actively resisting the officers' efforts to get her into the car. [*Id*.]. Plaintiff repeatedly agreed that

20

the officers asked her to get back into the police car, professionally, before any force was used on her. [*Id*. at 34; Doc. 165-1 at 72-73].

Once at the jail, Plaintiff never asked for aspirin, crutches, or to be taken to the hospital for her knee injury. [Doc. 128-9 at 48]. Plaintiff stated that she did not ask for any assistance because she was terrified of the police officers. [*Id*. at 50]. She admitted that she did not complain about any issues with her knee or ask to see the nurse again from the time of the restraint chair until the time that she left the jail. [*Id*.]. When asked what could have been done at the jail for her knee, she stated that something could have been done to assist her walking so that she was not putting her full weight on her knee, and she could have been given pain medication. [*Id*. at 59].

On June 24, 2015, Plaintiff bonded out of jail around 4 a.m., went home, took a shower, and took a nap. [*Id*. at 49]. She then drove to her job at Children's Hospital. [*Id*. at 52]. She parked in the parking garage and walked into her workplace. [*Id*. at 54]. Her knee hurt, and gave out several times during the day, but she was able to walk. [*Id*.]. She worked from 9 a.m. to 3 p.m., and none of her coworkers saw her having problems with her knee. [*Id*.]. After work, she walked about a block and a half to her parking spot to leave. [*Id*. at 55]. When she got home from work, she contemplated whether to go to the emergency room for a bit, and ultimately decided to go, arriving at 7:16 p.m. [*Id*. at 57-58]. The hospital diagnosed the problem with her knee, but did not do anything to "fix" it. [*Id*. at 59]. Instead, at the hospital she was given a brace and crutches, as well as a prescription for pain medication. [*Id*. at 23].

21

When asked how the situation that occurred with the APD and Blount County had affected her emotionally, Plaintiff stated that her anxiety had gotten worse, especially when she sees a police car. [*Id*. at 33]. However, she had not received any mental health treatment since June 23, 2015, for any mental injury as a result of the incident, and had no plans to do so. [Doc. 128-9 at 35]. In fact, since 2010, she had not been treated by a mental health professional at all for her panic attacks, other than getting her Klonopin prescription refilled. [*Id*. at 24].

Plaintiff admitted that, at an appointment on July 2, 2015, an orthopedic doctor could not tell from his physical exam whether or not she had an ACL tear. [Doc. 128-9 at 60]. She ultimately waited until May 2017 to have surgery to correct the knee issue because her insurance would not pay for the surgery at first. [*Id*. at 61-62]. Plaintiff missed 12 weeks of work after she had her knee surgery. [Doc. 165-1 at 16]. Plaintiff stated that one of her physical therapists informed her that her ACL and LCL tears were probably two separate events, because the knee going one direction would not have caused both injuries. [Doc. 165-1 at 48-49]. Plaintiff stated that she believed that being forced to stand on the knee after the initial injury, with the knee buckling and her falling, caused the second injury to her knee. [*Id*. at 48]. Plaintiff admitted that her injury was not life-threatening, and she was never told that it was a serious medical condition. [Doc. 128-9 at 22-23]. No medical professional ever told her that her knee injury worsened because she waited until June 24th to get treatment. [*Id*. at 23]. Plaintiff stated that, as a result of her knee injury, she could no longer go "mushroom hunting," could not sleep on her right side or stomach, could not

22

stand for an extended period of time, could not go hiking, and was uncomfortable when she crossed her legs or drove. [Doc. 165-1 at 83].

Plaintiff admitted that she pled guilty to resisting arrest, she knew what she was signing, and she understood that the guilty plea was as a result of facts that she knew existed and conclusively proved the elements of the charge of resisting arrest. [Doc. 173-2 at 2]. When asked at what point she committed the offense of resisting arrest, she responded "I guess at the hospital." [Doc. 128-9 at 3]. When asked what she did that constituted resisting, she stated that she had a panic attack and "stiffened up." [*Id*. at 3-4]. Plaintiff stated that the point where she refused to get back into the police cruiser was what she considered to have been the offense of resisting arrest, to which she pleaded guilty. [*Id*.]. She later stated that the offense of resisting, in her mind, began when she refused to get in the car and continued to the point where she was finally placed in the car. [*Id*. at 5].

Plaintiff admitted that she had no personal knowledge of the policies and procedures of the APD, and had no knowledge of the training that Officers Cook or Wilson, Lieutenant Fletcher, or former Chief Potter had with the APD. [Doc. 128-9 at 19-20]. She also admitted that she had no personal knowledge of any prior unlawful act committed by Officers Cook or Wilson, Lieutenant Fletcher, or former Chief Potter. [*Id*. at 20-21]. Plaintiff stated that she never saw Lieutenant Fletcher or Chief Potter on June 23, 2015. [*Id*. at 21-22].

In a later affidavit, Plaintiff stated that the symptoms she has suffered during a panic attack include racing heart, labored breathing, claustrophobia, trembling, chest pains, faintness, nausea, disorientation, a sense of imminent danger, and an urge to escape. [Doc.

23

165-23 at 3]. She stated that these attacks can last from 10 minutes to an hour. [*Id*.]. At the hospital on June 23, she began having a panic attack and asked the officers for a few seconds to breathe. [*Id*. at 4]. One of the officers began counting down, and then both officers began attempting to force her back into the car. [*Id*.]. Plaintiff stated that she was not resisting the officers' commands, but was incapable of following any commands in the middle of a "full-blown" panic attack. [*Id*.]. When she arrived at the jail, she was able to walk a short distance, but later her knee would not support her and she fell to the ground on multiple occasions. [*Id*. at 6]. Plaintiff claimed that her behavior on the night of June 23 "was not me being combative at all. I was having the worst panic attack I had ever had." [*Id*. at 8].

### c. Medical Testimony

Dr. Edwin Michael Holt testified in his deposition that Plaintiff was seen by a doctor on July 10, 2015, who reviewed her MRI findings, which showed an ACL tear and LCL strain, and a small avulsion fracture of the fibular head, which is a piece of bone that is pulled off by a ligament or capsular structure usually when the knee is placed in an abnormal position. [Doc. 165-5 at 3]. Dr. Holt stated that, in his medical opinion, Plaintiff could have suffered this injury in her scuffle with the police, but also could have been injured during her car accident before her arrest. [*Id*. at 4]. Dr. Holt stated that he had reviewed the video of Plaintiff's incident with the police and "found it very odd" that she did not limp after leaving the police car. [*Id*. at 5]. Dr. Holt acknowledged that if Plaintiff was "kneed in the knee and her knee was extended" it could result in the ACL tear. [*Id*. at 6]. However, Dr. Holt stated that the delay in not getting Plaintiff to the hospital would

24

not have impacted her medical care or treatment. [Doc. 173-5 at 2]. In fact, Dr. Holt stated that it could be dangerous to give crutches to an individual if their blood alcohol content was high, and it could be very dangerous to give someone pain medication, even aspirin, to an intoxicated person. [*Id*. at 3-4]. Dr. Holt concluded that the delay in getting treatment in no way worsened Colson's knee injury or caused any medical detriment. [*Id*. at 5-6].

## II.    STANDARD OF REVIEW

The City Defendants' motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment. Rule 56(a) provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion[.]" Fed. R. Civ. P. 56(c)(1). This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Additionally, a party may "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.

25

1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Moreover, mere conclusory and unsupported allegations, rooted in speculation, are insufficient to meet this burden. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

To defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

## III.   ANALYSIS

As an initial matter, the Court notes that the City Defendants, in support of their motion, have filed numerous video recordings—from the point of view of the officers' body cameras—for the Court's consideration. These videos bring illumination to many of the events and circumstances that the parties have disputed through the pleading stage and up to this point. Because the Court does not ordinarily receive video evidence when resolving motions for summary judgment, it will explain how it intends to view—not weigh, but view—this evidence through the prism of the legal standard governing summary judgment.

First, the Court may properly consider the videos as evidence at this stage in the litigation, and neither party argues otherwise. *See Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (recognizing that "a court may properly consider videotape evidence at the summary-judgment stage"). However, the Court must also "view[] the facts in the light

26

depicted by the videotape." *Scotty v. Harris*, 550 U.S. 372, 38 (2007). In other words, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the [video], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. at 380. In short, the Court, under the guise of construing the videos in the light most favorable to Plaintiff, will not peddle a version of events that is tantamount to "visible fiction." *Id*. at 381.

## A. Counts 1 and 2: Excessive Force

In Count 1 of her complaint, Plaintiff alleges that Officer Wilson used excessive force by striking her in the right knee, causing a tibial plateau fracture, a torn ACL, and a torn LCL, while she was in the midst of a panic attack. [Doc. 1 at 36-37]. Plaintiff also asserts that Officer Wilson used excessive force against her by applying a jugular-notch pressure point maneuver on her, while completely ignoring her panic attack, which she asserts rendered her "entirely incapable of comporting herself to even basic instructions[.]" [*Id*. at 37]. In Count 2, Plaintiff alleges that Officer Cook used excessive force by applying a clavicle pressure point tactic to her immediately after Officer Wilson had struck her right knee. [*Id*. at 38-39].

The City Defendants argue that they are entitled to summary judgment on Counts 1 and 2, for several reasons. [Doc. 129 at 17-24]. First, because Plaintiff pleaded guilty to resisting arrest, her excessive force claims are barred by *Heck v. Humphrey,* 512 U.S. 477 (1994). [*Id*. at 20]. The City Defendants further argue that Officer Wilson's use-of-force, by leaning into and trying to push Plaintiff was a reasonable amount of force under the

27

circumstances. [*Id.* at 21]. Additionally, the City Defendants argue that Officer Cook's application of pain compliance technique to Plaintiff was not objectively unreasonable, given that Plaintiff was resisting arrest. [*Id.* at 24]. Finally, the City Defendants contend that Officers Cook and Wilson are entitled to qualified immunity. [*Id.* at 36-37].

Plaintiff responds that the applicable factors indicate that Officers Wilson and Cook's uses-of-force were unreasonable, because: (1) her offense of DUI was not violent or particularly serious; (2) she did not react violently or attempt to use physical force against the officers; and (3) her actions did not bear the hallmarks of "active resistance," or, at least, her level of resistance is a materially disputed fact for the jury. [*Id.* at 19-20; 24]. Plaintiff also contends that her excessive force claims are not barred by *Heck*, because, to the extent that she could "actively resist," such resistance only occurred after the officers began forcing her into the back of the police cruiser. [*Id.* at 23]. Plaintiff further contends, regarding Count 2, that a significant physical injury is not required to survive summary judgment. [*Id.* at 24]. As to qualified immunity, Plaintiff contends that the primary issue is her level of resistance, which is a proper matter for the jury. [*Id.* at 35]. Plaintiff asserts that any reasonable officer in Officer Wilson and Cook's positions would have known that their actions were not reasonable under the circumstances. [*Id.* at 37].

The City Defendants reply, as to the *Heck*-bar argument, that Plaintiff's own undisputed facts in her responses to Defendants England and Russell's motions for summary judgment, acknowledged that her actions forced the officers to "struggle" to get her back in the police cruiser, thus, she was resisting arrest when she was asked to sit in the police car and refused to do so, well before any force was used on her. [Doc. 173 at

28

10].  The City Defendants contend that because Plaintiff was resisting at all times force was used on her, the officers had a lawful right to use the level of force that they did, and once Plaintiff ceased resisting, all use of force stopped.  [*Id*. at 13].  Moreover, as to Officer Cook's use of force, the City Defendants point out that there was no injury whatsoever to Plaintiff.  [*Id*.].  Finally, with regard to qualified immunity, the City Defendants argue that Plaintiff has not met her burden of showing that the right she alleges was violated was clearly established.  [*Id*. at 20].

### 1. *Heck* Bar

In *Heck v. Humphrey*, the Supreme Court held that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

512 U.S. 477, 486-87 (1994) (footnotes omitted).  There are two circumstances in which an excessive-force claim may conflict with a conviction: (1) when the criminal provision makes the lack of excessive force an element of the offense; or (2) when excessive force is an affirmative defense to the crime.  *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010).

Under Tennessee law, an officer's use of excessive force is a defense to a charge of resisting arrest, thus, a guilty plea, and resulting conviction, for resisting arrest necessarily include a finding that the officer did not use excessive force.  *Parvin v. Campbell*, 641 F. App'x 446, 449 (6th Cir. 2016); *Roberts v. Anderson*, 213 F. App'x 420, 427 (6th Cir.

29

2007). Thus, under the second scenario, a claim of excessive force may conflict with a Tennessee conviction for resisting arrest.

However, the inquiry does not end there. Although excessive force that occurred before the actions that constitute resisting arrest would be *Heck*-barred, because such could have been raised as an affirmative defense to the charge of resisting arrest, excessive force claims based on conduct that occurred before the resisting began or after the resisting ended are not barred by *Heck*. *Cook v. McPherson*, No. 1:05-cv-136, 2007 WL 1004606, at *5 (E.D. Tenn. Mar. 30, 2007) ("*Heck* bars a plaintiff's § 1983 excessive force claim to the extent that the claim is based on excessive force that occurred *before* the plaintiff began to resist arrest."); *Potvin v. City of Westland Police Dep't*, No. 05-cv-70291, 2006 WL 3247116, at *9 (E.D. Mich. Nov. 7, 2006) ("*Heck* does not bar any excessive force that occurred after Plaintiff had been arrested."). When the officer's use of force and the suspect's criminal conduct are inextricably intertwined, *Heck* bars the excessive force claim. *Cummings v. City of Akron*, 418 F.3d 676, 682-83 (6th Cir. 2005). If the use of force occurs after a suspect is handcuffed and brought under control, the force would not be "inextricably intertwined" with the suspect's resistance to arrest. *Parvin*, 641 F. App'x at 450.

The Court is convinced that Counts 1 and 2, the excessive force claims against Officers Cook and Wilson, are barred by the *Heck* doctrine. Plaintiff admitted in her deposition that the conduct that gave rise to the resisting arrest charge, to which she pleaded guilty, was her refusal to get into the police car outside of BMH. Although her response brief argues that *Heck* does not apply because any resisting occurred only after the officers

30

began forcing her into the police car, this argument is directly contradicted by her own deposition testimony. Specifically, Plaintiff testified that she was asked professionally to get back into the police car several times before any force was used against her, and no force was used on her until she refused the officers' commands to get in the car. [Doc. 128-9 at 34, 72-73]. Plaintiff also admitted that the point at which she refused to get back in the car was when she was "resisting," and the "resisting" continued until the officers finally placed her in the car. [*Id*. at 3-5]. Plaintiff attempted to walk-back these admissions in her affidavit, stating instead that she never resisted, but was merely having a panic attack and could not comply with commands. [Doc. 165-23 at 4]. However, "a party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony." *United States ex rel Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302-03 (6th Cir. 1998). Because Plaintiff has admitted, in her sworn deposition testimony, that the conduct serving as the basis for her guilty plea to the charge of resisting arrest was her failure to return to the police car, the Court will accept this version of events.

Likewise, the basis of the excessive force complaints against Officers Cook and Wilson stem from the officers struggling to force Plaintiff into the police car, after she refused to get in voluntarily. Specifically, in Count 1, Plaintiff alleges that Officer Wilson used excessive force by striking her in the right knee and applying a jugular-notch pressure point maneuver. [Doc. 1 at 37]. Likewise, in Count 2, Plaintiff alleges that Officer Cook used excessive force by applying a clavicle pressure point tactic after Officer Wilson had struck her knee. [*Id*. at 38-39]. All three of these actions occurred while Officers Cook

31

and Wilson were attempting to force Plaintiff into the police car, which she admits was the point at which she was resisting.

Because an officer's excessive use of force is a defense to a charge of resisting arrest, and therefore, a guilty plea and resulting conviction for resisting arrest necessarily includes a finding that the officer did not use excessive force, *Parvin*, 641 F. App'x at 449, Plaintiff's guilty plea to the charge of resisting arrest forecloses her claims of excessive force against Officers Cook and Wilson. This case does not fall within the scenario where the use-of-force occurred before or after the resisting ended. Instead, the alleged use-of-force is inextricably intertwined with the conduct that Plaintiff admits was the basis for the resisting charge to which she pleaded guilty. Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Counts 1 and 2 are barred by the *Heck* doctrine, and the Court will **GRANT** summary judgment on this ground, and **DISMISS** Counts 1 and 2. However, for the sake of completeness, this Court will also address whether a genuine issue of material fact exists as to whether the officers are entitled to qualified immunity on these claims.

### 2. Qualified Immunity

"Qualified immunity is a personal defense that applies only to government officials in their individual capacities." *Benison v. Ross*, 765 F.3d 649, 665 (6th Cir. 2014) (citation omitted). It insulates government officials "from undue interference with their duties," *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982), affording them "breathing room to make reasonable but mistaken judgments" and protecting "all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (internal

32

quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). To obtain qualified immunity, the defendant shoulders the initial burden to present evidence showing that his acts were within his discretionary authority. *Gravely v. Madden*, 142 F.3d 345, 347 (6th Cir. 1998); *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991). If the defendant satisfies this burden, the burden then shifts to the plaintiff, who must identify evidence satisfying a two-part inquiry. *Gravely*, 142 F.3d at 348; *Wegener*, 933 F.2d at 392.

Under this two-part inquiry, the defendant is entitled to qualified immunity unless the evidence, "viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Morrison v. Bd. of Trs.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation and footnote omitted). "An answer of 'yes' to both questions defeats qualified immunity, while an answer of 'no' to either question results in a grant of qualified immunity." *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011). In performing an analysis under the two-part inquiry, a court does not have to address the prongs sequentially; neither one is an antecedent to the other. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see al-Kidd*, 563 U.S. at 735 (instructing courts to "think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions" under the two-part inquiry, particularly when those questions "will 'have no effect on the outcome of the case'" (quotation omitted)).

### a. The Specific Constitutional Right

The Supreme Court has held that a claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of the person is properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than a substantive due process standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that arise in the context of an arrest or investigatory stop of a free citizen, while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010) (internal citations and alterations omitted). When neither the Fourth nor the Eighth Amendment apply, courts have applied the Fourteenth Amendment. *Id.*

As the Sixth Circuit has noted, the *Graham* Court left undecided the question of whether the Fourth Amendment continues to provide protection against the deliberate use of excessive force beyond the point at which arrest ends and pretrial detention begins. *Aldini*, 609 F.3d at 864 (citing *Graham*, 490 U.S. at 395 n.10). The Sixth Circuit has answered this question by determining that the dividing line between the Fourth and Fourteenth Amendment zones of protection is the probable cause hearing. *Id.* at 867. Here, because the use of force occurred after Plaintiff was under arrest, but before the probable cause hearing, the Fourth Amendment standard applies to her excessive force claims.

34

### b.  The Two-Part Inquiry for Qualified Immunity

Now that the Court has determined that the Fourth Amendment is the appropriate standard for Plaintiff's excessive force claims against Officers Cook and Wilson, it must next address Officers Cook and Wilson's right to qualified immunity under the two-part inquiry.  The Court has license to begin with either prong, and makes this decision based on "the circumstances in the particular case at hand."  *Pearson*, 55 U.S. at 236.  Because it is clear, viewing the facts in the light most favorable to Plaintiff, that Officers Cook and Wilson did not violate Plaintiff's Fourth Amendment right against the use of excessive force, the Court begins with the first prong.

In evaluating a claim of excessive force, courts should utilize the Fourth Amendment's "objective reasonableness" standard, whereby a court analyzes whether "the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397, 399.  Reasonableness is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks and citations omitted).

Three non-exclusive factors should be examined in making this determination: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight ("the *Graham* factors").  *Graham*, 490 U.S. at 396.  These factors are evaluated from the perspective of a reasonable officer on the scene,

"rather than with the 20/20 vision of hindsight." *Id.* Additionally, these three factors are not an exhaustive list, and a court's ultimate inquiry should be "whether the totality of the circumstances justifies a particular sort of seizure." *Id.* The circumstances should be evaluated at the moment force is employed. *See Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007) (stating that the reasonableness of the use of force at a particular time is based on an "objective assessment of the danger a suspect poses at that moment"). Courts should account for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. The *Graham* standard is intended to contain "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances in the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

When making an arrest, "the government has the right to use some degree of physical coercion or threat thereof to effect it." *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (internal quotation marks omitted). The government also has the right to use force when a person is actively resisting arrest. *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). "Active resistance includes physically struggling with, threatening, or *disobeying officers*." *Id.* (internal quotation marks omitted) (emphasis added). The Sixth Circuit has held that "[w]hen a suspect actively resist arrest, the police can use a taser (*or a knee strike*) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Id.* at 642 (emphasis added). The Sixth Circuit has also held that pushing and pulling an arrestee who was uncooperative and verbally abusive into a patrol car in a

36

rough manner was force necessitated by the arrestee's own resistance, and could not be deemed excessive force as a matter of law. *Lockett v. Donnellon*, 38 F. App'x 289, 292 (6th Cir. 2002). In *Lockett*, the Court noted that the arrestee refused to have his photograph, fingerprints, and breath-test taken, all while protesting his arrest and threatening to sue the officers. *Id*. He then actively resisted the officers' attempts to place him in the patrol car. *Id*.

Viewing the evidence in the light most favorable to the Plaintiff, the Court concludes that there is no genuine issue of material fact as to whether Officers Cook and Wilson violated Plaintiff's Fourth Amendment rights through the use of excessive force. As noted previously, the three acts that Plaintiff alleges constituted excessive force are: (1) a strike to her knee; (2) a jugular-notch pressure point maneuver; and (3) a clavicle pressure point tactic. Given the evidence, the Court cannot conclude that a genuine issue of material fact exists as to whether these uses of force were objectively reasonable.

The Court looks to the *Graham* factors, discussed above, as a guide in determining whether Officer Cook and Officer Wilson's use of force was objectively reasonable under the circumstances. First, the crimes for which Plaintiff was arrested were sufficiently serious. In her response to the motion for summary judgment, Plaintiff argues that DUI is not a "violent or particularly serious offense." [Doc. 162 at 19]. While DUI alone may not be a "particularly serious offense," *see Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009) (concluding that speeding, DUI, and failure to appear were not particularly serious crimes under the *Graham* standard), Plaintiff's argument disregards the fact that she was also arrested for felony reckless endangerment, because she was driving with her

37

11-year-old son in the car while she was intoxicated, and then attempted to chase him down with the car, which witnesses said nearly resulted in Plaintiff hitting her son with the vehicle. Although Plaintiff later pleaded this charge down to a misdemeanor, that fact is irrelevant, as the standard here is specific to whether the officer's actions were objectively reasonably based on the information that the officers had at the time. Thus, the Court concludes that Plaintiff's criminal offense was sufficiently serious under the *Graham* standard, and this factor weighs in favor of finding that Officers Cook and Wilson's uses of force were objectively reasonable.

Second, Plaintiff presented an immediate threat to the officers or the general public. Plaintiff asserts that she could not possibly have posed a threat to Officers Wilson and Cook who are 6'2" and 260-270 pounds and 5'8" and 185 pounds respectively. [Doc. 162 at 19-20]. However, this argument is undermined by the sheer fact that, despite their size, Officers Wilson and Cook struggled significantly to maintain physical control over Plaintiff when she refused to return to the police car outside the hospital. Further, Plaintiff had consistently behaved recklessly and aggressively throughout the recorded interaction with police. As several APD personnel testified, the APD had a policy of not taking a combative arrestee, such as Plaintiff, into the hospital, absent a life-threatening situation, because doing so would subject the general public to the risk of harm from the arrestee's behavior. Moreover, given Plaintiff's level of intoxication, with a blood alcohol content of nearly twice the legal limits when her blood was finally tested, hours after her arrest, Plaintiff clearly was a threat to the safety of those around her. The Court finds that Plaintiff, in her drunken and combative state, presented an immediate safety risk to Officers Cook

38

and Wilson, as well as the general public, and thus, this factor weighs in favor of a conclusion that the officers' uses-of-force were objectively reasonable.

Third, Plaintiff was actively resisting arrest at the time that the force was used. In her response to the motion for summary judgment, Plaintiff states that a reasonable officer would have determined that her actions "did not bear the hallmarks of 'active resistance.'" [Doc. 162 at 20]. She asserts that her "level of resistance" is a materially disputed fact. [*Id*.]. Plaintiff appears to base this argument on her allegation that, rather than actively resisting the officers' commands to get back into the police car, she was suffering from a panic attack, and therefore, was unable to follow commands. Even assuming, as the Court must at the summary judgment stage, that Plaintiff's allegation that she was suffering from a panic attack is true, this does not change the fact that a reasonable officer in Officer Cook and Officer Wilson's positions would reasonably have believed that Plaintiff was actively resisting their efforts to transport her to the jail and obtain a warrant for her blood, and thus, that the use of force was appropriate.[3] Plaintiff admits that she never informed Officer Cook or Officer Wilson that she was having a panic attack, and, based on Officer Cook's body camera recording of the incident, any reasonable person would have concluded that Plaintiffn was intentionally resisting the officers' commands, rather than suffering from a

---

[3] The Court notes that it was particularly critical that the officers timely transport Plaintiff to the jail, because she had refused to consent to the blood draw. The officers thus needed to obtain a warrant and have a jail nurse conduct the blood draw to collect crucial evidence, and, given that blood alcohol content decreases with time, time was of the essence in proceeding to the jail. The Court notes that, at times, Plaintiff acknowledged her awareness that delaying the blood test would impact the results of that test in her favor. For example, at the jail, prior to the blood draw, Plaintiff yells "I'll sit her until it don't fucking matter," referring to the blood draw. This extra wrinkle further supports a finding that a reasonable officer would conclude that Plaintiff was actively resisting by refusing to get into the police car to be transported to the Blount County jail.

39

panic attack.  Accordingly, the Court finds that all three of the *Graham* factors weigh in favor of a finding that the officers' use of force was objectively reasonable.

The Court finds that Plaintiff's resistance is particularly compelling to support the use of force in this instance.  As noted above, the use of force is permissible when a person is actively resisting arrest, which includes physically struggling with, threatening, or disobeying officers.  *See Rudlaff*, 791 F.3d at 641.  Regardless of whether her reason for doing so was a panic attack, Plaintiff was clearly physically struggling with and disobeying Officers Cook and Wilson.  Plaintiff also repeatedly threatened to sue the officers. Moreover, the Court notes that a genuine dispute exists as to the level of force used to "pop" Plaintiff's knee.  Taking the evidence in the light most favorable to Plaintiff, the Court can only conclude that Officer Wilson pressed his knee into Plaintiff's knee for several seconds, leading to the pop.  Although Plaintiff describes a strike to the knee in her complaint, in her deposition testimony, she repeatedly stated that it felt like she was "kneed in the knee" and that several seconds of pressure occurred before her knee actually popped. Because the Sixth Circuit has held that a knee strike may be used against an arrestee who is actively resisting, *id*. at 642, pressure on the knee of an arrestee who is actively resisting, which does not amount to a knee strike, certainly must be permissible.

Finally, the Court finds that the similarities between the instant case and *Lockett* compel the conclusion that Officers Cook and Wilson did not use excessive force against Plaintiff.  The *Lockett* Court summarized the circumstances leading to the excessive complaint as follows:

40

At the police station, Lockett refused to cooperate with having his fingerprints and photograph taken. While in the holding cell, Lockett, who was extremely upset and had a "very short fuse," loudly protested his arrest and threatened legal action. At the request of Lockett's parole officer, Officer Stuewer repeatedly asked Lockett to take a preliminary breath test. Lockett refused, saying, "If you beat me down to the ground first, I still wouldn't take your test."

Unable to process Lockett, Officers Thomas and Stuewer were instructed . . . to transport him to the St. Clair County Jail. The officers escorted Lockett to the police station's garage. In his affidavit, Lockett states that he was "boiling mad" and continued to threaten to bring a civil rights complaint against the officers. When they reached the garage, Officer Stuewer allegedly hit Lockett in the chest and grabbed him by the collar of his sweatshirt while Officer Thomas pulled his arm. Both officers then pushed him toward the patrol car. Officer Stuewer opened the rear door, and both officers attempted to push him into the opening, slamming his chest into the edge of the car door. Lockett's head hit the upper frame of the car's rear door as well. Lockett became even angrier and yelled "I SWEAR ON ALL THAT'S HOLY, I'M GOING TO SUE THE SHIT OUT OF YOU TWO BITCHES, I SWEAR, I SWEAR, I SWEAR TO GOD." Lockett alleges that the officers then punched him in the body, head, and chest. Officer Thomas kneed him in the inner thigh and hip and then wrapped her hand around his throat. Officer Stuewer inflicted "a serious of wicked body blows" into Lockett's back. According to Lockett, Officer Stuewer then went around to the other side of the patrol car, opened the rear door, and grabbed the pocket of Lockett's sweatpants to pull him into the car. As he did this, Officer Thomas pushed from the other direction.

*Lockett*, 38 F. App'x at 290-91. The Court concluded that, although the officers pushed and pulled Lockett into the car in a rough manner, "such force was necessitated by Lockett's resistance and cannot be deemed excessive as a matter of law." *Id*. at 292.

Plaintiff's behavior in the instant matter is incredibly similar to Lockett's behavior. Like Lockett, Plaintiff refused to participate in tests (blood draw and sobriety tests in her case), repeatedly threatened legal action, refused to get into a police car for transport, and yelled abuse at the officers. However, the only force used against Plaintiff in this

41

circumstance was Officer Wilson "kneeing her in the knee," and both officers using pressure point techniques on her. Thus, much less force was used on Plaintiff than on Lockett, to get her into the police car. The Court can only conclude that, as in *Lockett*, the force used by Officers Cook and Wilson "was necessitated by [Plaintiff's] resistance and cannot be deemed excessive as a matter of law." *See id.* Accordingly, viewing the evidence in the light most favorable to Plaintiff, there is no genuine issue of material fact as to whether Officers Cook and Wilson violated Plaintiff's Fourth Amendment rights by using excessive force, and thus, Officers Cook and Wilson are entitled to qualified immunity. The Court will **GRANT** summary judgment in favor of Officers Cook and Wilson as to Claims 1 and 2, on this alternative ground, and those claims will be **DISMISSED**.

## B. Count 4: Excessive Force and Cruel and Unusual Punishment

In Count 4, Plaintiff alleges a claim of excessive force and cruel and unusual punishment against all individual defendants. [Doc. 1 at 41]. Plaintiff vaguely states that, on June 23, 2015, Defendants violated her civil rights by using an unnecessary degree of physical force and inflicted cruel and unusual punishment, and such collective actions proximately caused her injuries. [*Id*. at 42]. Thus, Plaintiff concludes that Defendants are individually liable. [*Id*.]. In her response to the City Defendants' motion for summary judgment, Plaintiff states that she is abandoning Claim 4, as it relates to Officers Wilson and Cook, Chief Potter, and Lieutenant Fletcher. [Doc. 162 at 5, n. 2]. Based on Plaintiff's statement of abandonment, the Court will **GRANT** summary judgment in favor of Officers

Cook and Wilson, Chief Potter, and Lieutenant Fletcher on Count 4, and this claim will be **DISMISSED**.

Because Count 4 has now been dismissed as to all Defendants, with the exception of the Doe Defendants, the Court will *sua sponte* address the claim against the Doe Defendants. The Court concludes that Plaintiff's § 1983 claims brought against unnamed officers and staff of the APD or the Blount County Sheriff's Department must be dismissed with prejudice. After filing her complaint, Plaintiff failed to exercise due diligence to take discovery and conduct a reasonable investigation to promptly determine the actual names of the John and Jane Does. Plaintiff has not timely made a motion pursuant to Fed. R. Civ. P. 15(a) for leave to amend her complaint to correctly identify John or Jane Does by their real names. Moreover, Plaintiff has not timely effected service of process upon the individual defendants identified in the complaint by the pseudonym John or Jane Doe as required by Fed. R. Civ. P. 4(m).

Section 1983 itself does not contain a statute of limitations. Where Congress does not specify a period of limitations in a federal statute for bringing a civil action, the court is required to apply the most closely analogous statute of limitations provided under the laws of the State of Tennessee. *Eidson v. State of Tennessee Dep't of Children's Serv.*, 510 F.3d 631, 634 (6th Cir. 2007). *Id.* The statute of limitations accrues and commences to run when the plaintiff knows or has reason to know of the injury that is the basis of the complaint. *Id.*

Any cause of action that Plaintiff may have against John and Jane Does under § 1983 accrued, at the latest, on June 24, 2015, the date when Plaintiff bonded out of the

43

Blount County Jail. Consequently, Plaintiff had one year from June 24, 2015, within which to file suit on her § 1983 claims. On June 24, 2016, the statute of limitations expired on any cause of action that Plaintiff may have against John and Jane Does in their individual capacities under § 1983 and such claims are now time-barred. Plaintiff did not timely amend her complaint prior to June 24, 2016, to identify John and Jane Does by their real names and add them as defendants to this action.

Where a plaintiff is temporarily unable to ascertain a defendant's actual name, the plaintiff may initially file a complaint that names an unknown defendant by using a "John Doe" appellation or similar pseudonym. *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *12 (E.D. Tenn. Nov. 4, 2009). However, simply identifying an unknown defendant in a complaint by the pseudonym of John Doe is not enough to commence a civil action against that unknown defendant. *Id.* A civil action cannot be commenced against a fictious party such as an unknown John Doe. *Bufalino v. Michigan Bell Tel. Co.*, 404 F.2d 1023, 1028 (6th Cir. 1968). Until the plaintiff files an amended complaint under Fed. R. Civ. P. 15 that identifies and adds or joins a John Doe defendant by his true name, the John Doe allegations in the complaint are mere surplusage. *Pierce v. Hamblen Cnty.*, No. 2:09-cv-34, 2009 WL 2996333, at *1 (E.D. Tenn. Aug. 17, 2009). A civil action is commenced against a John Doe defendant when the complaint is amended under Rule 15 to specifically name and identify that defendant by his true name and the plaintiff effects service of process upon that named defendant in compliance with Rule 4. The unknown John Does in Plaintiff's complaint have never been properly joined in this lawsuit and served with process.

44

At this juncture it is too late for Plaintiff to make a motion pursuant to Rule 15(a) for leave to amend her complaint to identify John and Jane Does by their real names and add or join them as individual defendants in this case. The scheduling order provides that the deadline for joinder of additional parties is 150 days before trial, which has expired. [Doc. 12 at 5].[4]

Moreover, a motion to amend the complaint under Rule 15 at this point in time would be futile. The federal civil rights claims brought against John and Jane Does in their individual capacities under § 1983 are time-barred by the statute of limitations. New party defendants may not be added to a complaint after the statute of limitations has run. If Plaintiff were to attempt to amend her complaint to identify John and Jane Does by their real names, the amendment would not relate back under Rule 15(c)(1) to the date when the original complaint was filed for purposes of applying the statute of limitations.

Rule 15(c) provides that an amendment to a pleading relates back to the date of the original pleading when the amendment changes the party or the naming of a party against whom a claim is asserted if the party to be brought in by amendment "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii). A plaintiff's lack of knowledge pertaining to an intended defendant's identify does not constitute a "mistake concerning the proper party's identity" within the meaning of Rule 15(c)(1)(C)(ii). *Cox v. Treadway*,

---

[4] Although the Court has continued the trial of this matter several times recently [docs. 184, 185], those orders only extended unexpired deadlines from the scheduling order, and the 150-day deadline for joinder had already expired.

45

75 F.3d 230, 240 (6th Cir. 1996). Amending a complaint to add or substitute a named defendant for an unknown John Doe defendant is considered a change in parties, not a mere substitution of parties. *Id*. The Sixth Circuit has held that Rule 15(c) was not intended to protect a plaintiff who does not know the identity of defendants and does not bother to ascertain the defendants' identities within the limitations period. *Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012). Thus, any attempt to amend the complaint to name the John and Jane Doe defendants at this juncture would not relate back, and therefore, the claims would be barred by the statute of limitations.

Finally, Plaintiff's claims against John and Jane Does are also dismissed on the alternative ground that Plaintiff failed to identify them by their real names and effect service of process upon them within 120 days from the filing of the original complaint as required by Rule 4(m). *Dubose v. City of Morristown*, No. 2:07-cv-115, 2009 WL 1766008, at *6 (E.D. Tenn. June 22, 2009). Accordingly, Claim 4, raised against unnamed John and Jane Does officers, is **DISMISSED**.

## C. Count 9: Failure to Provide Adequate Medical Care

In Count 9, Plaintiff alleges that the Defendants failed to provide her with adequate medical care. [Doc. 1 at 52]. Plaintiff alleges that Officers Cook and Wilson should have sought medical treatment inside BMH, while standing directly outside the hospital, rather than transporting her to the Blount County Jail. [*Id*. at 53]. Plaintiff states that she should have been treated in the hospital for two reasons. [*Id*. at 54]. First, she states that she was having a severe panic attack, accompanied by crippling symptoms, after Officer Cook ordered her to get back into his patrol car. Plaintiff alleges that by not seeing to her panic

46

attack, Officers Cook and Wilson unnecessarily caused the situation to escalate, after unreasonably and incorrectly viewing her involuntary behavior as that of a resisting and combative suspect. Second, Plaintiff states that the failure of Defendants to provide adequate medical care to her after Officer Wilson injured her knee resulted in hours of excruciating pain and suffering. [*Id*.].

The City Defendants argue that summary judgment should be granted on this claim, because they had no control over the jail nurse or her decisions or evaluation, and, at the time the jail nurse saw Plaintiff, the City Defendants had no custody or control over Plaintiff, as she had passed into the custody of Blount County. [Doc. 129 at 28]. The City Defendants also dispute whether Plaintiff's knee injury was sufficiently serious, noting Plaintiff's activities after her release from the Blount County Jail. [*Id*.]. Further, the City Defendants argue that there was no "reckless or callous indifference" towards Plaintiff's rights, as Lieutenant Fletcher knew jail medical personnel could tend to Plaintiff's injuries at the jail, outside the hospital context, where Plaintiff may have presented a risk to the general public. [*Id*. at 29]. Finally, the City Defendants contend that the "pop" heard from Plaintiff's knee was not sufficient to have notified the officers that Plaintiff had a serious injury, and, in fact, Plaintiff continued resisting officers after the knee pop. [*Id*. at 29-30]. The City Defendants also contend that they are entitled to qualified immunity as to Claim 9. [*Id*. at 36-37].

Plaintiff responds that, in her complaint, she raised two separate instances of serious medical need: (1) her panic attack; and (2) her knee injury, but the City Defendants did not seek summary judgment relating to her panic attack. [Doc. 162 at 26-27]. Nevertheless,

47

Plaintiff notes that courts have recognized that panic attacks are easily recognized by a lay person as necessitating medical attention and constitute a serious medical need. [*Id.* at 28]. As to the knee injury, Plaintiff notes that, in denying Defendant Mandy England's first motion for summary judgment, the Court determined that Plaintiff had identified more than enough evidence establishing genuine issues of material fact in the record. Plaintiff notes that the same complaints about her knee pain, her screams, and her intermittent ability to remain standing, which served as a basis for the Court's denial of Defendant England's motion, also occurred in the presence of Officers Wilson and Cook, and was relayed to Lieutenant Fletcher. [*Id.*]. As to qualified immunity, Plaintiff contends that there is a question of fact regarding whether Officers Cook and Wilson and Lieutenant Fletcher were aware of the risk to Plaintiff and disregarded it, therefore, they are not entitled to qualified immunity. [*Id.* at 40]. Plaintiff states that she will abandon Count 9, as it relates to Chief Potter. [*Id.* at 6, n.4].

The City Defendants reply that Plaintiff's alleged panic attack was not a situation necessitating medical care, and Plaintiff has offered no proof beyond speculation and hearsay that she even suffered from a panic attack. [Doc. 173 at 15]. Regarding her knee injury, the City Defendants assert that, because Plaintiff's claim is that she was inadequately examined, she must provide verifying medical evidence of the detrimental effect of any delay to succeed, but the undisputed evidence is that various delays in treatment had no effect. [*Id.* at 16].

As an initial matter, because Plaintiff states that she is abandoning Count 9 as it relates to Chief Potter, the Court will **GRANT** summary judgment in favor of Chief Potter

48

on this claim, and Count 9 will be **DISMISSED** as to Chief Potter. Additionally, as discussed in further detail below, a municipality cannot be held liable under § 1983 based on a theory of *respondeat superior*. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 691 (1978). Rather, "it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is liable under § 1983." *Monell*, 436 U.S. at 694. Plaintiff has alleged a separate *Monell* claim against the City of Alcoa, based on the allegedly inadequate medical care, but has also named the City of Alcoa as a defendant to Count 9. Because the City is only liable under § 1983 to the extent that Plaintiff can establish a *Monell* claim, the Court will **GRANT** summary judgment in favor of the City on Count 9, and Count 9 will be **DISMISSED** as to the City of Alcoa.

The deliberate indifference to serious medical needs of prisoners, through failure to respond to medical needs or intentional denial or delay of medical care, constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). The Fourteenth Amendment's Due Process Clause governs these claims presented by pretrial detainees, however, the claims "'are analyzed under the same rubric as Eighth Amendment claims brought by prisoners.'" *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (quoting *Villegas v. Metro Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)); *see also Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) ("Pre-trial detainees have a right under the Fourteenth Amendment to adequate medical treatment, a right that is analogous to the right of prisoners under the

49

Eighth Amendment") (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001)).[5]

Courts employ a two-prong test with objective and subjective components to assess deliberate indifference to serious medical needs claims. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, under the objective prong, the court must determine whether the plaintiff had a sufficiently serious medical need. *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). A plaintiff may establish a serious medical need in two ways: (1) by showing that the injury was so obvious that even a lay person would easily recognize the need for medical treatment; or (2) if the injury was less-obvious, by showing the detrimental effect of a delay in treatment. *Blosser v. Gilbert*, 422 F. App'x 453, 460 (6th Cir. 2011) (citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004)). Where a plaintiff's claims arise from an injury so obvious that even a layperson would easily recognize the necessity for a doctor's attention, the plaintiff need not present verifying medical treatment to show that her condition worsened due to the delay in treatment. *Blackmore*, 390 F.3d at 899-900 (internal quotation marks and citations omitted). However, "[i]f a 'deliberate indifference' claim is based on the prison's failure to treat a condition *adequately*, it is in the second category and a plaintiff must 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Blosser*, 422 F. App'x at 460 (internal citations omitted) (quoting *Blackmore*, 390 F.3d at 897-98).

---

[5] The City Defendants appear to contest whether the same standard applies under the Eighth Amendment and Fourteenth Amendment but provide no citation for their assertion that the standards are not the same. [*See* doc. 173 at 14].

50

Second, the court must determine, under the subjective prong, whether the defendant had a sufficiently culpable state of mind in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). The subjective component requires evidence showing that the City Defendants (1) knew of and (2) disregarded a substantial risk to Plaintiff's health. *Farmer*, 511 U.S. at 840-47. As to the first element—knowledge—the City Defendants must have (a) been "aware of facts from which the inference could be drawn that a substantial risk of serious harm" to Plaintiff was present, and (b) must "[have] draw[n] the inference." *Id.* at 837. As to the second element—disregard for a substantial risk of harm to Plaintiff—the City Defendants must have "fail[ed] to take reasonable measures to abate" this risk. *Id.* at 847; *see Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 816 (6th Cir. 1996). The subjective component is the equivalent of recklessly disregarding the risk of the medical condition. *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015). Because government officials do not readily admit the subjective component, it may be demonstrated through circumstantial evidence. *Baynes*, 799 F.3d at 618.

Where the plaintiff has received some medical treatment, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). However, it is possible for the treatment provided to be "so woefully inadequate as to amount to no treatment at all." *Id.*

51

### i.    Panic Attack

In determining whether the City Defendants are entitled to qualified immunity as to Plaintiff's deliberate indifference to her panic attack claim, the Court will begin with analyzing whether the City Defendants violated Plaintiff's constitutional right.

### a.  Objective Component

Under the objective component, Plaintiff contends that panic attacks are easily recognized by a lay person as necessitating medical attention and constitute a serious medical need. [Doc. 162 at 28]. Plaintiff cites to an unpublished opinion from the District of New Jersey, which states that "[p]anic attacks are easily recognized by a layperson as necessitating medical attention, and thus, constitute a serious medical need." *Reyes v. City of Trenton*, No. 05-1882, 2007 WL 1038482, at *8 (D.N.J. Mar. 30, 2007). However, the *Reyes* court did not provide any explanation of the analysis that led to this conclusion. *See id*. Moreover, as an unpublished, out-of-circuit opinion, *Reyes* has no binding effect on this Court. Respectfully, for the reasons that follow, the Court disagrees with the *Reyes* Court's conclusion that a panic attack is easily recognized by a layperson as necessitating medical attention.

In an unpublished opinion, the Eastern District of Michigan concluded that a plaintiff had not established that her panic attacks were sufficiently serious to pose a substantial risk of serious harm. *Jackson v. Williams*, No. 10-cv-14985, 2012 WL 3597187, at *8 (E.D. Mich. Aug. 20, 2012). The Court noted that the plaintiff had testified that her panic attacks left her feeling faint and short of breath, and caused her heart to race, but that she had never passed out as a result of a panic attack. *Id*. The Court further stated

52

that there was no testimony that the plaintiff's anxiety or depression caused her to be suicidal or a risk to herself or others. *Id*. Thus, the Court concluded that the plaintiff had not shown that her panic attacks posed a substantial risk of serious harm. *Id*.

In the instant case, Plaintiff testified that the symptoms she experiences when having a panic attack include chest pain, feeling like she cannot breathe, lightheadedness, stomach pain, racing heart, shaking, and feeling like she is having a heart attack. [Doc. 128-9 at 44; Doc. 165-1 at 18-19]. She also testified that she had suffered from approximately 25 panic attacks since 2009 and was prescribed medication for them in 2011. [Doc. 165-1 at 19-20]. Plaintiff presented no evidence that she ever suffered any lasting effects from her panic attacks or that her panic attacks caused her to be a danger to herself or others. Based on this evidence, the Court concludes that Plaintiff has not shown that her alleged panic attack was obvious to a layperson as necessitating medical need. Moreover, the Court has reviewed the video footage of Plaintiff's alleged panic attack, and concludes that it is not even obvious to a layperson that Plaintiff was suffering from a panic attack at the time, nor less that she required medical attention. Indeed, Plaintiff's behavior during the alleged panic attack is consistent with the belligerent behavior she exhibited throughout her encounter with police, rather than a sudden change in behavior that could have indicated a problem to the officers. Accordingly, the Court concludes that Plaintiff has not shown that her alleged panic attack was a serious medical need through the first method.

To the extent that Plaintiff attempts to show that that her panic attack was a less-obvious, but still serious medical need, Plaintiff has not met her burden of proof because she has presented no evidence that the delay in receiving treatment for her panic

53

attack caused any detrimental effect. Indeed, Plaintiff testified at her deposition that she has not sought any mental health treatment since her encounter with the APD. Thus, because Plaintiff has not shown that her panic attack was a serious medical need, she cannot show that her constitutional right was violated, and the City Defendants[6] are entitled to qualified immunity on Count 9, to the extent that it relies on the alleged panic attack. Nevertheless, for the sake of completeness, the Court will also briefly address the subjective component of the deliberate indifference analysis as to the alleged panic attack.

### b. Subjective Component

This Court has previously addressed a deliberate indifference claim based on failure to treat a panic attack, and concluded that, even assuming that the panic attack presented a serious medical need, without some indication from the plaintiff that she informed the defendant of her symptoms, and that the defendant disregarded those complaints and failed to take reasonable steps to alleviate the symptoms, there was no basis for a finding of deliberate indifference. *Williams v. Linda L/N/U*, No. 2:09-cv-212, 2011 WL 345822 at *3 (E.D. Tenn. Jan. 31, 2011). As in *Williams*, here, Plaintiff explicitly acknowledges that she did not tell Officers Cook or Wilson about her panic attack, stating that she was trying to calm down and concentrate on her breathing instead. [Doc. 165-1 at 30-31]. Regardless of her reasons for not informing the officers about her panic attack, or even the symptoms that she was experiencing, because she did not make any of her symptoms known, and

---

[6] It is unclear from the record whether Plaintiff intended to raise a claim relating to her alleged panic attack against Lieutenant Fletcher. However, to the extent that Plaintiff did raise such a claim, Lieutenant Fletcher is entitled to qualified immunity on this portion of the claim, for the same reasons that Officers Cook and Wilson are entitled to qualified immunity.

54

because, as the Court previously noted, it is not obvious from her behavior that she was suffering from a panic attack or that she needed medical attention, Plaintiff simply cannot show that the City Defendants were aware of facts from which they could have drawn the inference that a substantial risk of serious harm to Plaintiff was present. *See Farmer*, 511 U.S. at 837.

Accordingly, the Court finds that there is no genuine issue of material fact as to either the objective or subjective components of the deliberate indifference claim, as it relates to Plaintiff's alleged panic attack, and, accordingly, because Plaintiff cannot show that her constitutional right was violated with regard to her alleged panic attack, the City Defendants are entitled to qualified immunity. The Court will **GRANT** summary judgment on the portion of Count 9 that relates to the panic attack, in favor of the City Defendants, and Count 9 will be **DISMISSED IN PART** as to the City Defendants.

### ii.     Knee Injury

Again, as to Plaintiff's allegation that the City Defendants were deliberately indifferent to her knee injury, the Court must look at the two-part inquiry to determine whether the City Defendants are entitled to qualified immunity as to this portion of Count 9. The Court will begin by looking at whether Plaintiff has shown that the right which she alleges was violated was "clearly established," and will then look to whether the City Defendants violated such right.

#### a.  Clearly Established Right

In her response to the City Defendants' motion for summary judgment, Plaintiff cites the following cases to support her contention that her right to adequate medical care

55

was clearly established: *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005); *Estate of Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005); *Heflin v. Stewart Cnty.*, 958 F.2d 709 (6th Cir. 1992); and *Hopper v. Plummer*, 887 F.3d 774 (6th Cir. 2018). [Doc. 162 at 38-39].

In *Owensby*, the plaintiff died after restraint attempts by officers, and each of the defendants had viewed the plaintiff in physical distress, yet made no attempt to summon or provide any medical care until several minutes later, when it was discovered that the plaintiff was not breathing. 414 F.3d at 603. In evaluating whether the defendants had violated a clearly established right, the Sixth Circuit noted that the defendants did not dispute that in general, the Fourteenth Amendment right of pretrial detainees to adequate medical care is, and has long been, clearly established. *Id*. at 604. The Court then rejected the defendants' argument that the "contours" of the right were different in that case, because the plaintiff was a just-arrested, fleeing, and resisting suspect. *Id*.

In *Carter*, defendants knew that the plaintiff was exhibiting the classic symptoms of a heart attack, knew that she had cried out for help, and believed that she was three days behind on her heart medication. 408 F.3d at 310. In light of this, the Sixth Circuit concluded that the defendants' failure to order transport to take the plaintiff to the hospital violated her clearly established right to adequate medical treatment in pretrial custody. *Id*. The Sixth Circuit concluded that "[w]here the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Id*. at 313 (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)). The Sixth Circuit then stated that, in 1992, it had

56

explicitly held that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987. *Id.* (citing *Heflin*, 958 F.2d at 717). Thus, the Court concluded, the right violated was clearly established. *Id.*

In *Heflin*, an inmate hanged himself in the shower, and officers concluded that the inmate was dead after checking his pulse and checking for signs of respiration, but never cut the body down from the hanging position, instead, leaving the inmate's body hanging for over 20 minutes. 958 F.2d at 711-12. The Sixth Circuit acknowledged that, for a right to be "clearly established," there must be more than a general constitutional right recognized, but rather, the right must have been established in a "more particularized" sense. *Id.* at 717. However, the Court stated that "[i]t is not necessary that the very action in question has previously been held unlawful. Rather, the unlawfulness of the action must be apparent to the official in light of pre-existing law." *Id.* (internal quotation marks omitted). The Court then stated that "[t]here c[ould] be no doubt that in 1987 existing law clearly established the right of pretrial jail inmates to receive care for their serious medical needs." *Id.* The Court thus concluded that the unlawfulness of doing nothing to save the plaintiff's life would have been apparent to a reasonable officer in light of the pre-existing law. *Id.*

In *Hopper*, the plaintiff suffered a seizure, and both corrections officers and medical staff responded, but officers handcuffed the plaintiff behind his back and restrained him face down on the floor, causing the plaintiff to suffocate after a 22-minute struggle. 887 F.3d at 748. With regard to whether they had violated a clearly established right, the defendants argued that the case was unique because prior cases had not involved law

57

enforcement officers working alongside qualified medical staff in dealing with an inmate not responding to commands and struggling with officers. *Id.* at 758-59. However, the Sixth Circuit pointed out that the defendants failed to discuss case law cited by the district court which discussed the "longstanding precedent establishing that a detainee has a constitutional right to medical care when an officer becomes aware that the detainee needs medical attention." *Id.* The Court noted that it had made clear that "fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness or injury where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness." *Id.* (internal quotation marks and alterations omitted). The Court further noted that the defendants conceded that this was a medical situation, and concluded that it "fail[ed] to see how, considering our precedent, a detainee like [plaintiff] could have no clearly established right to adequate medical care under circumstances even defendants admit indicated a need for medical attention." *Id.*

The Sixth Circuit also rejected the defendants' claim that the presence and activities of medical personnel absolved them of any liability. *Id.* The Court noted that it was "sharply disputed whether and to what extent" the defendants reasonably relied on or deferred to medical staff expertise. *Id.* at 758. The Court concluded that "[w[hen the legal arguments advanced rely entirely on a defendant's own disputed version of the facts, the appeal boils down to issues of fact and credibility determinations that we cannot make." *Id.* (internal quotation marks omitted). Thus, the Court found that this was a determination for the jury. *Id.* at 759.

In light of the case law presented by Plaintiff, the Court concludes that Plaintiff has met her burden of showing that the right that was violated was "clearly established." Although the City Defendants point out that Plaintiff has not cited a case with the exact same facts as the instant matter, the cases cited by Plaintiff make clear that the City Defendants' interpretation of the "particularized" requirement is too narrow. Rather, the Sixth Circuit has repeatedly held that a pretrial detainee has a right to adequate medical care when it is obvious that the detainee needs medical attention, and has repeatedly held that this is a sufficiently particularized right to be "clearly established" within the qualified immunity framework. Notably, the Court has already concluded that Plaintiff's medical need was obvious, therefore, given the precedent cited by Plaintiff, the Court concludes that Plaintiff's right, as a pretrial detainee, to receive *adequate* medical care, is clearly established.

Moreover, to the extent that the City Defendants contend that there is no clearly established right here because they relied on Nurse Russell's assessment, the Court has previously explained, and explains again later in this memorandum opinion, why there is a genuine issue of material fact as to whether Nurse Russell provided any medical evaluation at all, nor less one that the officers could reasonably have relied upon. Accordingly, as in *Hopper*, there is a genuine issue for the jury, and the Court will not conclude that Plaintiff's right to adequate medical care was not clearly established on this ground. Plaintiff has met her burden as to the first prong of the qualified immunity test.

### b. Constitutional Violation

### i. The Objective Component

Under the objective component, Plaintiff contends that her knee injury would have been obvious to a layperson, [doc. 162 at 28], and, as the Court previously determined, [doc. 105], Plaintiff identifies more than enough evidence establishing genuine issues of material fact in the record as to whether her knee injury would have been obvious to Officers Cook and Wilson. Officer Wilson specifically heard and felt Plaintiff's knee pop, while trying to push her into the police car, and mentioned this fact to Officer Cook several times, even asking whether they should get her knee looked at. Additionally, Plaintiff's repetitious complaints about knee pain, her screams, and her intermittent ability to remain standing—the majority of which occurred in Officer Cook and Wilson's presence—were sufficient to make her knee injury obvious to any layperson.[7] This is particularly true given that Officers Cook and Wilson had the background knowledge that Plaintiff had been screaming about knee pain, and crying out "I want my mom," repeatedly in the back of the patrol car, after her knee audibly popped.

The City Defendants respond, in part, with implications that Plaintiff's knee injury was not as severe as she claims. But, as the Court has previously noted, such conflicting evidence is precisely why the record contains genuine factual disputes. Some of the evidence points to obvious signs of injury at the time of the conduct in question. *Cf. Taylor*

---

[7] According to his deposition testimony, Officer Wilson, who had followed Officer Cook to the Blount County Jail in a separate vehicle, arrived in the pat down room at 42:58 in the video recording, which was after Plaintiff had gotten into the pat-down room, and after she fell in the pat-down room, but before the nurse was called. [Doc. 128-12 at 19; Exh. H].

60

*v. Franklin Cnty.*, 104 F. App'x 531, 538 (6th Cir. 2004) (stating that a plaintiff's "debilitating immobility" was one symptom that indicated a serious problem, even if the defendants did not believe him). Meanwhile, other evidence indicates that Plaintiff was not suffering from a serious injury at the time of the conduct in question. The objective component of the deliberate indifference test therefore requires a jury's deliberation as to Officers Cook and Wilson.

On the other hand, the Court concludes that the seriousness of Plaintiff's knee injury would not have been obvious to Lieutenant Fletcher. Plaintiff acknowledges that Lieutenant Fletcher did not witness the events outside the hospital, as Officers Cook and Wilson did, but asserts that Officer Cook called Lieutenant Fletcher and relayed "the nature of Plaintiff's injury and how it occurred[.]" [Doc. 162 at 31, n.26]. However, the video evidence reveals that, on the phone call with Lieutenant Fletcher, Officer Cook stated that Plaintiff had become combative, the officers had struggled to force her back into the patrol car, and Officer Wilson "had heard her knee maybe pop or something like that." Other than the statement that Plaintiff's knee "maybe pop[ped]," there is no evidence in the record that Lieutenant Fletcher had any other information to indicate that Plaintiff was suffering from a serious injury, such as hearing her screams or complaints of knee pain, or witnessing her falling down. Accordingly, the Court concludes that Plaintiff's knee injury would not have been obvious to Lieutenant Fletcher. Moreover, to the extent that Plaintiff attempts to rely on the second method of establishing the objective component, as to Lieutenant Fletcher, Plaintiff has not met her burden of proof because she has not presented any evidence that a delay in treatment for her knee injury had any detrimental effect.

61

Accordingly, Lieutenant Fletcher did not violate Plaintiff's constitutional right to adequate medical care, and is entitled to qualified immunity. The Court will therefore **GRANT** summary judgment in favor of Lieutenant Fletcher on Count 9, and **DISMISS** this Count as to Lieutenant Fletcher. The Court will proceed to analyze the subjective component as to the remaining City Defendants: Officers Cook and Wilson.

### ii. Subjective Component

In this Circuit, "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to the medical professionals' opinions.'" *McGaw v. Sevier Cnty.*, 715 F. Appx 495, 498 (6th Cir. 2017) (internal quotation marks omitted). However, to "reasonably defer[]" to a medical professional's opinion," an officer must have "had no reason to know or believe that [the] recommendation was inappropriate." *Id.*; *see also Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with . . . deliberate indifference.").

In *McGaw*, the plaintiff was noticeably impaired when he turned himself in at the Sevier County Jail and, when he told officers that he had consumed an unspecified amount of vodka and three roxicodone pills, they called the nurse. *McGaw*, 715 F. App'x at 496. The nurse performed an exam and discovered that the plaintiff had constricted pupils and slurred speech, but his blood pressure, heart rate, and blood-oxygen levels were all normal. *Id.* After meeting with her supervisor, the nurse informed the officers that the plaintiff did not require a physician's oversight or hospitalization and could remain in a cell overnight

62

for monitoring. *Id*. However, plaintiff suffered cardiac arrest overnight and died in his cell. *Id*. The plaintiff's estate sued the officers under § 1983, contending that they had not provided the plaintiff with adequate medical care, in violation of the Eighth Amendment. *Id*. at 496-97. The Sixth Circuit reasoned that the officers were not deliberately indifferent because they recognized the plaintiff's ailment, summoned a proper person to assess his medical risks, and followed the nurse's "indication that this was an appropriate response to [his] condition." *Id*. at 497-98. Moreover, the Sixth Circuit pointed out that nothing in the record even supported an inference that the officers had "reason to know or believe that [the nurse's] recommendation was inappropriate." *Id*. at 498.

Unlike in *McGaw*, the facts in this case show that Officers Cook and Wilson had ample reasons to believe that the nurse's assessment of Plaintiff's knee was not reliable. As the Court previously held, whether the nurse even rendered any type of medical opinion to begin with— much less one that should invite deference—is dubious. After the nurse completed her exam, her lone statement was "I don't see no swelling," and she left the room without uttering another word to the officers. Unlike the nurse in *McGaw*, she did not confer with her supervisor and did not recommend a particular—or even a general— course of action that the officers should follow based on her exam. The question of whether this evidence amounts to a medical opinion or recommendation at all is a genuine issue of material fact for a jury.

Next, as to whether Officers Cook and Wilson had reasons to believe that the nurse's medical opinion—to the extent she offered one—was not reliable, Officers Cook and Wilson, like Officer England, were privy to the exam and observed Plaintiff's pained

63

reactions to the movements that the nurse asked her to perform, if not her outright inability to perform them. At the nurse's request, Plaintiff tried to extend her leg, bend it, and move it from side to side. "It hurts, it hurts," she said. The nurse further instructed her to stand up straight against the wall. "I can't," she said. "I can't straighten my legs." This evidence raises genuine issues of material fact as to Officer Cook and Wilson's states of mind. From these issues of fact, a reasonable jury could decide that Officers Cook and Wilson not only knew that Plaintiff had a serious medical need but also harbored reasons to believe that the nurse's opinion was not reliable. *See Baynes*, 799 F.3d at 618-19.

In reaching this conclusion as to the subjective component, the Court pauses here to stress an important point: the requirement that the record must support a substantial risk of serious harm "does not require actual harm to be suffered." *Blackmore*, 390 F.3d at 899. Rather, "[w]here the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise." *Id.* Instead, it is only when the medical need is not obvious, or when the medical need was addressed, but insufficiently, that verified medical evidence of the detrimental effect of a delay in treatment is required. Here, the evidence shows that Plaintiff arguably demonstrated an obvious and serious need for medical treatment. It also shows that a reasonable jury could find that Officers Cook and Wilson knew of this need and disregarded it despite having reasons to believe that the nurse rendered an unreliable medical opinion, if no medical opinion at all.

In sum, the factual questions in the record raise genuine issues of material fact under the deliberate indifference test, precluding the Court from granting qualified immunity to Officers Cook and Wilson. *See Bass v. Robinson*, 167 F.3d 1041, 1051 (6th Cir. 1999)

64

("We . . . hold that Defendants are not entitled to qualified immunity on this claim because a question of fact exists[.]").  A jury must consider Plaintiff's deliberate indifference claim against Officers Cook and Wilson as it relates to her knee injury.

### c. Custody Issue

Despite the Court's conclusion that genuine issues of material fact exist as to Plaintiff's deliberate indifference claim relating to her knee injury, the Court must address one other point with regard to the City Defendants' liability.  The City Defendants argue that there was no violation of Plaintiff's right to adequate medical care that can be linked to them, because, once Plaintiff was brought into the Blount County Jail, the City Defendants no longer had custody over her, and therefore, had no control over the medical care that she received.  Ultimately, whether summary judgment should be granted in favor of the City Defendants on this issue hinges on this question: Can officers for the City of Alcoa Police Department be held liable under § 1983 for alleged deliberate indifference to Plaintiff's serious medical need, when the serious medical need arose while Plaintiff was in their custody, but Plaintiff was shortly thereafter transferred to the custody of the Blount County Sheriff's Department, by virtue of her intake at the jail, and the City officers remained at the County jail to view the allegedly inadequate medical treatment?

"The 'custody exception' triggers a constitutional duty to provide adequate medical care to incarcerated prisoners, those involuntarily committed to mental institutions, foster children, pre-trial detainees, and those under 'other similar restraint of personal liberty.'" *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (quoting *DeShaney v. Winnebago Cnty. Dep't of Social Services*, 489 U.S. 189, 200 (1989)).  "The custody exception is

65

premised on an affirmative act that exposes an individual to harm after being placed in a 'special relationship' with the state, such as in an officer's custody." *Shaw v. City of Dayton, Ohio*, 183 F. Supp. 3d 876, 885 (S.D. Ohio, May 2, 2016) (citing *Schneider v. Franklin Cnty.*, 288 F. App'x 247, 252 (6th Cir. 2008)). "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . but from the limitation which is imposed on his freedom to act on his own behalf.'" *Id.* (quoting *DeShaney*, 489 U.S. at 200).

Although this case law indicates that there must be "custody" over Plaintiff to incur liability for deliberate indifference under § 1983, the Court is unaware of any case addressing similar circumstances to the instant case, where Plaintiff was in the custody of Alcoa City officers when the alleged serious injury occurred, was then taken to the Blount County jail, where custody transferred automatically to Blount County, but both County and City officers remained at the scene, witnessing the questionable care Plaintiff received. Given the lack of briefing on this issue, the Court is unwilling to conclude at the juncture that the City Defendants may avoid liability merely because custody of Plaintiff transferred to Blount County when she arrived at the jail. Therefore, given the current information before the Court, it cannot conclude that the City Defendants are entitled to judgment as a matter of law on Plaintiff's deliberate indifference claim, as it relates to her knee injury, and the Court will **DENY** summary judgment as to this claim. However, because this appears, at first blush, to be a novel issue of law, and because the parties have not fully argued their positions before the Court, the Court will **GRANT** leave to renew the motion

for summary judgment on this limited issue of the impact of the transfer of custody on the City Defendant's § 1983 liability for deliberate indifference.

## D. Counts 5, 6, and 7: Failure to Train and Failure to Supervise

In Count 5, Plaintiff alleges that the City of Alcoa has a custom, policy, or procedure of not differentiating suspects or inmates who suffer severe mental disorders as it relates to discipline, use of force, or punishment, and officers are not trained to address the special needs of such suspects or inmates, or properly supervised with respect to using force against these inmates. [Doc. 1 at 43]. In Count 6, Plaintiff alleges a claim for failure to train and supervise and acquiescing in unconstitutional conduct of subordinates against Chief Potter and Lieutenant Fletcher. [*Id*. at 44]. Finally, in Count 7, Plaintiff alleges that the City of Alcoa failed to ensure that officers were properly trained or properly supervised with respect to uses-of-force and provision of adequate medical care, particularly with respect to vulnerable citizens. [*Id*. at 47]. Plaintiff further asserts that Alcoa had a policy, custom, or practice of exhibiting deliberate indifference to the unreasonable use of force and deprivation of adequate medical care. [*Id*. at 49].

The City Defendants contend that they are entitled to summary judgment on Counts 5 and 7 because Plaintiff has no personal knowledge or evidence of the policies, procedures, customs, or practices of the City, or of the supervision and/or training that was provided. [Doc. 129 at 38]. The City Defendants also contend that, because there is no underlying constitutional right violated, there can be no liability for the City. [*Id*. at 39]. Moreover, the City Defendants contend that, even if there was such a violation, Plaintiff

cannot show that the City was deliberately indifferent to her constitutional rights. [*Id*. at 40].

Plaintiff responds that the City Defendants' argument challenges only one of the two possible ways by which she can establish that inadequate training is the product of deliberate indifference. [Doc. 162 at 41]. Plaintiff states that her claims rely entirely on the theory of a single violation accompanied by a showing that the City failed to train its officers to handle recurring situations presenting an obvious potential for constitutional violations. [*Id*. at 42]. Moreover, Plaintiff notes that she has produced evidence showing that Alcoa police officers receive absolutely no training on panic disorders. [*Id*. at 44]. Plaintiff states that she will abandon her claim in Count 6 as to Chief Potter and Lieutenant Fletcher. [*Id*. at 5, n.3].

The City Defendants reply as to Counts 5 and 7, and contend that they have supplied ample evidence that the City provided training that met, at the very least, the minimum requirements of the State of Tennessee, and such required training does not encompass recognizing a person suffering from a panic attack. [Doc. 173 at 22-23]. Moreover, the City Defendants state that there is no evidence in the record that any of the individually named Alcoa officers were improperly supervised. [*Id*. at 23]. The City Defendants argue that Counts 5 and 7 are conclusory allegations with no evidentiary support in the record. [*Id*.].

As an initial matter, based on Plaintiff's abandonment of Claim 6, the Court will **GRANT** summary judgment in favor of Chief Potter and Lieutenant Fletcher on this claim,

and Claim 6 will be **DISMISSED**. The remainder of this section will address the City Defendants' arguments in favor of summary judgment on Claims 5 and 7.

A municipality cannot be held liable under § 1983 based on a theory of *respondeat superior*. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 691 (1978). Rather, "it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is liable under § 1983." *Monell*, 436 U.S. at 694. A plaintiff must prove two elements to invoke municipal liability: "(1) that a constitutional violation occurred; and (2) that the [municipality] is responsible for that violation." *Graham v. Cnty. Of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (internal quotation marks omitted). "There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act." *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007). A municipal policy or custom cannot be shown by one instance of misconduct. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-33 (6th Cir. 2005). However, an unlawful policy or custom may be shown by a policy of inadequate training or supervision. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

The Court pauses here to note that, as to Claim 5, and the portion of Claim 7 that relies on excessive force as the underlying constitutional violation, no further analysis is necessary. Plaintiff's only allegation that the City officers punished or used force against her was the force used to return her to the patrol car. The Court has already concluded that the City Defendants did not violate Plaintiff's constitutional rights by using excessive force in the course of returning her to the patrol car. Accordingly, because Claim 5 in its entirety

69

relies on excessive force as the underlying constitutional violation, and because the Court has concluded that Plaintiff's constitutional rights against excessive force were not violated, summary judgment will be **GRANTED** in favor of the City of Alcoa on Claim 5. *See Wilson*, 477 F.3d at 340. Claim 5 will therefore be **DISMISSED** as to the City of Alcoa. Moreover, to the extent that Claim 7 relies on excessive force as the underlying constitutional violation, summary judgment will be **GRANTED IN PART** in favor of the City of Alcoa. The Court will now address the remaining portion of Plaintiff's Claim 7, which alleges failure to train and supervise relating to the provision of adequate medical care.[8]

### a. Failure to Train

A plaintiff can establish that inadequate-training is the product of deliberate indifference "in one of two ways." *Shadrick v. Hopkins County*, 805 F.3d 724, 738 (6th Cir. 2015). She can plead sufficient facts showing (1) the municipality's officers engaged in a pattern of comparable constitutional violations or (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential" for a violation. *Id.* at 738-39 (quoting *Bryan Cnty.*, 520 U.S. at 409). An allegation of a pattern of similar misconduct— the first of the two approaches—is the "ordinar[y]" or traditional way for a plaintiff to establish an inadequate-training theory. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

---

[8] The Court will limit its analysis on this issue specifically to the alleged constitutional violation of deliberate indifference to Plaintiff's knee injury, as the Court has previously concluded that no constitutional violation occurred as to Plaintiff's allegation that Defendants were deliberately indifferent to her panic attack.

70

This is so because repetitive wrongdoing by officers who exercise their discretion is a sure sign that those officers require additional training, and it should be "plainly obvious to the city policymakers." *Bryan Cnty.*, 520 U.S. at 407 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

But the Supreme Court has acknowledged "the possibility," "in a narrow range of circumstances," *Connick*, 563 U.S. at 63 (quoting *id.* at 409), that a municipal policy-maker's deliberate indifference "could" arise without a pattern of prior constitutional misconduct, *Bryan Cnty.*, 520 U.S. at 409. This is where the second of the two approaches has its application. The Supreme Court confined this second approach to cases in which there is a "likelihood that [a] situation will recur" with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." *Id.* at 409-10. To flesh out these elements, the Supreme Court provided the hypothetical of a municipality that arms its officers and then mobilizes them into the public to capture absconding felons without training them to use proper force. *Canton*, 489 U.S. at 390 n.10; *Connick*, 563 U.S. at 63-64. "Given the known frequency with which police attempt to arrest fleeing felons and the 'predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the consequences of the municipality's failure to train the officers "could be so patently obvious" that the municipality could be liable without a pattern of previous violations. *Connick*, 563 U.S. at 63-64 (emphasis added) (quotation omitted). For "liability to attach in the instance of a single violation, the record must show a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or

71

would properly be characterized as substantially certain to result." *Harvey v. Campbell County, Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011) (internal quotation marks omitted).

As the Court noted previously, Plaintiff explicitly states that her claim is based on the second theory: a showing of a single violation accompanied by a showing that the City failed to train its employees to handle recurring situations presenting an obvious potential for a violation. However, there is no indication in the record that the City failed to train its officers to handle situations such as Plaintiff's knee injury. In fact, the record shows that Alcoa police officers receive the 40 hours of training required by the State, as well as additional hours of training, above and beyond the State-mandated hours. [Doc. 128-1 at 2; Doc. 128-2 at 2; Doc. 128-10 at 19; Doc. 128-12 at 24]. The record also indicates that Alcoa police officers are trained to take combative, disruptive, or belligerent arrestees to the jail for medical treatment, rather than to a hospital, if an injury is non-life-threatening. [Doc. 128-1 at 2]. Moreover, Plaintiff herself admits that she has no knowledge of the training that the Alcoa police officers received. [Doc. 128-9 at 19-20]. Ultimately, there is absolutely no evidence in the record before the Court that would support Plaintiff's speculation that the City did not provide adequate training to its employees regarding the provision of medical care for non-life-threatening injuries. At this point in the litigation, Plaintiff must present something more than her own conclusory and speculative contentions that the City failed to train its employees. Because there is no genuine issue of material fact in the record presented as to whether the City's training was so recklessly negligent that future misconduct was inevitable, the Court concludes that the City is entitled to judgment as a matter of law on this claim. Accordingly, to the extent that Claim

72

7 raises a failure-to-train claim, the Court will **GRANT** summary judgment in favor of the City Defendants, and this claim will be **DISMISSED** as to the City Defendants.

### b. Failure to Supervise

"A claim for failure to supervise must meet the rigorous standards of culpability and causation that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights in spite of its facially lawful policies." *Amerson v. Waterford Tp.*, 562 F. App'x 484, 491-92 (6th Cir. 2014) (quoting *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010)) (internal alterations omitted). "While plaintiffs may successfully bring claims against municipalities for failure to supervise where they do not conduct reviews or monitor the performance of their employees, plaintiffs must also show that the municipality lacks such a process out of deliberate indifference for the constitutional violation that may occur as a result." *Id*. at 492. Failure to conduct performance evaluations alone is insufficient to show deliberate indifference, especially absent evidence of a pattern of constitutional violations, a record of officers going unpunished for constitutional violations, or other evidence tending to show that the municipality knew that the officers were prone to committing constitutional violations. *Id*. In order to impose liability in the failure to supervise context, "the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be plainly obvious." *Campbell v. Anderson Cnty.*, 695 F. Supp. 2d 764, 775 (E.D. Tenn. Feb. 8, 2010) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)).

Plaintiff's allegations regarding the alleged failure-to-supervise are sparse. In her complaint, with regard to this claim, Plaintiff simply states that Officers Cook and Wilson

73

believed that their actions would not be monitored or corrected by supervisory officers, and they were correct in this belief. [Doc. 1 at 49]. But, at least as it relates to the provision of medical care for Plaintiff's knee injury, the video evidence in this matter does not support Plaintiff's contention. Indeed, the video evidence shows that, after Plaintiff's knee injury allegedly occurred, outside the hospital, the officers called their supervisor, Lieutenant Fletcher, informed him that Plaintiff's knee had popped, and sought guidance as to the appropriate course of action. Ultimately, Officers Cook and Wilson were instructed by their supervisor to take Plaintiff to the Blount County Jail for medical treatment, and Officers Cook and Wilson complied with this directive. This evidence simply does not support Plaintiff's contention that the City failed to supervise officers in relation to provision of medical care.

Moreover, the record before the Court is deplete of any other evidence showing that the City failed to supervise its officers with regard to provision of adequate medical care. Instead, this claim is again based merely on Plaintiff's speculation that, because she allegedly did not receive adequate medical care for her knee injury, the City must have failed to properly supervise its employees. This speculation alone is insufficient, particularly in light of the fact that there is no other evidence that the officers engaged in a pattern of repeatedly depriving arrestees of adequate medical care, that the officers regularly went unpunished for failure to provide adequate medical care to arrestees, or any evidence indicting that the City should have known that these officers were prone to failing to provide arrestees with appropriate medical care. Because there is no genuine issue of material fact in the record, the Court concludes that the City is entitled to judgment as a

74

matter of law on this claim. Accordingly, the Court will **GRANT** summary judgment in favor of the City of Alcoa, and Count 7 will be **DISMISSED** as to the City of Alcoa.

### E. Count 10: Failure to Protect

In Count 10, Plaintiff asserts that Defendants, including the Doe defendants, who observed and recorded fellow officers assaulting the Plaintiff, but did nothing to stop the use of excessive force or cruel and unusual punishment, are equally liable for this violation. [Doc. 1 at 56]. Plaintiff asserts that such deliberate indifference and reckless disregard for her safety subjected her to excessive force and cruel and unusual punishment at the hands of Officers Cook, Wilson, and England. [*Id.*]. In her response to the City Defendants' motion for summary judgment, Plaintiff states that she will abandon Count 10 as it relates to the City Defendants. [Doc. 162 at 6, n.5]. In light of Plaintiff's abandonment of this claim, the Court will **GRANT** summary judgment on Count 10 in favor of the City Defendants, and Count 10 will be **DISMISSED** as to these defendants.

### F. Count 11: Assault & Battery

In Count 11, Plaintiff states a claim of assault and battery, pursuant to Tenn. Code Ann. § 8-8-301, *et seq.*, listing Officers Cook, Wilson, and England as defendants. [Doc. 1 at 57]. However, within her factual allegations supporting this cause of action, Plaintiff states that "Defendants Alcoa and Blount County are responsible for the acts of their employees and agents pursuant to the doctrine of respondeat superior and are liable to Plaintiff pursuant to Tennessee Code Annotated § 8-8-301 et seq." [*Id.*]. In light of this, the Court will construe Count 11 as a claim against Officers Cook, Wilson, England, the City of Alcoa, and Blount County. In this claim, Plaintiff alleges that Officers Cook,

75

Wilson, and England each committed an assault against her and made contact with her in a harmful and offensive way, thus committing battery against her. [*Id.*]. In her response to the City Defendants' motion for summary judgment, Plaintiff states that she will abandon Count 11 as it relates to the City Defendants. [Doc. 162 at 6, n.6]. In light of Plaintiff's abandonment of this claim, the Court will **GRANT** summary judgment on Count 11 in favor of the City Defendants, and Count 11 will be **DISMISSED** as to the City Defendants.

## G. Count 12: Intentional Infliction of Emotional Distress

In Count 12, Plaintiff alleges that Defendants intentionally inflicted emotional distress by their conduct described in the previously discussed claims, and thus, are liable under Tenn. Code Ann. § 8-8-301, *et seq.* [Doc. 1 at 58-59].

The City Defendants contend that this Court previously dismissed this claim against the City, Chief Potter, and Lieutenant Fletcher, but it remains pending as to Officers Wilson and Cook. [Doc. 129 at 43].[9] However, the City Defendants contend that there is no evidence of any intentional act that was committed against Plaintiff by Officers Cook or Wilson. [*Id.*]. Moreover, the City Defendants argue that Plaintiff has produced no

---

[9] The Court notes that, in reviewing the record, it discovered a typographical error in the order dismissing this claim against Defendants Alcoa, Potter, and Fletcher [doc. 79]. Specifically, the final page of that order states that Count 12 is dismissed as to Defendants Cook and Wilson [*id.* at 31]. However, the body of the order makes clear that Count 12 was actually intended to be dismissed against Defendants Alcoa, Potter, and Fletcher, as the parties appear to agree here [*see id.* at 24-27]. For clarification, the Court now notes that that Count 12 was dismissed against Defendants Alcoa, Potter, and Fletcher in the prior order [doc. 79], and remains pending as to Defendants Wilson and Cook. Accordingly, the Court will address the claim as it relates to Defendants Wilson and Cook at this stage.

76

evidence that she suffered any type of psychological or physiological symptoms in this case. [*Id*. at 44].

Plaintiff responds that Officers Cook and Wilson's own rendition of the incident in the hospital parking lot clearly indicates that both used force and pain-inducing techniques against Plaintiff to force her into the police cruiser, which were intentional acts. [Doc. 162 at 45]. Moreover, regarding psychological or physiological symptoms, Plaintiff contends that she has no burden to present proof at the summary judgment stage, but, nevertheless, she submitted an affidavit and testified about her mental state since the incident. [*Id*. at 46].

The City Defendants reply that even if Plaintiff suffered from a panic attack, the actions of Officers Cook and Wilson did not amount to an intentional act, but rather, required job duties under the circumstances with which they were confronted. [Doc. 173 at 23]. The City Defendants contend that Plaintiff's only evidence supporting her alleged serious mental injury is her own inadmissible medical opinion testimony and affidavit. [*Id*. at 24].

To recover damages on a theory of intentional infliction of emotional distress in Tennessee, a Plaintiff must show that the defendant's conduct was "(1) intentional or reckless; (2) so outrageous that it is not tolerated by civilized society; and (3) caused her to suffer serious mental injury." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 210 (Tenn. 2012). The first element's state-of-mind requirement is "significantly higher" than that for negligence and it means that—at a minimum—a defendant has to "be aware of, but consciously disregard, a substantial and unjustified risk," grossly deviating from the

77

standard of care.  *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 39 (Tenn. 2005).  As to the second element, the outrageousness requirement "is an 'exacting standard' which provides the primary 'safeguard' against fraudulent and trivial claims."  *Id.*  As to the third element, liability for mental distress does not extend to "mere insults, indignities, threats, annoyances, petty oppression or other trivialities."  *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (internal quotation marks omitted).

It is the court's duty in the first instance to determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.  *Bain*, 936 S.W.2d at 623.  The Tennessee Supreme Court has adopted the high threshold standard described in the Restatement (Second) of Torts as follows:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Id.* (quoting *Medlin*, 398 S.W.2d at 274).  A serious case of excessive force can constitute outrageous behavior such that it satisfied a claim of intentional infliction of emotional distress.  *Harris v. U.S. Department of Veterans Affairs*, 776 F.3d 807, 917 (D.C. Cir. 2015).

78

Plaintiff admits that the intentional acts committed by Officers Cook and Wilson, on which she bases her claim of intentional infliction of emotional distress, were the uses-of-force against her outside BMH, while Officers Cook and Wilson attempted to force Plaintiff back into the patrol car.  However, the Court has already concluded that Officers Cook and Wilson's uses-of-force outside the hospital were reasonable under the circumstances, and not excessive as a matter of law.  In light of the conclusion that the uses-of-force were reasonable, the Court must conclude that the same conduct is not "outrageous," such that it goes "beyond all bounds of decency" and is "regarded as atrocious and utterly intolerable in a civilized community."  Because Officer Cook and Wilson's actions were not outrageous, the Court will **GRANT** summary judgment on Count 12 in favor of Officers Cook and Wilson, and this claim will be **DISMISSED** as to Officers Cook and Wilson.

## H. Count 13: Negligence

In Claim 13, Plaintiff asserts that Defendants violated the TGTLA, Tenn. Code Ann. § 29-20-101, by breaching their duty of care to ensure that she was free from excessive force and cruel and unusual punishment, and provide her with a safe environment and adequate medical care while she was detained in their custody.  [Doc. 1 at 59-60].

The City Defendants argue that Plaintiff's claim against each of the individually named Defendants should be dismissed, because they retain immunity.  [Doc. 129 at 44]. The City Defendants also conclude that, based on their prior arguments, there was no negligence committed by the City Defendants.  [*Id.*].  Plaintiff responds that the Court previously declined to dismiss this claim, finding that because Plaintiff's allegations of

79

negligence "arose out of" a civil rights claim, the officers and Lieutenant Fletcher are not entitled to immunity. [Doc. 162 at 47-48]. Plaintiff also contends that the City Defendants do little to show that the underlying negligence claim is factually inadequate. [*Id.* at 48]. The City Defendants reply that Count 13 sets out a simple negligence claim, not an intentional tort, and does not reference a civil rights action. [Doc. 173 at 24].

As an initial matter, in her response brief, Plaintiff explicitly states that she is abandoning all claims against Chief Potter. Accordingly, the Court will **GRANT** summary judgment in favor of Chief Potter on this claim, and Claim 13 will be **DISMISSED** as to Chief Potter.

### a. TGTLA Immunity

As the Court previously explained, the TGTLA governs liability in tort for Tennessee's governmental entities and employees, and it contains the codification of Tennessee's sovereign immunity law. As the fountainhead of sovereign immunity for Tennessee's governmental entities,[10] it insulates them, although not without some exceptions, from lawsuits involving alleged tortious conduct. *See* Tenn. Code Ann. § 29-20-201(a) ("Except as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result from . . . the exercise and discharge of any of their functions, governmental or proprietary."). In addition to furnishing governmental entities with immunity, the TGTLA extends immunity to their

---

[10] The definition of a "governmental entity" under the TGTLA is longwinded, but includes "any municipality, metropolitan government [and] county" in Tennessee. Tenn. Code Ann. § 29-20-102(3)(A).

employees,[11] but only when immunity is unavailable to governmental entities under the state—or, that is to say, only when immunity for governmental entities is "removed" by the TGTLA: "No claim may be brought against an employee . . . [when] the immunity of the governmental entity is removed by this chapter[.]" *Id*. § 29-20-310(b).[12]  In other words, the TGTLA does not provide governmental entities and employees with simultaneous immunity.

In one provision in particular, subsection 29-20-205(2), the TGTLA removes immunity for governmental entities, and by extension provides it to employees, for an injury "proximately caused by" an employee's negligence conduct—*except* when the negligent conduct causes an injury that "arises out of" certain causes of action:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of: False imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right to privacy, or civil rights[.]

---

[11] The TGTLA defines an "employee" as "any official (whether elected or appointed), officer, employee or servant, or any member of any board, agency, or commission (whether compensated or not) or any officer, employee or servant thereof, of a governmental entity, including the sheriff and the sheriff's employees and, further including regular members of the voluntary or auxiliary firefighting, police, or emergency assistance organizations." *Id*. § 29-20-102(2).

[12] This provision contains an exception for claims "for health care liability brought against a health care practitioner." *Id*. § 29-20-301(b).

Tenn. Code Ann. § 29-20-205(2).[13]  When this provision does not result in removal of immunity for governmental entities—that is, when the exception applies because a negligent act "arises out of" certain conduct—employees remain subject to liability in their individual capacities for negligence.  *See Baker v. Snyder*, No. 1:05-CV-152, 2006 WL 2645163, at *10 (E.D. Tenn. Sept. 14, 2006) ("If the TGTLA does not remove sovereign immunity from a governmental entity, that entity's employees can be liable in their individual capacities." (*citing Baines v. Wilson County*, 86 S.W.3d 575, 583 n.5 (Tenn. Ct. App. 2002), *abrogated on other grounds by Young v. City of LaFollette*, 479 S.W.3d 785 (Tenn. 2015))).

So, under § 29-20-205(2), if Plaintiff's negligence claims arise out of her civil rights claims, the City of Alcoa has immunity, and Lieutenant Fletcher, Officer Cook, and Officer Wilson would then be subject to liability for negligence in their individual capacities.  *See* Tenn. Code Ann. § 29-20-310(b); *Baker*, 2006 WL 2645163 at *10.  If Plaintiff's negligence claims do not arise out of her civil rights claims, the inverse occurs: the City of Alcoa's immunity is removed and Lieutenant Fletcher, Officer Cook, and Officer Wilson, as a result, would retain immunity as employees.  *See* Tenn. Code Ann. § 29-20-310(b); *Baker*, 2006 WL 2645163, at *10.

When a plaintiff's negligence claims arise out of the same facts and circumstances as her civil rights claims under § 1983, they fall within the civil rights exception to the

---

[13] This Court, in prior case law, construed the term "civil rights" that appears in this provision to "mean[] and include[e] claims arising under the federal civil rights laws, *e.g.*, 42 U.S.C. § 1983." *Campbell v. Anderson County*, 695 F. Supp. 2d 764, 778 (E.D. Tenn. 2010).

82

waiver of sovereign immunity in the TGTLA. *Allred v. Rodriguez*, 399 F. Supp. 3d 730, 734 (W.D. Tenn. June 25, 2019). Here, Plaintiff's complaint states that her negligence claim is based on alleged violations of the duties to not use excessive force against her and to provide her with adequate medical care while detained. [Doc. 1 at 59]. Based on this, Plaintiff's negligence claim is clearly based on the same facts and circumstances as her claims of excessive force and deliberate indifference under § 1983. Therefore, this claim falls within the civil rights exception to the waiver of sovereign immunity in the TGTLA. Accordingly, to the extent that Plaintiff seeks to hold the City of Alcoa liable under the TGTLA for negligence, the City retains sovereign immunity. Summary judgment will therefore be **GRANTED** as to the City of Alcoa on this claim, and Count 13 is **DISMISSED** as to the City of Alcoa.

### b. Common Law Negligence

To the extent that Plaintiff's Count 13 is raised against Lieutenant Fletcher and Officers Cook and Wilson in their individual capacities, although Plaintiff labels Count 13 as a claim under the TGTLA, Plaintiff's claim is more properly considered a claim of common law negligence against these individual defendants. As noted previously, because the City retains immunity under the TGTLA, these individual defendants are not immune from suit in their individual capacity.

To state a plausible claim for negligence, a plaintiff must allege facts establishing that (1) the defendant owed a legal duty of care to the plaintiff, (2) the defendant engaged in conduct that was below the applicable standard of care, amounting to a breach of the

83

legal duty, (3) an injury or loss, (4) cause in fact, and (5) proximate cause. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009).

As to Plaintiff's claim that these defendants were negligent in their individual capacities for failing to provide her with adequate medical care, the Court concludes that, as a matter of law, these defendants are entitled to summary judgment. In their individual capacities, Lieutenant Fletcher, Officer Cook, and Officer Wilson owed Plaintiff no duty to ensure that she received adequate medical care. Because these defendants owed Plaintiff no duty, in their individual capacities, they cannot be liable for negligence, in their individual capacities. Indeed, in the failure-to-train context, Courts have held that a Sheriff, in his individual capacity, does not have a duty to train subordinates, but rather, that duty arises only out of his official status. *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 856 (E.D. Tenn. Aug. 10, 2011); *see also Doe v. May*, No. E2003-1642-COA-R3-CV, 2004 WL 1459402, at *5 (Tenn. Ct. App. Jun. 29, 2004) ("[A]bsent his official status, the sheriff has no duty to train the employees in the sheriff's department. Thus, a sheriff cannot be individually liable for failing to train his subordinates"). The same analysis is applicable to Plaintiff's negligence claim, to the extent that it is based on an alleged duty to provide adequate medical care. Because Lieutenant Fletcher, Officer Cook, and Officer Wilson did not owe Plaintiff a duty to provide adequate medical care, in their individual capacities, they cannot be held individually liable. Accordingly, the summary judgment will be **GRANTED IN PART** on this claim, and the negligence claim against Lieutenant Fletcher, Officer Cook, and Officer Wilson, in their individual capacities, will be **DISMISSED**, only

to the extent that the negligence claim is based on the failure to provide adequate medical care.

On the other hand, to the extent that Plaintiff's negligence claim against Lieutenant Fletcher, Officer Cook, and Officer Wilson, in their individual capacities, is based on the duty not to use excessive force, the same analysis does not clearly apply, based on the record currently before the Court. Notably, the briefing on this claim at the summary judgment claim is woefully inadequate, and the Court declines to *sua sponte* investigate potential grounds for granting summary judgment. Thus, summary judgment will be **DENIED IN PART** on this claim, and the negligence claim against Lieutenant Fletcher, Officer Cook, and Officer Wilson, in their individual capacities, will be allowed to proceed only on the use-of-force theory.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, the City Defendants' motion for summary judgment [doc. 128] will be **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Court will rule on summary judgment as follows with regard to each count:

- **GRANTED** on Count 1 as to Officer Wilson. Count 1 will be **DISMISSED**.

- **GRANTED** on Count 2 as to Officer Cook. Count 2 will be **DISMISSED**.

- **GRANTED** on Count 4 as to Officer Cook, Officer Wilson, Chief Potter, Lieutenant Fletcher, and the Doe defendants. Count 4 will be **DISMISSED**.

- **GRANTED** on Count 5 as to the City of Alcoa. Count 5 will be **DISMISSED** as to the City of Alcoa.

85

- **GRANTED** on Count 6 as to Chief Potter and Lieutenant Fletcher.  Count 6 will be **DISMISSED**.

- **GRANTED** on Count 7 as to the City of Alcoa.  Count 7 will be **DISMISSED** as to the City of Alcoa.

- **GRANTED** on Count 9 as to Chief Potter, Lieutenant Fletcher, and the City of Alcoa.  Count 9 will be **DISMISSED** as to Chief Potter, Lieutenant Fletcher, and the City of Alcoa.

- **GRANTED IN PART** and **DENIED IN PART** on Count 9 as to Officer Cook, and Officer Wilson.  Summary judgment will be **GRANTED** on Plaintiff's claim regarding her alleged panic attack, and **DENIED** on Plaintiff's claim regarding her knee injury.

-  **GRANTED** on Count 10 as to the City Defendants.  Count 10 will be **DISMISSED** as to the City Defendants.

- **GRANTED** on Count 11 as to the City Defendants.  Count 11 will be **DISMISSED** as to the City Defendants.

- **GRANTED** on Count 12 as to Officer Cook and Officer Wilson.  Count 12 will be **DISMISSED** as to Officer Cook and Officer Wilson.

- **GRANTED** on Count 13 as to Chief Potter and the City of Alcoa.  Count 13 will be **DISMISSED** as to Chief Potter and the City of Alcoa.

- **GRANTED IN PART** and **DENIED IN PART** as to Lieutenant Fletcher, Officer Cook, and Officer Wilson in their individual capacities.  Summary

judgment will be **GRANTED** to the extent that the claim is based on the provision of medical care, but will be **DENIED** to the extent that it is based on uses-of-force.

To the extent that the Court has permitted a renewed motion for summary judgment on the limited issue discussed herein, such renewed motion must be filed no later than **June 1, 2020**.  An order consistent with this opinion will be entered.

_____
s/ Leon Jordan
United States District Judge
